**In re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION.**

**Mark Newby, et al., Plaintiffs**

**v.**

**Enron Corporation, et al., Defendants.**

**No. MDL–1446.**

**Civ.A. No. H–01–3624.**

United States District Court, S.D. Texas, Houston Division.

Sept. 8, 2008.

Richard J. Zook, Cunningham Darlow et al., Roger B. Greenberg, Schwartz Junell et al., Lawrence David Finder, Haynes & Boone LLP, Jeffrey C. Kubin, Gibbs & Bruns LLP, Earnest W. Wotring, Connelly Baker et al., R. Paul Yetter, Yetter Warden et al. LLP, Charles R. Parker, Locke Liddell and Sapp, Thomas W. Sankey, Duane Morris, LLP, Thomas E. Bilek, The Bilek Law Firm LLP, Jack Edward McGehee, McGehee and Wachsman, Tom Alan Cunningham, Cunningham Darlow LLP, Ronald Joseph Kormanik, Attorney at Law, Gregory Sean Jez, Fleming & Asoc LLP, Robin L. Harrison, Campbell

Harrison et al., Kimberly L. McMullan, Yetter Warden Coleman LLP, Jeffrey R. Elkin, Porter Hedges, L.L.P., Houston, TX, George Paul Howes, Patrick J. Coughlin, Ray Mandlekar, Helen J. Hodges, Keith F. Park, James I. Jaconette, Couglin Stoia et al., Shawn M. Hays, William S. Lerach, Matthew P Siben, Lerach Coughlin et al., San Diego, CA, Regina M. Ames, Coughlin Stoia et al., Mary S. Thomas, Kathryn E. Sweeney, Quinn Emanuel et al., Los Angeles, CA, James D. Baskin, III, The Baskin Law Firm, Rose Ann Reeser, Texas Attorney General, Consumer Protection Division, Austin, TX, John P. Pierce, The Pierce Law Group, Bethesda, MD, Ira M. Press, Attorney at Law, Vincent R. Cappucci, Andrew J. Entwistle, Johnston de Forest Whitman, Jr., Stephen D. Oestreich, Entwistle & Cappucci, Richard A. Speirs, Jeffrey C. Zwerling, Zwerling Schachter et al., Daniel W. Krasner, Robert B. Weintraub, Wolf Haldenstein et al., David Alan Solomon, Jeffrey Lewis Glatzer, Anderson Kill et al., Sascha N. Rand, Christopher M. Evans, Kevin S. Reed, Stephen R. Neuwirth, Quinn Emanuel et al., New York, NY, Michael I. Behn, Futterman & Howard Chtd., Chicago, IL, Glen DeValerio, Wendy Hope Zoberman, Jeffrey C. Block, Berman DeValerio et al., Boston, MA, Michael Jameson Pucillo, Berman DeValerio Pease Tabacco Burt & Pucillo, West Palm Beach, FL, Neil L. Selinger, Stephen Lowey, Lowey Dannenberg et al., White Plains, NY, Joy A. Kruse, Melanie M. Piech, Richard M. Heimann, Elizabeth Cabraser, Lieff Cabraser et al., Paul F. Bennett, Gold Bennett et al., Loren Kieve, Kieve Law Offices, Inc., San Francisco, CA, Sherrie R. Savett, Arthur Stock, Berger & Montague PC, Deborah R. Gross, Law Offices Bernard M. Bross PC, Philadelphia, PA, William B. Federman, Federman Sherwood, Oklahoma City, OK, Martin D. Chitwood, Edward H. Nicholson, Jr., Chitwood Harley Harnes LLP, Atlanta, GA, Sidney S. Liebesman, Jay W. Eisenhofer, Grant & Eisenhofer PA, Wilmington, DE, Larry E. Klayman, Meredith Cavallo Di Liberto, Judicial Watch Inc., Washington, DC, Damon Michael Young, Young Pickett et al., Texarkana, TX, Andrew J. Mytelka, Tara Beth Annweiler, Steven Carl Windsor, Greer Herz & Adams, Galveston, TX, for Plaintiffs.

Robin D. Hosea, Seabrook, TX, pro se.

Kensington International Limited, pro se.

Rushmore Capital-1 LLC, pro se.

Rushmore Capital-II LLC, pro se.

Springfield Associates, pro se.

Arab Banking Corporation, pro se.

DK Acquisition Partners LP, pro se.

Dresdner Bank AG, New York and Grand Cayman Branches, pro se.

DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt Main, pro se.

Standard Chartered Bank, pro se.

Whitewood Holdings LLC, pro se.

Ravenswood Capital-I LLC, pro se.

William Coy, pro se.

Mike Lange, Fairfield, CT, pro se.

Reinhardt Lange, pro se.

Westboro Properties LLC, pro se.

Stonehurst Capital Inc., pro se.

Candy Mounter, pro se.

OIP Limited, pro se.

Steven J. Toll, Cohen Milstein et al., Washington, DC, David R. Scott, Neil Rothstein, James E. Miller, Scott & Scott, Colchester, CT, Theodore C. Anderson, Kilgore & Kilgore PLLC, Dallas, TX, Arthur L. Shingler, III, Scott & Scott LLC, San Diego, CA, Emery Lawrence Vincent, Jr., Attorney at Law, Plano, TX, Hector G. Gancedo, Gancedo & Nieves LLP, Pasadena, CA, Allyson L. Mihalick, Herbert

Blake Tartt, Jr., Beirne Maynard et al., Joseph Albert McDermott, III, Attorney at Law, John G. Emerson, Emerson Poynter LLP, Debra Brewer Hayes, Reich & Binstock, Paul Thomas Warner, The Warner Law Firm, Edward Morgan Carstarphen, III, Ellis Carstarphen et al., Gary Benjamin Pitts, Pitts and Mills, Bonnie E. Spencer, Spencer & Associates, Patrick Andrew Zummo, Law Offices of Patrick Zummo, Daniel James Petroski, Jr., Vahldiek, Cano & Petroski, Charles W. Kelly, Kelly Sutter et al., Brian P. Johnson, Johnson Spalding Doyle West and Trent, Houston, TX, Robert C. Finkel, Robert M. Kornreich, Wolf Popper LLP, Jonathan M. Plasse, Labaton Sucharow et al., Saul Roffe, Sirota & Sirota LLP, Aaron Brody, Stull Stull et al., Robert N. Kaplan, Kaplan Fox et al., Harvey Greenfield, Attorney at Law, Laura M Perrone, Law Firm of Harvey Greenfield, Mark A. Strauss, Roger W. Kirby, Kirby McInerney et al., Kenneth F. McCallion, McCallion & Associates, Stanley M. Grossman, Pomerantz Haudek et al., Paul Paradis, Abbey Gardy LLP, Charles G. Berry, Arnold Porter LLP, Brian Steven Traficante, Robert A Goodman, Arnold & Porter, New York, NY, David B. Kahn, Attorney at Law, Northfield, IL, Michael D. Donovan, Donovan Searles LLC, Curtis L. Bowman, Cauley Geller et al., Philadelphia, PA, Steven E. Cauley, Emerson Poynter LLP, J. Allen Carney, Cauley Bowman et al., Little Rock, AR, Fredrick F. Neid, Ass't Atty Gen., Lincoln, NE, Lynn Lincoln Sarko, Britt L. Tinglum, Derek W. Loeser, Erin M Riley, Keller Rohrback LLP, Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Seattle, WA, Baxter Ward Banowsky, Banowsky Levine PC, Dallas, TX, Jeffrey R. Krinsk, Attorney at Law, Spencer A. Burkholz, Coughlin Stoia et al., San Diego, CA, Corey D. Holzer, Holzer Holzer et al., Atlanta, GA, Keith Alan Ward, Shannon Gracey et al., Austin, TX, Reinhardt Lange, Fairfield, CT, John Lee Ringgenberg, Attorney at Law, Littleton, CO, Richard A. Lockridge, Lockridge Grindal et al., Minneapolis, MN, Aron K. Liang, Joseph W. Cotchett, Steven Noel Williams, Cotchett Pitre and Carthy, Burlingame, CA, Howard C. Goode, Attorney at Law, Philip T. Reinstein, Reinstein & Sherman, Northbrook, IL, John H. Boone, Attorney at Law, Palm Springs, CA, Joseph M. Alioto, Alioto Law Firm, Steven F. Helfand, Helfand Law Offices, San Francisco, CA, Andy Wade Tindel, Provost Umphrey LLP, Tyler, TX, Thomas Walter Umphrey, Provost & Umphrey, Beaumont, TX, Keith W. Schneider, Maguire & Schneider, Columbus, OH, J. Michael Hennigan, Hennigan Bennett et al., Los Angeles, CA Brant C. Martin, Puls Taylor et al., William Kelly Puls, Attorney at Law, Fort Worth, TX, Edward F. Haber, Shapiro Haber et al., Boston, MA, J. Michael Rediker, Dorothy R. Drake, Michael K.K. Choy, Page A. Poerschke, Haskell Slaughter et al., Birmingham, AL, Thomas T. Gallion, III, Constance C. Walker, Haskell Slaughter et al., Montgomery, AL, Andrew R. Tillman, Paine Tarwater Bickers & Tillman LLP, Knoxville, TN, Carol V. Gilden, Attorney at Law, Chicago, IL, for Consol Plaintiffs.

David Michael Gunn, Beck Redden Secrest LLP, Houston, TX, for Appellant.

Scott David Lassetter, The Lassetter Law Firm, John B. Strasburger, Weil Gotshal and Manges, Robin C. Gibbs, Gibbs & Bruns, Ronald Gene Woods, Attorney at Law, George W "Billy" Shepherd, III, Cruse Scott et al., Barry G. Flynn, Attorney at Law, Barnet B. Skelton, Jr., Attorney at Law, Mark K. Glasser, Baker Botts, Charles G. King, III, King & Pennington LLP, Barry Abrams, Abrams Scott et al., Mark Daniel Manela, Mayer Brown et al., Joel M. Androphy, Berg & Androphy, David J Beck, Beck Redden and Secrest, Taylor M. Hicks, Jr.,

Hicks Thomas et al., Ronald Earl Cook, Cook & Roach LLP, Robert Hayden Burns, Liskow & Lewis, David Michael Bond, Boyar & Miller PC, Hugh R. Whiting, Jones Day, Justin McKenzie Waggoner, Smyser Kaplan et al., Kathy Dawn Patrick, Aundrea Kristine Frieden, Brian Turner Ross, Jennifer H. Greer, Gibbs & Bruns, Amy Catherine Dinn, Thomas Anthony Hagemann, Marla Thompson Poirot, Peter Scaff, Gardere Wynne et al., C. Robert Mace, Tekell Book et al., Odean L. Volker, Haynes and Boone LLP, Jacks C. Nickens, Nickens Keeton et al., Matthew Okin, Okin & Adams LLP, Claude L Stuart, III, Phelps Dunbar LLP, Jessica Lynne Wilson, Nickens Keeton et al., Glen M. Boudreaux, Jackson Walker LLP, Maryellen Shea, Boudreaux Leonard et al., Houston, TX Jeffrey Kilduff, Robert M. Stern, Shannon M. Barrett, O'Melveny & Myers, Reid M. Figel, David L. Schwarz, Kellogg Huber et al., Michael L. Spafford, McKee Nelson LLP, Philip T. Inglima, Crowell & Moring LLP, Barry J. Pollack, Kelley Drye et al., Mark J. Rochon, Miller & Cehvalier Chartered, Robert P. Trout, Trout Cacheris, PLLC, Washington, DC, Robert K. Spotswood, Attorney at Law, Kenneth D. Sansom, Spotswood LLC, Anne Sikes Hornsby, Warren B. Lightfoot, Lightfoot Franklin et al., Lightfoot Franklin White LLC, N. Lee Cooper, Maynard Cooper et al., Matthew Todd Lowther, Spencer M. Taylor, Balch & Bingham LLP, Birmingham, AL, Salvador M. Hernandez, Bowen Riley et al., Nashville, TN, William J. Melley, III, Attorney at Law, Michael Joseph Walsh, Moukawsher & Walsh, Hartford, CT, Jeffrey A. Barker, O'Melveny & Myers LLP, James J. Farrell, Miles N. Ruthberg, Alicia A. Pell, Camille N. Rybar, Charles W. Cox, III, Latham Watkins, Los Angeles, CA, Catherine E. Palmer, Christopher R. Harris, Ethan J. Brown, Seth L. Friedman, Latham & Watkins, Christopher C. Costello, Curtis Mallet et al., Daniel F. Kolb, Sharon Katz, Davis Polk et al., Eliot Lauer, Michael J. Moscato, Curtis Mallet-Prevost et al., Andrew B. Kratenstein, Darin P. McAtee, Julia A. North, Richard W. Clary, Cravath Swaine and Moore, Adam R. Brebner, Caroline M. Flintoft, David H. Braff, Jennifer Parkinson, Julian C. Swearengin, Marc DeLeeuw, Michael T. Tomaino, Jr., Richard H. Klapper, Todd G. Cosenza, Daniel H.R. Laguardia, James V. Masella, III, Jeffrey T. Scott, Matthew A. Parham, Peter Tsapatsaris, Rajwant Mangat, Steven J. Purcell, Sullivan & Cromwell LLP, Lance Croffoot-Suede, Lawrence Byrne, Joseph B. Schmit, Ruth Harlow, Linklaters LLP, Owen Pell, Timothy Pfeifer, Cyrus M. Nezhad, Johanna S. Wilson, Jonathan Beemer, Jonathan Grant White & Case LLP, Adam S. Hakki, Daniel M. Segal, Michael Cordera, Benoit Quarmby, Herbert S. Washer, Shearman & Sterling LLP, Ignatius Grance, James D. Miller, Christopher M. Joralemon, James B. Weidner, James N. Benedict, James F. Moyle, Mark A. Kirsch, Guy C. Quinlan, Jason A. D'Angelo, Sean M. Murphy, Attorney at Law, Clifford Chance et al., New York, NY, Jeffrey S. Bagnell, Ethan A. Levin Epstein, Garrison Levin Epstein et al., New Haven, CT, Matthew D. Harrison, Peter Wald, Gabriel G. Gregg, Latham & Watkins LLP, Stan G. Roman, Krieg Keller et al., John A Reding, Jr., Paul Hastings et al., San Francisco, CA, Andrew Ramzel, Administaff, Inc., Kingwood, TX, George Walton Walker, III, Copeland France et al., Montgomery, AL, William Chester Wilkinson, Thompson Hine LLP, John Wolcott Zeiger, Zeiger & Carpenter, Columbus, OH, Julie Ann North, Cravath Swaine et al., NY, Angelo Russo, Howrey Simon, Curtis D. Ripley, Michele L. Odorizzi, T. Mark McLaughlin, Andrew D. Campbell, Jordan M. Rudnick, Mayer Brown et al., Alan S. Madans, Rothschild Barry et al., Avidan J. Stern, Jenner Block LLC, Chicago, IL, James W. Bow-

en, Hunton & Williams, Dallas, TX, Marc I. Machiz, Cohen Milstein et al., Philadephia, PA, Eric H. Cottrell, Mary K. Mandeville, Mayer Brown Rowe and Maw, Charlotte, NC, Charles E. Geister, III, David A. Elder, Drew Neville, Kurt M. Rupert, Lincoln C. McElroy, Ryan S Wilson, Hartzog Conger et al., Oklahoma City, Ok, Timothy K. Roake, Gibson Dunn et al., Palo Alto, CA, Madeleine F. Grossman, Levett Rockwood PC., Westoport, CT Ronald T. Adams, Black Helterline LLP, Portland, OR, for Defendants.

### CONCLUSIONS OF LAW, FINDINGS OF FACT, AND ORDER RE AWARD OF ATTORNEYS' FEES FROM SETTLEMENT FUND

MELINDA HARMON, District Judge.

## ROADMAP

I. Conclusions of Law ........................................................... 742
 A. Jurisdiction ............................................................ 742
 B. Standard of Review for Fee Award ................................. 743
 C. PSLRA and Fee Award ............................................. 743
 D. Federal Rule of Civ. P. 23 ......................................... 744
 E. Fee Methodology, the PSLRA, and the Fifth Circuit .............. 745
 1. Percentage Method ............................................. 746
 2. Contingent Fee Agreements and the Fifth Circuit ............ 748
 3. PSLRA ......................................................... 749
 4. Common Fund Cases ............................................ 750
 5. Hybrid Approach and the Fifth Circuit ....................... 751
 6. Megafund Rule ................................................. 453
 7. Reasonable Hourly Rate ........................................ 754
 8. *Johnson* Factors and the Multiplier ........................... 755
 9. Enhancement: *City of Burlington v. Dague* and *Fee–Shifting–*
 *Statute v. Common–Fund Cases* ........................... 757
 10. Enhancement Requirements ..................................... 761
 11. Burden of Proof ................................................ 762
 12. Compensating for Delay in Payment ........................... 763
 13. Non–Class Counsel, The Common–Fund Doctrine, and the PSLRA ..... 763

II. Findings of Fact ............................................................ 766
 A. Fee Agreement and Percentage Method ........................... 766
 1. 9.52% Fee Agreement .......................................... 766
 2. Size and Diversity of the Undertaking ........................ 771
 3. Evaluation by Professor Coffee ................................ 773
 4. Comparable Litigation Fee Awards ............................ 774
 B. Alternatively, Lodestar Cross–Check ............................. 778
 1. The Lodestar .................................................. 778
 2. Application of the *Johnson* Factors ........................... 786
 a. time and labor required ................................... 786
 b. novelty and difficulty of the issues ...................... 788
 c. skill required to perform legal services properly ......... 789
 d. preclusion of other employment .......................... 789
 e. customary fee ............................................. 790
 f. whether the fee is fixed or contingent .................... 790
 g. time limitations imposed by client or the circumstances ... 796
 h. amount involved and the results obtained ................. 796
 i. experience, ability, and reputation of the attorney ....... 797
 j. undesirability of the case ................................ 797
 k. nature and length of the professional relationship with the
 Regents .................................................. 797
 *l.* awards in similar cases ................................... 798

III. Remaining Objections from Class Members and Attorneys . . . . . . . . . . . . . . . . . . . . . . . 803
 A. Non–Objector Public Pension Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 803
 B. Objections To Issues Not Previously Addressed . . . . . . . . . . . . . . . . . . . . . . . . . . . 804
 1. General Objections by Multiple Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 804
 2. Individual Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 804
 a. Debra Lee Silverio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 804
 b. Peter Carfagna on Behalf of the Rita Murphy Carfagna & Peter
 A. Carfagna Irrevocable Charitable Lead Annuity Trust U/A
 DTD 5/31/96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 805
 c. Brian Dabrowski . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 811
 d. Rinis Objectors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 817
 e. The Enron Savings Plan and the Enron Stock Ownership Plan . . . . . 820
 f. George S. Bishop, Jill R. Bishop, Lon Wilkens, and Betty
 Wilkens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 821
 g. Texas Attorney General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 827

IV. Court's Rulings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 828

Pending before the Court in the above referenced cause is Lead Counsel Coughlin Stoia Rudman & Robbins LLP's[1] motion for an award of attorney's fees (instrument # 5815) from the total recovery of approximately $7.2 billion,[2] plus interest, achieved in settlements in this action.[3] It is supplemented by a Statement, # 5864. Also pending, relating to the fee issue, are (1) a motion for additional information and for appointment of special master or enlargement of time for review (# 5963), filed by Peter Carfagna on behalf of Rita Murphy Carfagna & Peter A. Carfagna Irrevocable Charitable Lead Annuity Trust U/A DTD 5/31/96; (2) a motion for an order directing counsel to file and serve within two weeks a summary by law firm of what software was used by each firm to track and gener-

ate the time or billing records submitted, and CDs or DVDs of the data in electronic format with the metadata stripped (# 5967), filed by Rinis Travel Service Inc. Profit Sharing Trust U.A. 06/01/1989 and Michael J. Rinis, IRRA ("the Rinis Objectors"); and (3) Plaintiff Class Member/Objector Brian Dabrowski's unopposed request to file supplemental objection (# 5890). Chitwood Harley Harnes LLP and Cunningham Darlow LLP have withdrawn (# 5990) their partial objection to Lead Counsel's motion for an award of fees and their separate motion for attorneys' fees and reimbursement of expenses (# 5858) after reaching an agreement with Lead Counsel regarding allocation of fees to them for legal services provided for the benefit of the class, to be paid out of

---

**1.** Lead Plaintiff originally chose Milberg Weiss Bershad Hynes & Lerach, LLP. In May 2004 the lawyers prosecuting this action withdrew from that firm and formed Lerach Coughlin Stoia Geller Rudman and Robbins LLP ("Lerach Coughlin"). After William Lerach retired from the firm in 2007, it was renamed Coughlin Stoia Rudman & Robins LLP ("Coughlin Stoia"). References to Coughlin Stoia in this opinion include its predecessors.

**2.** The settlement fund is comprised of the following recoveries:

Andersen Worldwide $ 33,330,000

| | |
|---|---|
| Bank of America | $ 69,000,000 |
| Lehman | $ 222,500,000 |
| Outside Directors/Harrison | $ 168,000,000 |
| LJM2 | $ 51,900,000 |
| Arthur Andersen | $ 72,500,000 |
| Kirkland & Ellis | $ 10,160,000 |
| Citigroup | $2,000,000,000 |
| JPMorgan Chase | $2,200,000,000 |
| CIBC | $2,400,000,000 |
| **Total** | **$7,227,000,000** |

Declaration of Helen Hodges, # 5818 at 2.

**3.** It is undisputed that this amount represents the largest recovery ever in a class action.

whatever award granted pursuant to Lead Counsel's fee petition, all with the approval of Lead Plaintiff.

Specifically Lead Counsel seeks a fee of 9.52% of the total recovery, or approximately $688 million, plus interest accrued, in accordance with a fee agreement negotiated with Lead Plaintiff the Regents of the University of California [4] at the outset of this litigation.

Alternatively, if the Court chooses to apply the lodestar method and the twelve factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974),[5] Lead Counsel insists their requested fee of approximately $688 million is also fair and reasonable if calculated under that method. Providing an analysis of the *Johnson* factors, Lead Counsel claims that as of September 30, 2007, Coughlin Stoia's lodestar plus that of co-counsel was $127 million. Given the $688 million counsel would receive under the fee agreement, Lead Counsel requests the Court to apply a 5.4 multiplier to the $127 million lodestar to equal that amount. Alternatively, with counsel's subsequent substantial work up to and including December 15, 2007, including the Plan of Allocation, Coughlin Stoia and co-counsel collectively have spent a total of 289,593.35 hours on this litigation at a blended hourly rate of $456, resulting in a lodestar of $131,971,583.20, and they request a multiplier of 5.2 if this time period [6] is used.[7]

In addition to their own documentation, Lead Counsel's fee request is supported by nationally prominent experts on fee awards in class actions: Professor Charles Silver from the University of Texas (# 5822, 5906); Professor John C. Coffee, Jr. from Columbia University Law School (# 5821); former Federal District Judge and Third Circuit Court of Appeals Judge H. Lee Sarokin (# 5819); Lucian Bebchuk, Professor of Law, Economics and Finance and Director of the Program on Corporate Governance at Harvard University (# 5820); and Kenneth M. Moscaret (# 5903, corrected 5911). Also in support

---

**4.** The Regents of the University of California was appointed Lead Plaintiff on February 15, 2002. The fee agreement, negotiated in December 2001–January 2002 between Lead Counsel's firm and James Holst (former General Counsel, now General Counsel Emeritus), John Lundberg (Deputy General Counsel), and Lloyd Lee (University Counsel) of The Regents' General Counsel's Office, provided,

> [T]his representation has been undertaken on a contingent fee basis and [the] firm will look only to the proceeds of any recovery for all of our fees. We have agreed upon the following fees as a percentage of the recovery for the class: 0–$1 billion, 8%; $1–2 billion, 9%; $2 + billion, 10%. The higher percentages apply only to the marginal amounts. In addition, we will also advance all costs and disbursements, and will look only to the proceeds of any recovery for repayment of those costs.

# 5818, Declaration of Helen J. Hodges, Ex. 3 (Letter to James E. Holst from Milberg Weiss dated January 25, 2002; see also letter to Holst dated Dec. 18, 2001, also part of Ex. 3).

As applied to the current recovery, this provision yields an overall percentage of 9.52%. See also Decl. of Christopher M. Patti, # 5796 at 7–8.

**5.** *Johnson v. Georgia Highway Express, Inc.* was a statutory (Title VII) fee-shifting case under 42 U.S.C. § 2000e–5(k) ("In any action or proceeding under this subchapter the Court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the cost of the litigation."). See *infra* discussion of attorney's fees under the common fund doctrine versus fee-shifting statutes, including footnote 10.

**6.** The Court finds the longer period appropriate for reasons discussed later.

**7.** Declaration of Helen Hodges, # 5818, ¶ 18, ¶¶ 296–97, and Exs. 1 and 2. Lead Counsel reports that up to and including December 15, 2007, Coughlin Stoia by itself spent 248,-803.91 hours, giving a lodestar of $113,251,049 of this amount.

of the requested fee award are Declarations from James H. Holst (# 5824) and Christopher M. Patti (# 5796) of the Regents, and Helen Hodges of Coughlin Stoia. (# 5818, 5909).

After substantial briefing on Lead Counsel's request for an award of fees, the Fairness Hearing held on February 29, 2008 regarding final approval of the settlement included extensive oral argument on the issue of the fee award. The Court has carefully reviewed those instruments in the record relating to the fee award issue.[8] Accordingly, in approving Lead Counsel's requested award, which the Court finds to be a fair and reasonable fee, the Court enters the following conclusions of law and findings of fact.

## I. Conclusions of Law:

### A. Jurisdiction

The Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 over this dispute arising out of violations of the federal securities laws, in particular §§ 10(b), 20(a), and 20A of the Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and 78t–1, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and §§ 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o. This Court also has jurisdiction under the Private Securities Litigation Reform Act of 1995 ("PSLRA") pursuant to § 22 of the Securities Act of 1933, 15 U.S.C. 77v, and § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

■■■ As for personal jurisdiction over the absent plaintiff class members, in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), the Supreme Court noted the distinction between an out-of-state defendant haled into a foreign court to defend or suffer a default judgement and an absent class-action plaintiff who may lack all minimum contacts with the forum state and cited its earlier opinion in *Hansberry v. Lee*, 311 U.S. 32, 40–41, 61 S.Ct. 115, 85 L.Ed. 22 (1940):

> [A] "class" or "representative" suit was an exception to the rule that one could not be bound by a judgment *in personam* unless one was made fully a party in the traditional sense.... As the Court pointed out in *Hansberry*, the class action was an invention of equity to enable it to proceed to a decree in suits where the number of those interested in the litigation was too great to permit joinder. The absent parties would be bound by the decree so long as the named parties adequately represented the absent class and the prosecution of the litigation was within the common interest.

*Shutts*, 472 U.S. at 808, 105 S.Ct. 2965. Thus "a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though the plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant." *Id.* at 811, 105 S.Ct. 2965. Nevertheless,

> [i]f the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection. The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. The notice must be the best practicable, "reasonably calculated under all circumstances", to apprise interested parties of

---

8. Instruments # 5796, 5799, 5800, 5815, 5816–36, 5839–40, 5845, 5849, 5852, 5856, 5864, 5866–69, 5872–72, 5875, 5877, 5879–82, 5884, 5886–88, 5890–5911, 5913, 5916–18, 5922, 5927, 5930–31, 5934, 5942–43, 5948–49, 5951, 5957, 5959, 5960, 5962,5963, 5964, 5967, and 5974.

the pendency of the action and afford them an opportunity to present their objections.... The notice should describe the action and the plaintiffs' rights in it. Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court. Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.

*Id.* at 811–12, 105 S.Ct. 2965 [citations omitted]; *see also Silber v. Mabon,* 18 F.3d 1449, 1453–54 & n. 3 (9th Cir.1994) (applying *Shutts* in securities class action). Such reasonable notice and opportunity to opt out has been provided to out-of-state Class Members in this action.

## B. Standard of Review for Fee Award

■ "The standards employed calculating attorneys' fees awards are legal questions subject to plenary review, but '[t]he amount of a fee award ... is within the district court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous.'" *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 299 (3d Cir.2005), *quoting Pub. Interest Research Group of N.J., Inc. v. Windall,* 51 F.3d 1179, 1184 (3d Cir. 1995). Thus the amount of an attorney's fee award by the district court is reviewed by the Fifth Circuit for abuse of discretion, while any fact finding underlying the award is reviewed for clear error. *Strong v. BellSouth Telecomms., Inc.,* 137 F.3d 844, 850 (5th Cir.1998).

## C. PSLRA and Fee Award

■ As a threshold matter, some parties have argued the Private Securities Litigation Reform Act of 1995 limits the award of attorney's fees and costs and preempts the traditional approaches to calculating a fee award. The relevant statute provides, "Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." *See* 15 U.S.C. § 78u–4(a)(6).[9]

The statute does not define "reasonable percentage." While the term expressly embraces the percentage method, the PSLRA does not prohibit the application of the lodestar method to fees as long as the result does not exceed a reasonable percentage of the class recovery. *See, e.g., In re Cendant Corp. Litig.,* 264 F.3d 201, 284–85 (3d Cir.2001) (citing H.R. Conf. Rep. 104–369) ("By not fixing the percentage of fees and costs counsel may receive, the Conference Committee intends to give the court flexibility in determining what is reasonable on a case-by-case basis. The Conference Committee does not intend to prohibit use of the lodestar approach as a means of calculating attorney's fees. The provision focuses on the final amount of fees awarded, not the means by which such fees are calculated."), *cert. denied sub nom. Mark v. Cal. Pub. Employees' Retirement System,* 535 U.S. 929, 122 S.Ct. 1300, 152 L.Ed.2d 212 (2002); *Rite Aid,* 396 F.3d at 300 ("We do not believe the Private Securities Litigation Reform Act precludes the use of the lodestar method as a check on the percentage-of-recovery calculation."); *Manual for Complex Litig.*

9. Lead Plaintiff's "share of any final judgment or of any settlement ... shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," although Lead Plaintiff may also recover "reasonable costs and expenses (including lost wages) directly relating to the representation of the class...." 15 U.S.C. § 78u–4 (a)(4).

*Fourth ("MCL (Fourth)")*, § 12.122 (Federal Judicial Center 2004) ("the lodestar is at least useful as a cross-check ... using affidavits and other information provided by the fee applicant"). *See also* S.Rep. No. 104–98 at *12 (1995), U.S.Code Cong. & Admin.News 1995, p. 679 ("By not fixing the percentage of attorney's fees and costs that may be awarded, the Committee intends to give the court flexibility in determining what is reasonable on a case-by-case basis. The provision focuses on the final amount of damages awarded, not the means by which they are calculated.") As long as the resulting fee award is reasonable, it is not in violation of the PSLRA. The Advisory Committee Notes to Fed. R.Civ.P. 23(h), allowing an award of reasonable fees, states that the PSLRA "explicitly makes this factor a cap for a fee award in actions to which it applies."

It should also be noted that the statute empowers the Lead Plaintiff to choose and retain Lead Counsel, 15 U.S.C. § 78u–4 (a)(3)(B)(v), including to select payment by the percentage method, as long as the result is reasonable.

## D. Federal Rule of Civil Procedure 23 and Court's Role

 Fed.R.Civ.P. 23(e)(2) requires that the district court, when asked to approve a proposed settlement that would bind class members, to hold a hearing and determine whether the settlement "is fair, reasonable and adequate." As part of its duty to independently review and approve class action settlement agreements under Fed. R.Civ.P. 23 for the protection of the absent class and the public, the district court "must assess the reasonableness of the attorneys' fees" and ensure that they are "divided up fairly among plaintiffs' counsel." *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 849 (5th Cir. 1998); *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 227–28 (5th Cir.2008).

Federal Rule of Civil Procedure 23(e) states, "The claims, issues or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."

Federal Rule of Civil Procedure 23(h) addresses the issues of attorney's fees and nontaxable costs and provides in relevant part:

> In a certified class action, the court may award **reasonable** attorney's fees and nontaxable costs that are authorized by law **or by the parties' agreement.** The following procedures apply:
>
> (1) A claim for an award must be made by motion under Rule 54(d) subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.
>
> (2) A class member; or a party from whom payment is sought, may object to the motion.
>
> (3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a) . . . .

*Id.* (emphasis added by the Court). The Advisory Committee Notes indicate that "an action certified as a class" includes cases where a class is certified for settlement purposes.

In a common fund case,[10] as noted by

---

**10.** Two exceptions to the American Rule that parties to a lawsuit generally pay their own expenses no matter which prevails are (1) statutes with fee-shifting provisions and (2) creation of a common fund for the benefit of a plaintiff class from which the court, exercising its equitable powers, can award plaintiffs' attorneys' fees. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247–67, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Thus in the statutory fee shifting context, the unsuccessful litigant bears the burden of paying

the Third Circuit Task Force,[11]

there is a greater need for the judge to act as a fiduciary for the beneficiaries (who are paying the fee), particularly in the class action situation, because few if any of the action's beneficiaries actually are before the court at the time the fees are set. Judicial scrutiny is necessary inasmuch as the fee will be paid out of the fund established by the litigation, in which the defendant no longer has any interest, and the plaintiff's attorney's financial interests conflict with those of the fund beneficiaries. As a result there is no adversary process that can be re-

lied upon in the setting of a reasonable fee.

*Report of the Third Circuit Task Force: Court Awarded Attorney Fees*, 108 F.R.D. 237, 251 (1986). Furthermore, "the plaintiffs' attorney's role changes from one of a fiduciary for the clients to that of a claimant against the fund created for the clients' benefit." *Id.* at 255.

### E. Fee Methodology, the PSLRA, and The Fifth Circuit

The two traditional methods employed by courts for determining an attorneys' fees award in common fund class action cases are (1) the percentage of the settlement fund (or contingent fee) method [12]

---

attorney's fees of the prevailing party, while in the common fund situation, the fee is taken from the common fund, diminishing the amount ultimately to be distributed to the plaintiff class members, i.e., as with a contingent fee, "the plaintiff class pays its attorneys by sharing its recovery with them." *See, e.g., Skelton v. General Motors Corp.*, 860 F.2d 250, 251–53 (7th Cir.1989). The fee-shifting statutes were intended to "encourag[e] the private prosecution of certain favored actions, by requiring defendants who have violated plaintiffs' rights to compensate plaintiffs for the costs they incurred to enforce those rights." *Id.* at 552–53. In contrast, the purpose of the "common fund doctrine," or "equitable fund doctrine," is "to avoid the unjust enrichment of those who benefit from the fund … who otherwise would bear none of the litigation costs." *Report of the Third Circuit Task Force: Court Awarded Attorney Fees*, 108 F.R.D. 237, 250 (1986) ("based on the equitable notion that those who have benefited from the litigation should share its costs."). *See also Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1882) (in accord with traditional practice in courts of equity, a litigant or an attorney who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole); *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478–79, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (same); *Skelton*, 860 F.2d at 252 (the common fund doctrine is based on the idea that not one plaintiff, but all "those who have benefited from litigation should share its costs").

11. In 1985, a task force appointed by the Third Circuit Court of Appeals under the direction of Harvard University Professor Arthur Miller issued an influential study that argued for use of the percentage fee method in common fund cases and pointed out deficiencies of the lodestar method. *Report of the Third Circuit Task Force: Court Awarded Attorney Fees* 108 F.R.D. 237, 246–59 (1986). The Honorable H. Lee Sarokin, one of Lead Counsel's expert witnesses, was for seventeen years a United States District Judge and a United States Circuit Judge on the Third Circuit Court of Appeals. *Inter alia*, he also chaired the Task Force and notes that the Report "has been frequently used by both federal and state courts across the United States. It has also been cited as support for attorney fee awards in a multitude of published opinions." # 5819 at 3 (Copy of Report attached as Ex. B).

12. Some courts applying the percentage method have tried to establish a specific "benchmark" percentage, either a particular number or a range, subject to adjustments depending on the particular facts of the case, but the suggested benchmark figures have been quite disparate. *See, e.g., In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7–12 Litig.*, 447 F.Supp.2d 612, 629–30 (E.D.La.2006) (using 25% benchmark), *citing inter alia* MCL (4th) § 14.122 (a fee of 25% of the common fund "represents a typical benchmark"); *Faircloth v. Certified Finance, Inc.*, No. Civ. A. 99–3097, 2001 WL 527489, *8–9 (E.D.La. 2001) (and cases cited therein); "MCL

and/or (2) the lodestar method (multiplying the number of hours reasonably expended by a reasonable hourly rate and then, in its discretion, in the Fifth Circuit the Court can adjust the lodestar up or down by applying the twelve factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974)).[13] *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 850 (5th Cir., 1998); *Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir.1990). As will be discussed, there are hybrid versions of the two.

### 1. Percentage Method

The United States Supreme Court has held that the application of the percentage method is proper for determination of a reasonable fee award in common fund cases. *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

The Third Circuit Task Force concluded that the percentage method has certain significant advantages over the lodestar approach in contingent common-fund cases. Recommending the use of the percentage method when a common settlement fund is created, the influential Third Circuit Task Force's Report determined that a lodestar approach (1) *"increases the workload of an already overtaxed judicial system"*; (2) is *"insufficiently objective and produce[s] results that are far from homogenous"*[14]; (3) *"creates a sense of mathematical precision that is unwar-*

*(Fourth)"*, § 14.121 at 188–90. A typical benchmark in a common fund case is 25% of the fund, but "in 'mega-cases' in which large settlements or awards serve as the basis for calculating a percentage, courts have often found considerably lower percentages of recovery to be appropriate. One court's survey of fee awards in class actions with recoveries exceeding $100 million found fee percentages ranging from 4.1% to 17.925%." *MCL (Fourth)* § 14.121 at 188–89, *citing In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 339–40 (3d Cir.1998) (and cases cited therein). *See also Faircloth*, 2001 WL 527489 at *8 ("Recent study has cast doubt on the assumption that fees awarded in percentage of common fund cases generally adhere to a twenty-five to thirty percent 'benchmark.' Particularly in extremely large recovery cases, percentage recoveries have often been well below twenty-five percent."), *citing the following cases: In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 737–38 (3d Cir. 2001) (charting twelve cases in which fees ranging from 2.8% to 36% were a smaller percentage of the settlement because the total recovery was so large) (awarding 5.7%, at the low end of the range, but noting that higher awards in other cases were more justified by their facts than one would be in *Cendant*), *cert. denied*, 534 U.S. 889, 122 S.Ct. 202, 151 L.Ed.2d 143 (2001); *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir.2000) (affirming fee award of 4 percent of the class recovery and rejecting counsel's objections to the fee as a substantial departure from the 25

percent "benchmark" in the profession); *In re Dreyfus Aggressive Growth Mutual Fund Litig.*, 2001 WL 709262, *4 (S.D.N.Y. June 22, 2001) (finding 30% of a common fund award "at the far end" of reasonableness for securities class actions, and awarding fees amounting to 15 percent of the fund); *In re Fine Host Corp. Sec. Litig.*, 2000 WL 33116538 (D.Conn. Nov. 8, 2000) (awarding fees amounting to 17.5% of the class recovery). *See also Di Giacomo v. Plains All American Pipeline*, Nos. Civ. A. H–99–4137 and H–99–4213, 2001 WL 34633373, *8 (S.D.Tex.2001) (applying *Johnson* factors to measure the reasonableness of a proposed benchmark).

**13.** This Court notes that the Advisory Committee Notes to Fed.R.Civ.P. 23(h) commented about the award of "reasonable" attorney fees,

> Depending on the circumstances, courts have approached the determination of what is reasonable in different ways. In particular there is some variation among courts about whether in "common fund" cases the court should use the lodestar or percentage method of determining what fee is reasonable. The rule does not attempt to resolve the question of whether the lodestar or percentage approach should be viewed as preferable.

**14.** The Task force observed, "Widespread variations in fees awarded lawyers, often in the same community, by different judges and in

*ranted in terms of the realities of the practice of law";* (4) *"is subject to manipulation by judges who prefer to calibrate fees in terms of percentages of the settlement fund or the amounts recovered by the plaintiffs or of an overall dollar amount";* (5) "encourages lawyers to expend excessive hours, . . . engage in duplicative and unjustified work, inflate their 'normal' billing rate, and include fictitious hours or hours already billed on other matters, perhaps in the hope of offsetting any hours the court may not allow"; (6) "creates a disincentive for early settlement of cases"; (7) *"does not provide the district court with enough flexibility to reward or deter lawyers to that desirable objectives, such as early settlement will be fostered";* and (8) *"works to the particular disadvantage of the public interest bar"* by undermining the efficacy of many of the fee statutes that Congress has enacted because the lodestars in the "money" cases, such as securities, "are set higher than in cases under statutes promoting nonmonetary social objectives such as the Civil Rights Attorneys Fees Awards Act of 1976." 108 F.R.D. at 247–49 (emphasis in original).[15] The Third Circuit Task Force Report on *Selection of Class Counsel,* 208 F.R.D. 340, 421 (Jan. 15, 2002), asserts that "use of the lodestar may result in undercompensation of talented attorneys. Experienced practitioners know that a highly qualified and dedicated attorney may do more for a class in an hour than another attorney could do in ten. The lodestar can end up prejudicing lawyers who are more effective with a lesser expenditure of time." One treatise writer has observed, "A lodestar figure cannot fully compensate counsel" in a contingency common fund case "because the resulting

amount does not reflect the risk of nonpayment and thus is not equal to the fair market value of the counsel's services." 1 Alba Conte, *Attorney Fee Awards* § 2.10 (database updated May 2007). Furthermore, risk must be assessed *ex ante,* from the outset of the case, not in hindsight. *In re Cardinal Health Inc. Sec. Litig.,* 528 F.Supp.2d 752, 758 (S.D.Ohio 2007), *citing In re Cendant Corp. Litig.,* 264 F.3d 201, 282 (3d Cir.2001).

Here the requested percentage (blended 9.52%) of the settlement fund was that set out in a fee agreement between Lead Plaintiff and Lead Counsel at the beginning of the litigation. The *Restatement (Third) of the Law Governing Lawyers* § 34 (2007) proposes that the court should examine three issues in evaluating the reasonableness of a fee agreement. "First, when the contract was made, did the lawyer afford the client a free and informed choice?" Some of the circumstances the court should consider include the sophistication of the client in entering into the agreement, whether the client had a reasonable opportunity to pursue other legal representation, and whether the lawyer sufficiently informed the client of the probable cost, the benefits and the drawbacks of the agreement. *Id.* "Fees agreed to by clients sophisticated in entering such arrangements (such as a fee contract made by inside legal counsel in behalf of a corporation) should almost invariably be found reasonable." *Id.* The second issue is "does the contract provide for a fee within the range commonly charged by other lawyers in similar representations?" The court should compare the percentage in the contingent-fee contract before it with "percentages commonly used in similar repre-

---

different categories of cases, have led to a loss of predictability as to treatment as well as a loss of confidence in the integrity of the fee-setting procedure." 108 F.R.D. at 246–47.

**15.** The Task Force did recommend use of the lodestar method for determining fees under fee-shifting statutes, which have different purposes and underlying policies than a common fund.

sentations for similar services." *Id.* Third, did a subsequent change in circumstances make the fee contract unreasonable? *Id.* The Restatement observes, "Although reasonableness is usually assessed as of the time the contract was entered into, later events might be relevant." *Id.* "A contingent fee contract ... allocates to the lawyer the risk that the case will require much time and produce no recovery, and to the client the risk that the case will require little time and produce a substantial fee. Events within the range of risks, such as a high recovery, do not make unreasonable a contract that was reasonable when made." *Id.*

Most federal courts use the percentage of the fund approach in awarding attorneys' fees in common fund classes. " 'Despite the apparent advantages of the percentage fee method over the lodestar method in common fund cases the law in the Fifth Circuit concerning which method should be applied is at best unclear.' " 4 Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 14:10 Hybrid Class Actions (4th ed. Database updated June 2007), *quoting In re Harrah's Entertainment, Inc.,* No. Civ. A. 95–3925, 1998 WL 832574, *3 (E.D.La.1998) (citing *In re Combustion, Inc.,* 968 F.Supp. 1116, 1134 (W.D.La.1997)). Although the clear trend of the majority of courts in common fund cases is to use the percentage method, the Fifth Circuit has not expressly adopted such an approach. 4 *Newberg on Class Actions* § 14:10. Nor, for that matter, has it ever reversed a district court's application of the percentage method. *Shaw v. Toshiba America Information Systems,* 91 F.Supp.2d 942, 967, n. 15 (E.D.Tex.2000) ("Quite the contrary, in *Longden v. Sunderman,* 979 F.2d 1095[, 1100 n. 11] (5th Cir.1992), the Fifth Circuit *affirmed* a percentage fee award in a securities class action, noting that the district court had stated its preference for the percentage-of-recovery method 'as a matter of policy.' ").

### 2. Fee Agreements and the Fifth Circuit

Originally in *Johnson v. Georgia Highway* the Fifth Circuit applied the twelve factors in a statutory "fee-shifting" context. Subsequently, however, in *Hoffert v. General Motors Corp.,* 656 F.2d 161, 165 (5th Cir.1981), even though the parties had previously entered into a contingent fee agreement, the appellate panel applied the *Johnson* analysis to insure that the fee was "reasonable under all circumstances of the case, including the risk and uncertainty of compensation." Thus in *Hoffert* where a fee agreement existed, the Fifth Circuit "blended" the percentage fee award with the *Johnson* factors. *Strong,* 137 F.3d at 849 ("[A] district court is not bound by the agreement of the parties to the amount of attorneys' fees.... The court must scrutinize the agreed-to fees under the standards set forth in *Johnson* ... and not merely ratify a prearranged compact. [citations omitted]"), *citing inter alia Piambino v. Bailey,* 610 F.2d 1306, 1328 (5th Cir.) ("A district court is not bound by the agreement of the parties as to the amount of attorneys' fees.... In fixing the amount of attorneys' fees the court must, of course, take all of the Johnson criteria into account, including the difficulty of the case and the uncertainty of recovery. He is not, however, merely to ratify a pre-arranged compact.") (holding that by summarily approving attorney's fees in an unopposed settlement agreement the district court "abdicated its responsibility to assess the reasonableness of the attorneys' fees proposed under the settlement of a class action, and its approval of the settlement must be reversed on this ground alone."), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980). *See also Longden v. Sunderman,* 979 F.2d 1095, 1110 & n. 11 (5th Cir.1992) (affirming district court's use of percentage method

in evaluating fee petition where it was clear that the district court "had reviewed all of the relevant time and expense records before arriving at its conclusions, and that it had discussed each *Johnson* factor when it had ruled on the fee issue."). Nevertheless, the district court's "*Johnson* analysis 'need not be meticulously detailed to survive appellate review,' . . . [but] must be 'complete enough to assume a review which can determine whether the court has used proper factual criteria in exercising its discretion to fix just compensation.' [citations omitted]" *High Sulfur*, 517 F.3d at 228.

### 3. PSLRA

■ At the same time, despite such conclusory remarks about application of the *Johnson* factors for fee awards in non-securities cases, it should be emphasized that the Fifth Circuit has never ruled on a fee award in a post-PSLRA securities class action case nor addressed the fact that the statute clearly permits Lead Plaintiff to choose how to retain Lead Counsel, including under a percentage-of-the-settlement-fund agreement, limited only by a requirement that the result be reasonable. 15 U.S.C. § 78u–4 (a) (3)(B)(v) (The properly selected lead plaintiff,[16] presumably the plaintiff with the greatest losses and usually a sophisticated, institutional investor, "shall, subject to the approval of the court, select and retain counsel to represent the class."); 15 U.S.C. § 78u–4(a)(6) ("Total attorney's fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of any damages and prejudgment interest

actually paid to the class."); Declaration of Charles Silver, # 5906 at 6–9. This Court agrees with the Third Circuit Task Force Report on *Selection of Class Counsel*, 208 F.R.D. 340, 425–26 (Jan. 15, 2002), that deference to the empowered plaintiff's choice of *counsel* in PSLRA cases should extend to the *ex post* review of the fee agreement in those cases. The PSLRA establishes a model of client control that extends not only to appointment of counsel but also to monitoring of counsel and negotiation of the fee.[17] The Task Force concludes, therefore, that strict scrutiny of the fee agreement is inconsistent with the client-driven litigation model established in the PSLRA. . . . The fee reached by agreement between the "most adequate" plaintiff and counsel should be accepted by the court unless 1) it is clearly excessive; 2) it has been rendered unfair by unforeseen developments; or 3) it is found in an *ex post* review that the fee was not reached by arm's length negotiation between lead plaintiff and counsel.

Indeed, numerous district courts in this Circuit have applied the percentage method alone in awarding attorneys' fees in common fund cases under the PSLRA. *See, e.g., Shaw v. Toshiba America Information Systems*, 91 F.Supp.2d 942, 966–67 (E.D.Tex.2000) (listing twenty district court cases in the Fifth Circuit utilizing the percentage approach). Recently, in *In re Dynegy, Inc. Securities Litig.*, H–02–1571, Order Awarding Attorney's Fees and Reimbursement of Expenses, # 5817 (Compendium of Exhibits), Ex. C at 1, which was brought under the PSLRA,

---

**16.** The PSLRA requires the selection of the "most adequate plaintiff," the one "most capable of adequately representing the interests of class members," 15 U.S.C. § 78u–4(a)(3)(B)(I), the one who "has the largest financial interest in the relief sought by the class" and "otherwise satisfies the require-

ments" of Fed.R.Civ.P. 23. 15 U.S.C. § 78u–4 (a)(3)(B)(ii) and (iii)(I)(bb) and (cc).

**17.** The role of lead plaintiff under PSLRA is distinctively different from that in most class actions, wherein the first attorney to file suit is usually named lead counsel and basically controls the litigation.

Judge Lake expressly "adopt[ed] the percentage-of-recovery method of awarding attorneys' fees" under *Boeing,* 444 U.S. at 478, 100 S.Ct. 745, and *Blum v. Stenson,* 465 U.S. at 900 n. 16, 104 S.Ct. 1541, in a common fund securities action. Judge Lake stated that "the Supreme Court has indicated that computing fees as a percentage of the common fund recovered is the proper approach," and awarded fees in the amount of 8.725% of the common fund in accord with the fee percentage [18] negotiated by Lead Plaintiff with Lead Counsel (also Coughlin Stoia) prior to their appointment by the Court. *See also Schwartz v. TXU Corp.,* 3:02CV2243–K, Order Awarding Attorneys' Fees and Reimbursement of Expenses, sl. op. at 2–3 (N.D.Tex. Nov. 8, 2005) ("awarding percentage fee negotiated between Lead Plaintiffs and Co–Lead Counsel," 22.2% of $149,740,000 settlement fund, and recognizing a "presumption that a 22.2% fee is . . . reasonable" and that a "fee structure . . . which provides a higher percentage fee for increasing levels of recovery is entitled to deference because it was designed to incentivize counsel to achieve the maximum result possible for the class"), # 5817 (Compendium of Exhibits # 5817, Ex. D at 2–3).

### 4. Common Fund Cases

In addition to the PSLRA, whether the percentage is appropriate here depends on the existence of a common fund. Although opining in *Strong* (not a PSLRA securities suit, but an antitrust action) that the Fifth Circuit generally uses the lodestar method to assess an attorney's fee award in class actions, the Fifth Circuit distinguished that case by noting that the settlement in *Strong* had not produced "a traditional common fund"; specifically the panel highlighted the fact that the district court had "voiced concern that the $64 million 'common fund' figure was 'illusory' and refused to award anything in fees." 137 F.3d at 852, 848. Recognizing that the United States Supreme Court applied the percentage method to determine fees in a common fund class action in *Boeing Co. v. Van Gemert,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (holding that as an exception to the American Rule that each litigant should bear his own attorney's fees, "an attorney who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from that fund as a whole,[19] including the unclaimed portion"),

---

**18.** Expert Professor Charles Silver's report provides a chart demonstrating the breakdown of the fee in accordance with the graduating percentages agreed to by the parties and approved by Judge Lake. # 5822 at 32. The increasing fee schedule is similar to that in *Newby.* Lead Plaintiff and Lead Counsel in *Dynegy* were also The Regents and Milberg Weiss, respectively.

**19.** As noted earlier, the rationale for this equitable common fund doctrine or "common benefit" doctrine is that the successful class members who benefitted from the lawsuit would be unjustly enriched if their attorneys were not compensated by the fund created for these litigants. *Boeing,* 444 U.S. at 478, 100 S.Ct. 745; 4 Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 13:76 (4th

ed.2002). Specifically in a common fund case, charging the fund as a whole for the fees is justifiable since the costs of the litigation can be "shifted with some exactitude to those benefitting":

> [E]ach member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf. Once the class representatives have established the defendant's liability and the total amount of damages, members of a class can obtain their share of the recovery simply by proving their individual claims against the judgment fund. This benefit devolves with certainty upon the identifiable persons whom the court has certified as members of the class. Although the full value of the benefit to

the Fifth Circuit questioned whether *Boeing* "has any application to a case such as this one, which uses the lodestar method," but declined to resolve that question. 137 F.3d at 852. Since there was no traditional common fund, the panel observed that "several courts have advocated the use of the lodestar method in lieu of the percentage of fund method precisely in the situation where the value of the settlement is difficult to ascertain, reasoning that there is a strong presumption that the lodestar is a reasonable fee." *Id.* at n. 5. It thus implied that the percentage method might be proper or more appropriate where each member of the class had an "undisputed and mathematically ascertainable claim to part of a judgment." *Id.* at 852, *quoting Boeing,* 444 U.S. at 479, 100 S.Ct. 745.

In several post-*Strong* cases, the trial judges have followed the suggestion in *Strong* that the Fifth Circuit may recognize the propriety of applying the percentage method where "each member of the class has an 'undisputed and mathematically ascertainable claim to part of [a] judgment.' " *Shaw,* 91 F.Supp.2d at 967–68, *quoting Harrah's,* No. Civ. A. 95–3925, 1998 WL 832574, *3–4 (*quoting Strong,* 137 F.3d at 852) (*quoting Boeing Co.,* 444 U.S. at 479, 100 S.Ct. 745).

In contrast to the unusual situation in *Strong,* in the *Newby* settlement the requested fees would come from a traditional common fund in which each member of the class has an "undisputed and mathematically ascertainable claim to part of a judgment." *Id.* Thus under *Strong,* using a percentage method in this common fund case would appear to be proper.

### 5. Hybrid Approach

Yet the Fifth Circuit has several times come out with blanket pronouncements that it uses the lodestar method to assess attorneys' fees in class action suits, without mentioning a common fund or applying it to a PSLRA case. *See, e.g., Strong,* 137 F.3d at 850; *High Sulfur,* 517 F.3d at 228. As noted, none of these cases was a securities class action under the PSLRA.

In the wake of this uncertainty, some lower court in this Circuit, as well as the Tenth and Eleventh Circuit Courts of Appeals, have applied a hybrid approach, using some combination of a percentage and a "lodestar check." *See, e.g., In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7–12 Litigation,* 447 F.Supp.2d 612, 629 (E.D.La.2006) ("Under Fifth Circuit law, the Court has the flexibility to calculate fees based on the percentage method as long as it combines its determination with some analysis under the lodestar method."); *In re Bayou Sorrel Class Action,* No. 6:04CV1101, 2006 WL 3230771, *3–4 (W.D.La. Oct.31, 2006) (using percentage fee award within *Johnson* framework); *Shaw v. Toshiba America Information Systems, Inc.,* 91 F.Supp.2d 942, 968 (E.D.Tex.2000); *In re Catfish Antitrust Litig.,* 939 F.Supp. 493, 500 (N.D.Miss. 1996).[20]

The purpose of a lodestar cross-check of the results of a percentage fee award is to avoid windfall fees, i.e., to "ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple." *In re Cendant Corp. Sec. Litig.*

---

each absentee member cannot be determined until he presents his claim, a fee awarded against the entire judgment fund will shift the costs of litigation to each absentee in the exact proportion that the value of the claim bears to his total recovery. *Boeing,* 444 U.S. at 479, 100 S.Ct. 745.

**20.** Here Lead Plaintiff has proposed the fee should be the approximately $688 million plus interest, the same as that set out in the fee agreement, states that the lodestar for work up until December 15, 2007 was $131,971,583.20, and under this formula, seeks a multiplier of 5.2.

*("Cendant I"),* 264 F.3d 201, 285 (3d Cir. 2001); *In re Cendant Corp. Sec. Litig. ("Cendant II"),* 404 F.3d 173, 188 (3d Cir. 2005). "A cross-check is performed by dividing the proposed fee award by the lodestar calculation, resulting in the lodestar multiplier." *In re AT & T Corp.,* 455 F.3d 160, 164 (3d Cir.2006). "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 468 (S.D.N.Y.). Since the multiplier can then be "adjusted to account for particular circumstances, such as the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risks involved," if the court considers the multiplier too great, it should reduce the award. *Id.* at 164 & n. 4. It can also upwardly adjust the multiplier in rare and exceptional cases where such a modification is justified by specific evidence in the record and detailed findings by the court. *Id.* The "multiplier need not fall within any predefined range, provided that the District Court analysis justifies the award." *Rite Aid,* 396 F.3d at 307. "The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award. Even when the lodestar method is used only as a cross-check, 'courts must take care to explain how the application of a multiplier is justified by the facts of a particular case.' " *Id.,* at 306, *quoting In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions,* 148 F.3d 283, 333 (3d Cir.1998); *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 742 (3d Cir.2001).

It may be appropriate for the court to consider multipliers used in comparable cases. *Rite Aid,* 396 F.3d at 307 n. 17.

The Third Circuit observed that " '[m]ultiples from one to four are frequently awarded in common fund cases when the lodestar method is applied.' " *PRIDES,* 243 F.3d at 742, *quoting Prudential,* 148 F.3d at 341, *quoting in turn* 3 Herbert Newberg & Alba Conte, Newberg on Class Actions, § 14.03 at 14–15 (3d ed.1992). In the Rite–Aid litigation, the district court ultimately awarded a lodestar multiplier of 6.96. *In re Rite Aid Sec. Litig.,* 362 F.Supp.2d 587 (E.D.Pa.2005) (awarding 25% of the settlement fund of $126,800,000 and 6.96 multiplier). In *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1051 n. 6 (9th Cir.2002), the Ninth Circuit performed a survey of multipliers and found "a range of 0.6–19.6, with most (20 of 24, or 83%) from 1.0 and 4.0 and a bare majority (13 of 24, or 54%) in the 1.5–3.0 range." Nevertheless, insisting that the court must consider all relevant circumstances in determining the amount of a fee award, the Ninth Circuit affirmed the district court' increase of the standard benchmark of 25% to 28% in the fee award because of exceptional results, high risk, the wide-spread benefits of the litigation, and the market rate. *Id.* at 1048–49.

The Third Circuit is lenient in the kind of cross-check required: "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *Rite Aid,* 396 F.3d at 306–07. The Second Circuit has also concluded, "[W]here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 50 (2d Cir.2000), *citing In re Prudential Ins. Co. Am. Sales Litig.,* 148 F.3d 283, 342 (3d Cir.1998). Instead, the court can measure the claimed lodestar by its own familiarity with the case. *Goldberger,* 209 F.3d at

50.[21] The Fifth Circuit has never indicated that it would relax a lodestar calculation, so this Court has performed a detailed examination in spot checks of the records, though not exhaustive examination of each entry, relying also on the affidavits and declarations submitted by Class Counsel, and has used the *Johnson* factors endorsed by the Fifth Circuit.

As a variation on the percentage calculation, some district judges first establish a benchmark and then adjust it down or up based on analysis of the *Johnson* factors. *Shaw*, 91 F.Supp.2d at 968. *See, e.g., Harrah's*, 1998 WL 832574 (setting a benchmark fee of twenty-five percent and adjusting it according to *Johnson* factors, including time expended); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 447–48 (S.D.Tex.1999) (25% benchmark). A few Circuit Courts of Appeals utilize a percentage of fund method with a lodestar cross-check to evaluate a fee request in a common fund case. *See, e.g., In re AT & T Corp.*, 455 F.3d 160, 164 (3d Cir.2006)[22]; *United States v. 8.0 Acres of Land*, 197 F.3d 24, 33 (1st Cir.1999). *See also Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir.2007) (affirming district court's percentage of fund method cross-checked by application of the lode-

star method to determine reasonable fee award, but also permitting courts to use the lodestar approach alone in common fund cases); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047, 1050 (9th Cir.2002) (concluding that the district court has the discretion to choose either the percentage or the lodestar method and proving the district court's application of the lodestar method as a cross-check of the percentage method).

### 6. Megafund Rule

Some courts have recognized a "megafund rule" requiring a fee percentage to be capped at a low figure when the recovery is quite high, but the appellate courts that have examined such an approach have rejected it as a blanket rule. *See, e.g., In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir.2001) (court must award counsel at the market rate for legal services); *Rite Aid Corp.*, 396 F.3d at 303–03 & n. 12 (while Third Circuit has held that "it may be appropriate for percentage fees awarded in large recovery cases to be smaller in percentage terms than those with smaller recoveries ... [b]ut there is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable fund"; endorsing instead

21. Accordingly this Court does not think that the Fifth Circuit would go so far as to accord a presumption of reasonableness to a fee request based on a fee or retainer agreement between a properly-selected lead plaintiff and lead counsel, discussed *infra,* but would more likely require some consideration of the fee agreement for reasonableness under the *Johnson* factors. *See, e.g., In re Cendant Corp. Litig.,* 264 F.3d 201, 282 (3d Cir.2001). The Fifth Circuit does presume that a calculated lodestar is a reasonable fee, yet it, too, must be examined accordingly. *Walker v. Dept. of HUD,* 99 F.3d 761, 771 (5th Cir.1996).

22. Moreover, a number of courts applying the percentage of fund method have used the Third Circuit's seven-factor-test for determining the percentage, set out in *Gunter v. Ridge-*

*wood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000):(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) awards in similar cases. *See, e.g., Di Giacomo v. Plains All American Pipeline,* Nos. Civ. A. H–99–4137 and H–99–4213, 2001 WL 34633373, *9 (S.D.Tex.2001) (Rosenthal, J.) (applying *Gunter* factors to determine percentage and then the *Johnson* factors as a lodestar cross-check to ensure the percentage fee award is not unreasonably high).

a fact-intensive analysis). A mechanical, a *per se* application of the "megafund rule" is not necessarily reasonable under the circumstances of a case. The Fifth Circuit does not appear to have addressed the issue of capping attorney's fees in a megafund class action, no less a post-PSLRA megafund securities class action, but the megafund rule is contrary to the Fifth Circuit's approach that the district court scrutinize each case for the particular facts that will determine what constitutes a reasonable fee award. *See also Rite Aid*, 396 F.3d at 302 ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable fund. Put simply, the declining percentage concept does not trump the fact-intensive ... analysis. We have generally cautioned against overly formulaic approaches in assessing and determining the amounts and reasonableness of attorney's fees."). A firm charging a higher fee may earn proportionally more for the class than one that charges less. *See, e.g., Third Circuit Task Force Report*, 108 F.R.D. 340, 373 (2002).[23] A number of district courts have also rejected a rule requiring decreasing the fee percentage as the recovery grows larger. *See, e.g., Allapattah Services, Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185, 1212–13 (S.D.Fla.2006) (and cases cited therein); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ. A. 03–4578, 2005 WL 1213926, *9–10 (E.D.Pa. May 10, 2005) (rejecting formulaic application of declining reduction to award of attorneys' fees).

**7. Reasonable Hourly Rate**

 As noted, the lodestar is calculated by multiplying the number of hours reasonably expended by the reasonable hourly rate in the community for such legal services rendered by attorneys of comparable skill, experience, and reputation. *Alberti v. Klevenhagen*, 896 F.2d 927, 936, *vacated in part on other grounds*, 903 F.2d 352 (5th Cir.1990) (vacating its own reversal of district court's enhancement of the hourly rate for case undesirability and affirming as reasonable that enhancement to attract qualified counsel); *Heidtman v. County of El Paso*, 171 F.3d 1038, 1043 (5th Cir.1999) A reasonable hourly rate should be in accord with rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895–96 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). "A reasonable hourly rate is determined with reference to the prevailing market rate in the relevant legal community for similar work.... While the hourly rate must be 'adequate to attract competent counsel,' the 'measure is not the rates which lions at the bar may command.' " *Coleman v. Houston Independent School District*, 202 F.3d 264, 1999 WL 1131554 (5th Cir.1999) (Table) (available on Westlaw), *citing Leroy v. City of Houston*, 906 F.2d 1068, 1079 (5th Cir.1990). The relevant legal community is the one in which the district court sits, no matter how much of the work is done elsewhere. *Green v. Administrators of Tulane Educational Fund*, 284 F.3d 642, 662 (5th Cir.2002), *abrogated on other grounds, Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). In addition to the community rate, the district court must also consider the attor-

**23.** Coughlin Stoia seek a higher percentage fee than most attorneys have been granted in the last few megafund securities cases with the exception of *Tyco* (14.5%), but 9.52% is still a low percentage in comparison with those in security class actions generally and over a longer time period. Moreover, as will be discussed, the Court finds that the firm obtained exceptional results that justify such a fee, and their results demonstrate why the firm is so highly respected and feared in the securities field.

neys' regular rates. *Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 328 (5th Cir.1995). There is a strong presumption that the lodestar is a reasonable fee, and the fee applicant bears the burden of demonstrating that an adjustment by application of the *Johnson* factors is necessary to calculate a reasonable fee. *Walker v. Dept. of HUD,* 99 F.3d 761, 771 (5th Cir.1996).

### 8. *Johnson* Factors and the Multiplier

The twelve *Johnson* factors are (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson,* 488 F.2d at 717–19.

While the lodestar is relevant to determining a fee award, it is not the sole basis for determining that award; the *Johnson* factors are applicable to deciding whether the lodestar is reasonable, as well as to adjusting that award by a multiplier once the lodestar is calculated. *Abrams v. Baylor College of Medicine,* 805 F.2d 528, 536 (5th Cir.1986) ("The time and hours spent on a case are a necessary ingredient in determining a fee award, but they should not be the sole basis for determining a fee. The *Johnson* factors govern the determination of reasonableness itself; they are not merely factors to be considered in adjusting the award once the lodestar is calculated."), *citing Johnson v. Georgia Highway Express,* 488 F.2d at 717.

Compensable hours, reasonably spent, are determined from the attorney's time records. *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Usually courts require the applicant to provide contemporaneous time or billing records or other documentation which the district court must examine and discern which hours are compensable and which are not. *Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 324 (5th Cir.), *cert denied,* 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 113 (1995). Counsel must "exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary ...." *Id.* The fee applicant bears the burden of showing that the hours claimed were reasonably expended. *Hensley,* 461 U.S. at 437, 103 S.Ct. 1933. *See also Saizan v. Delta Concrete Products Company,* 448 F.3d 795, 799 (5th Cir. 2006) ("[P]laintiffs seeking attorney's fees are charged with the burden of showing the reasonableness of the hours billed and, therefore, are also charged with proving they exercised billing judgment. Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant. The proper remedy for omitting evidence of billing judgment does not include a denial of fees but, rather, a reduction of the award by a percentage intended to substitute for the exercise of billing judgment. [footnotes omitted]"). *See also Louisiana Power,* 50 F.3d at 324–25 ("[T]he documentation must be sufficient for the court to verify that the applicant has met its burden.... [A] district court may reduce the number of hours awarded if the documentation is *vague* or *incomplete....* Failing to provide contemporaneous billing statements does not preclude an award of fees per se as long as the evidence produced is adequate to determine reasonable hours."); *Saizan,* 448 F.3d at 799, 800 (billing judgment requires documentation of the hours

charged and of the hours written off as duplicative, unproductive or excessive; finding the district court did not commit clear error in finding a failure to produce evidence of billing judgment nor abuse its discretion by imposing a ten percent reduction in the lodestar because of that failure).

Furthermore, "[i]f more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized. The time of two or three lawyers in a courtroom or conference when one would do may be obviously discounted." *Abrams,* 805 F.2d at 535. "[H]ours ... spent in the passive role of an observer while other attorneys perform" are usually not billable. *Flowers v. Wiley,* 675 F.2d 704, 705 (5th Cir.1982), *quoted in Coleman,* 202 F.3d at 264, 1999 WL 1131554 (Table, available on Westlaw). "Litigants take their chances when submitting fee applications" without adequate information for the court to determine the reasonableness of the hours expended or with vaguely described tasks such as "review pleadings," "correspondence," or documents. *Louisiana Power,* 50 F.3d at 327.

■The hourly rate for attorneys should not be applied to clerical, secretarial or administrative work, since these are part of office overhead. *Reyes v. Spur Discount Store No. 4,* Civ. A. No. 07–2717, 2007 WL 2571905, *3 & nn. 19–20 (E.D.La. Aug.31, 2007); *Abrams,* 805 F.2d at 536 (court should consider whether the work performed was " 'legal work in the strict sense,' or was merely clerical work that happened to be performed by a lawyer."), *quoting Johnson v. Georgia Highway Express,* 488 F.2d at 717. "[I]nvestigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers, but which a lawyer may do because he has no other help available ... may command a lesser

rate. Its dollar value is not enhanced just because a lawyer does it." *Id.* at 535. Work by paralegals may only be recovered to the extent that it is similar to that typically performed by attorneys; otherwise it is an unrecoverable overhead expense. *Coleman,* 202 F.3d 264, *citing Allen v. United States Steel Corp.,* 665 F.2d 689, 697 (5th Cir. Unit B 1982).

■Generally in the Fifth Circuit the determination of a reasonable hourly rate for attorneys in a particular community is established by affidavits of other attorneys of similar caliber practicing in that community. *Watkins v. Fordice,* 7 F.3d 453, 458 (5th Cir.1993); *Tollett v. City of Kemah,* 285 F.3d 357, 368 (5th Cir.2002). "The evidence to support an hourly rate entails more than an affidavit of the attorney performing the work but must also address the rates actually billed and paid in similar lawsuits." *Watkins v. Input/Output, Inc.,* 531 F.Supp.2d 777, 784 (S.D.Tex.2007).

■As noted, based on one or more *Johnson* factors, the court may apply a multiplier to adjust the lodestar up or down if that factor or factors are not already taken into account by the lodestar, itself. *Strong,* 137 F.3d at 850. An adjustment may only be made if the *Johnson* factor has not already been accounted for in the lodestar. *In re Fender,* 12 F.3d 480, 487 (5th Cir.), *cert. denied,* 511 U.S. 1143, 114 S.Ct. 2165, 128 L.Ed.2d 888 (1994); *Shipes v. Trinity Indus.,* 987 F.2d 311, 320 (5th Cir.) ("[T]he district court must be careful ... not to double count a *Johnson* factor already considered in calculating the lodestar when it determines the necessary adjustments."), *cert. denied,* 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993).

■Four of the *Johnson* factors are presumably included in the lodestar calculation: the novelty and complexity of the issues, the special skill and experience of

counsel, quality of representation, and the results obtained from the litigation. *Blum v. Stenson*, 465 U.S. 886, 898–99, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Shipes*, 987 F.2d at 320.[24] "Although upward adjustments of the lodestar figure based on these factors are still permissible, such modifications are proper only in certain rare and exceptional cases supported by specific evidence on the record and detailed findings by the lower courts." *Id.*; see also *Walker*, 99 F.3d at 771, *citing Alberti v. Klevenhagen*, 896 F.2d 927, 936 (*citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air ("Delaware Valley I")*, 478 U.S. 546, 564–65, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)) (*quoting Blum v. Stenson*, 465 U.S. 886, 898–900, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 323–24 (W.D.Tex.2007). The Fifth Circuit has also held that two other factors, time limitations imposed by the client or the circumstances and preclusion of other employment, are generally subsumed in the lodestar calculation, too. *Shipes*, 987 F.2d at 321–22; *Heidtman v. City of El Paso*, 171 F.3d 1038, 1043 (5th Cir.1999). Increasing the fee award based on the eighth factor (the amount involved and the results obtained) is only proper when the applicant shows that "it is customary in the area for attorneys to charge an additional fee above their hourly rates for an excep-

tional result . . . ." *Shipes*, 987 F.2d at 322. The *Shipes* panel did state that "enhancement due to the results obtained may be warranted." *Id.* at 321.

### 9. Enhancement: *City of Burlington v. Dague* and Fee–Shifting–Statute versus Common–Fund Cases

 Relating to the sixth *Johnson* factor, whether the fee is fixed or contingent, in *City of Burlington v. Dague*, 505 U.S. 557, 567, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), the Supreme Court has held that enhancement of the lodestar by a multiplier based on the contingent nature of a fee is not allowed when fees are awarded to plaintiffs' counsel under fee-shifting provisions of statutes.

Several Circuit Courts of Appeals and some district courts that have examined the language in *Dague* and the policy behind its holding have concluded that because of key differences between fee-shifting and common-fund cases, *Dague* does not apply to common-fund class action settlement cases. The leading case is *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 564–65 (7th Cir.1994). This Court is persuaded by the reasoning in *Florin* and progeny.

In *Dague*, the Supreme Court reiterated its earlier rulings that in typical federal statutory fee-shifting cases there is a "strong presumption" that the lodestar by

---

**24.** For example, in *Shipes*, the Fifth Circuit reviewed a district court's enhancement of the "lodestar amount based on the novelty and difficulty of the case because it found that there were over three hundred plaintiffs, an entire spectrum of employment decisions was being challenged, the case was complex and highly technical, and Trinity's obstinate conduct caused additional difficulties." 987 F.2d at 321. The panel opined,

> These factors—not so uncommon in much present-day litigation—simply do not render a case "rare" or "exceptional" for purposes of enhancing the lodestar amount. All counsel competent to handle a case such

as this one are expected to be able to deal with complex and technical matters; this expertise is reflected in their regular hourly rate, based on fees for counsel of similar experience and ability. Still further, the difficulty in the handling of the case is adequately reflected in the number of hours billed-hours for which the attorney is compensated in the lodestar amount. Similarly, obstinate conduct by opposite counsel is compensated by the additional number of hours that are required to prevail over such obstinacy.

*Id.*

itself represents a "reasonable fee" and that an applicant seeking more money must establish that " 'such an adjustment is *necessary* to the determination of a reasonable fee.' ". 505 U.S. at 562, 112 S.Ct. 2638, *citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 733, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), and *Blum v. Stenson*, 465 U.S. at 898, 104 S.Ct. 1541. Opining that "an enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar, the high court noted that the risk of losing a case is the product of two factors: the relative legal and factual merits of the claim and the difficulty of demonstrating those merits". *Id.* at 562, 112 S.Ct. 2638. The latter factor is usually subsumed in the lodestar, either in the number of hours expended on the suit or in the hour rate of the attorney adequately skilled and experienced to prove those merits. *Id.* The first factor is not subsumed in the lodestar, but the Supreme Court found good reason it should not be used to enhance the lodestar figure. *Id.* Because relative merits are a factor in every case since no claim has a 100% chance of success, "computation of the lodestar would never end the court's inquiry in contingent-fee cases." *Id.* Furthermore,

the consequence of awarding contingency enhancement to take account of this 'merits' factor would be to provide attorneys with the same incentive to bring relatively meritless claims as relatively meritorious ones. Assume, for example, two claims, one with underlying merit of 20%, the other of 80%. Absent any contingency enhancement, a contingent-fee attorney would prefer to take the latter, since he is four times more likely to be paid. But with a contingency enhancement, this preference would disappear: the enhancement for the 20% claim would be a multiplier of 5 (100/20), which is quadruple the 1.25 multiplier

(100/80) that would attach to the 80% claim. Thus, enhancement for the contingency risk posed by each case would encourage meritorious claims to be brought, but only at the social cost of indiscriminately encouraging nonmeritorious claims to be brought as well.

*Id.* at 563, 112 S.Ct. 2638.

Previously, in *Delaware Valley*, 483 U.S. at 725, 107 S.Ct. 3078, in a "closely related" argument that the *Dague* Court expressly adopted, 505 U.S. at 567, 112 S.Ct. 2638, Justice White had insisted that because contingency enhancement is based on the weakness of the plaintiff's case, it "penalizes the defendants who have the strongest case; and in theory, at least, would authorize the highest fees in cases least likely to be won and hence encourage the bringing of more risky cases. . . ." The Dague Court's commented that the fee-shifting statutes were not intended to act " 'as a form of economic relief to improve the financial lot of lawyers.' " *Id.* at 563, 112 S.Ct. 2638 [citation omitted].

Instead, discussing reasons why contingency enhancement is incompatible with typical fee-shifting statutes, the Supreme Court in *Dague* observed that the fee-shifting statutory language usually limits fee awards to "prevailing," or substantially prevailing, parties, and thus bars a prevailing plaintiff from recovering fees on claims on which he lost; therefore "it should bar a prevailing plaintiff from recovering for the risk of loss." *Dague*, 505 U.S. at 565, 112 S.Ct. 2638, *citing Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40, and *Delaware Valley*, 483 U.S. at 719–20, 107 S.Ct. 3078. An attorney working on a contingency basis usually pools the risks of his various cases and relies on those in which he is successful to pay for the time he risked on those which were not. Therefore, under a fee-shifting statute, enhancing a lodestar for risk

"would in effect pay for the attorney's time (or anticipated time) in cases where his client does *not* prevail." *Id.* The Supreme Court, noting that it has "generally turned away from the contingent-fee model ... to the lodestar model" in determining fee awards under fee-shifting statutes, concluded that engrafting a contingency enhancement onto a lodestar model would result in "a hybrid scheme that resorts to the contingent-fee model to increase a fee award but not to reduce it. Contingency enhancement is therefore not consistent with our general rejection of the contingent-fee model for fee awards, nor is it necessary to the determination of a reasonable fee." 505 U.S. at 565–66, 112 S.Ct. 2638.

In *Florin,* brought under the Employee Retirement Income Security Act ("ERISA") and relying heavily on *Skelton v. General Motors Corp.,* 860 F.2d 250 (7th Cir.1989), the Seventh Circuit focused on a fee award to be paid, under equitable principles, out of a common fund created by a settlement of a class action suit, and not under ERISA's fee-shifting provision, 29 U.S.C. § 1132(g). 34 F.3d at 563. At issue was whether the district court had abused its discretion by failing to award appellants a multiplier for risk. *Id.* The district court had calculated a lodestar using counsel's usual hourly rate and the hours documented by the attorneys, but found that there was "no compelling reason" to apply a risk multiplier requested by the attorneys. Acknowledging that *Dague* "has been interpreted to preclude generally the use of risk multipliers in fee-shifting cases," the Seventh Circuit concluded that "*Dague,* by its terms, applies only to statutory fee-shifting cases, and its reasoning is largely based on the statutory language of fee-shifting provision"; moreover the policy considerations informing the *Dague* decision "have little force in common fund cases." *Id.* at 564. Earlier, in *Skelton,* the Seventh Circuit opined that

in statutory fee-shifting cases, awarding risk multipliers to prevailing plaintiffs may unfairly burden defendants because the risk multipliers have a tendency to penalize those with the strongest defenses, which increase the risk for the attorney bringing the suit. *Skelton,* 860 F.2d at 253. In a common fund case this inequitable burden on defendants will not exist because the plaintiff class is responsible for compensating its attorneys by sharing in its recovery. *Id.* Furthermore, in the fee-shifting context, "assessing risk multipliers against losing defendants in effect requires these defendants to 'subsidize' plaintiffs' lawyers for their unsuccessful lawsuits against other defendants. In statutory fee-shifting cases, this is 'manifestly inconsistent with Congress' intent to award attorney's fees only to prevailing parties.' " *Id.* at 253–54, *citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 720, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). In *Florin,* the Seventh Circuit panel pointed out that unlike in fee-shifting cases, in common-fund actions because a fee award with compensation for risk is ultimately charged against the plaintiffs' common fund, because the defendant has been released from liability in return for establishing the fund, and because the defendant's liability is therefore limited to the amount in that fund, there is no direct or immediate danger of unduly burdening the defendant with a multiplier to compensate for risk. 34 F.3d at 565. Nor can the defendants in common-fund cases be seen as subsidizing unsuccessful lawsuits against other defendants. *Id.* Finally, the panel observed that in pre-*Dague* cases, the Seventh Circuit had required that a risk multiplier be used if the court found that counsel " 'had no sure source of compensation for their services' .... Moreover ... 'the need for such an adjustment is particularly acute in class action suits. The lawyers

for the class receive no fee if the suit fails, so their entitlement to fees is inescapably contingent.'" *Id.* at 565, *citing In re Continental Illinois Sec. Litig.,* 962 F.2d 566, 569 (7th Cir.1992).

In *McLendon v. Continental Group, Inc.,* 872 F.Supp. 142 (D.N.J.1994) (agreeing with *Florin* ), Judge H. Lee Sarokin, then United States Judge for the Third Circuit Court of Appeals, sitting by designation in the United States District Court for the District of New Jersey, agreed with the analysis in *Florin:*

> This court is persuaded by this line of reasoning. First, it is unlikely that attorneys will find sufficient incentive to bring even highly meritorious suits that are also complex, innovative, and lengthy if they will at best recover merely their regular hourly rates if they prevail, and nothing if they do not. Second, numerous differences between statutory fee and common fund cases render much of the reasoning in the statutory fees cases inapplicable to the common fund context. Third, as noted in *Florin,* defendants' interests are amply protected in common fund settlements.

*McLendon,* 872 F.Supp. at 155–56. Judge Sarokin noted that the argument that enhancing an award for contingency would disproportionately penalize the defendants with the best cases is inapplicable when the plaintiffs rather than the defendants pay the fees. *Id.* at 156. He highlighted the different rationales behind the two types of fee awards: "Fee-shifting provisions are designed 'to encourage private enforcement of statutory substantive rights'" by imposing payment of plaintiffs' costs on defendants who violated those rights and allowing those plaintiffs to obtain counsel and not have their awards diminished by the expense of obtaining counsel[25]; "in contrast common-fund awards are 'based on the equitable notion that those who have benefitted from the litigation should share in its costs.'" *Id.,* citing *Task Force Report,* 108 F.R.D. at 250, and *Skelton,* 860 F.2d at 252. Moreover Judge Sarokin further distinguished fee-shifting cases, in which the right to fees belongs to the successful plaintiff, from common-fund cases, in which the attorney has the right to claim a portion of the fund. *Id.*

Progeny of *Florin* include *In re Washington Public Power Supply System Securities Litig.,* 19 F.3d 1291, 1299–1301 (9th Cir.1994) ("[B]ecause we find *Dagues'* reasoning inapposite in the common fund context, we hold that district courts have discretion to use risk multipliers to enhance the lodestar in common fund cases."); *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.,* 56 F.3d 295, 308 (1st Cir.1995) (permitting court to decide which method, percentage or lodestar, best fits common fund cases and rejecting application of *Dague* to common fund cases; "*Dague,* fairly read, does not require abandonment of the POF [per-

---

**25.** Fee-shifting statutes often apply to causes of action that result in nonmonetary relief or very modest monetary recoveries that are inadequate to provide a reasonable percentage fee. Thus to attract lawyers to represent plaintiffs and deter wrongdoing in such causes of action, the United States Supreme Court endorsed the use of the lodestar method, which is based on reasonable hours expended multiplied by prevailing market rates, adjusted for factors like delayed payment, partial success, etc., to be paid by nonprevail-

ing defendants. Alba Conte, 1 Attorney Fee Awards § 2:5 (3d ed. Database updated May 2007). In application of the lodestar method under a fee-shifting statute, fee awards are not limited to the amount of money recovered for the plaintiffs and do not need to be proportional, unlike common-fund fee awards, which are paid proportionally by each class member. *Id.* from common-fund cases, in which the attorney has the right to claim a portion of the fund. *Id.*

centage of fund] method typically used in common fund cases"); *Rawlings v. Prudential–Bache Props., Inc.,* 9 F.3d 513, 516–17 (6th Cir.1993) (in common fund case allowing court to decide whether to use POF method, which "more accurately reflects the results achieved," or the lodestar method, which "better accounts for the amount of work done"); *Cook v. Niedert,* 142 F.3d 1004, 1014–15 (7th Cir.1998); *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1267–70, 1273 (D.C.Cir.1993); *DeHoyos v. Allstate Corp.,* 240 F.R.D. 269, 329–30 (W.D.Tex.2007); *In re Bausch & Lomb, Inc. Sec. Litig.,* 183 F.R.D. 78, 86–87 (W.D.N.Y.1998) (agreeing with *Florin* and *Washington Public Power Supply* ); *Dubin v. E.F. Hutton Group, Inc.,* 845 F.Supp. 1004, 1014 (S.D.N.Y.1994) (in the absence of any ruling by the Second Circuit, holding that risk multipliers are appropriate in common fund cases as long as the court examines the action to avoid rewarding attorneys for bringing cases of "dubious merit" and determines "as a matter of public policy, it is the type of case worthy of judicial encouragement"), *citing In re Agent Orange Product Liability Litig.,* 818 F.2d 226, 234 n. 2, 236 (2d Cir. 1987) ("equitable fund cases may afford courts more leeway in enhancing the lodestar, given the absence of any legislative directive"). *See also* 1 Alba Conte, JD, *Attorney Fee Awards* § 2:10, Ch. 2 ("Common Fund–Fee Awards") (3d ed.2007).[26] While the Fifth Circuit has not directly addressed the issue, in a post-*Dague,* but pre-PSLRA, case, *Longden v. Sunderman,* 979 F.2d 1095, 1099 (5th Cir.1992), a common-fund case, it used the lodestar approach with multipliers, including one for risk, to determine a fee award.

This Court notes that under the reasoning of *Florin* and progeny, the *Dague*

opinion is not inconsistent with earlier Supreme Court opinions. In *Blum v. Stenson,* a 1984 opinion, in dicta the Supreme Court observed, "Unlike the calculation of attorney's fees under the 'common fund doctrine,' where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under [the fee-shifting statute before the Court] reflects the amount of attorney time reasonably expended in the litigation." 465 U.S. at 900 n. 16, 104 S.Ct. 1541. In *Boeing,* issued in 1980, the Supreme Court had affirmed a fee award decided by the percentage method in a common fund case. 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676. *See Swedish Hospital,* 1 F.3d at 1267–68.

This Court agrees with the reasoning of *Florin* and concludes that, as a matter of law, the holding in *Dague* does not apply to a common-fund case. .

### 10. Enhancement Requirements

██ To enhance a lodestar, the court " 'must explain with a reasonable degree of specificity the findings and reasons upon which the award is based, including an indication of how each of the *Johnson* factors was applied.' " *Id., quoting Shipes,* 987 F.2d at 320. "[O]f the Johnson factors, the court should give special heed to the time and labor involved, the customary fee, the amount involved and the result obtained, and the experience, reputation and ability of counsel." *Migis v. Pearle Vision,* 135 F.3d 1041, 1047 (5th Cir.1998), *citing Von Clark v. Butler,* 916 F.2d 255, 258 (5th Cir.1990); *Saizan v. Delta Concrete Products Co.,* 448 F.3d 795, 799 (5th Cir.2006). "The most critical factor in determining an attorney's fee award is the 'degree of success obtained.' " *Singer v. City of Waco, Texas,* 324 F.3d 813, 829

---

26. *But see* two cases that have applied Dague to common funds: *In re Bolar Pharmaceutical Co. Inc. Sec. Litig.,* 800 F.Supp. 1091 (E.D.N.Y.1992), and *Nensel v. Peoples Heritage Financial Group,* 815 F.Supp. 26 (D.Me. 1993).

(5th Cir.2003), *quoting Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Saizan,* 448 F.3d at 800 & n. 19. "This factor is particularly crucial when, as in this case, a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims." *Jason D.W. by Douglas W. v. Houston Indep. Sch. Dist.,* 158 F.3d 205, 209 (5th Cir.1998), *citing Hensley,* 461 U.S. at 434, 103 S.Ct. 1933.

In 7B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure Civ.3d* § 1803.1 (Database current through 2008), in discussing what factors may be taken into account to adjust a lodestar, Charles Alan Wright also identified as the most significant one, the benefit (monetary or otherwise) conferred. Wright further observed,

> In addition to the benefit conferred, the district court should make a qualitative appraisal of the petitioning lawyer's professional services under each of the categories of work reflected in the time records. This might include the following series of inquiries, First, to what extent do the petitioning attorney's credentials and legal experience mark the attorney as someone above the qualitative medium of those of comparable age practicing in the community? Second, what was the quality of the work the attorney actually performed in the case? Third, how efficient was the petitioning attorney in processing the lawsuit? This factor can only be considered by a careful examination of the novelty of the issues presented by the matter and the lawsuit's overall complexity.... Fourth, what responsibility did the petitioning attorney assume in the development and management of the case? .... All of these factors should help the court in evaluating the quality of the representation.

*Id.* Regarding enhancement of the lodestar because of a contingency element, Wright emphasized that in class action litigation, the plaintiff's attorney does not receive compensation until the lawsuit is concluded, and only then if he successfully obtains a judgment or settlement for the class. *Id.* Thus the court should not merely "guess-timate" *ex post facto* the likelihood of the plaintiff's ultimately succeeding, but "should look at the costs and impact on the lawyers of undertaking the case on a contingency basis, inquiring into the extent to which it required significant resources to be allocated to the case. An important consideration in this regard is the length of time that elapsed between the commencement of the litigation and the fee award, as well as whether it was foreseeable that the litigation would be protracted." *Id.* Moreover in appraising the risk, the court should "evaluat[e] the character of the defense," i.e., focus on the "degree to which the protraction in the case is attributable to the tactical maneuvers of the defendants" and "the professional quality of the defense." *Id.*

### 11. Burden of Proof

Lead Counsel bears the burden of demonstrating that the requested fee award is reasonable, of adequately documenting the attorney's time records, and producing evidence, such as affidavits, declarations, etc. to demonstrate the rates are in accord with "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Purdie v. Ace Cash Express, Inc.,* No. Civ. A. 301CV1754L, 2003 WL 22976611, *8 (N.D.Tex. Dec.11, 2003) (and cases cited therein). Evidence of the reasonableness of a proposed hourly rate must include an affidavit of the attorney performing the work and information about rates actually billed and paid in similar lawsuits. *Blum,* 465 U.S. at 896, 104 S.Ct. 1541 m.11. Appropriate rates can be determined through direct or opinion evi-

dence about what local attorneys charge under similar circumstances. *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292 (11th Cir.1988).

### 12. Compensating for Delay in Payment

One accepted method of compensating for a long delay in paying for attorneys' services is to use their current billing rates in calculating the lodestar. *Missouri v. Jenkins*, 491 U.S. 274, 283–84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). *See also Islamic Center of Mississippi, Inc. v. City of Starkville, Miss.*, 876 F.2d 465, 473–74 (5th Cir.1989) (alternatively, calculate the lodestar using historical billing rates and compensate by increasing the lodestar by the rate of inflation from the time services were provided to the date of judgment or, if the attorneys' rates have not changed over time, compensate for lost time-value by granting a delay enhancement with an explanation how it recompenses counsel for that lost-time value), *impliedly abrogated on other grounds, City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992).

### 13. Non–Class Counsel, The Common Fund Doctrine, and The PSLRA

The Third Circuit, in a very thoughtful and persuasive opinion, has directly addressed the issues of (1) whether the Court in its discretion may award fees from the common fund to non-class counsel who provided legal services to the class action, and (2) as the only appellate court to do so, whether or to what extent the common fund doctrine survives the enactment of the PSLRA. *Cendant II*, 404 F.3d 173 (3d Cir.2005). The equitable and flexible common fund doctrine " 'provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation including attorney's fees.' " *Id.* at 187, *citing In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820 n. 39 (3d Cir.1995), and *Boeing*, 444 U.S. at 478–79, 100 S.Ct. 745. The panel commented,

> The cases are unanimous that simply *doing* work on behalf of the class does not create a right to compensation; the focus is on whether the work provided a benefit to the class.... No-lead counsel will have to demonstrate that their work conferred a benefit on the class *beyond* that conferred by lead counsel. Work that is duplicative of the efforts of lead counsel—e.g., where non-lead counsel is merely monitoring appointed lead counsel's representation of the class, or where multiple firms, in their efforts to become lead counsel, filed complaints and otherwise prosecuted the early stages of the litigation—will not normally be compensated.

*Id.* at 191.[27]

Emphasizing the effect of the PSLRA, the Third Circuit panel noted that the statute "creates an exclusive mechanism for appointing and compensating class counsel in securities class actions." *Id.* at 189. "[S]hift[ing] the balance of power away from plaintiffs' attorneys, who tradi-

---

**27.** The Third Circuit opined,

> If a hundred lawyers each perform admirable but identical work on behalf of a class before the appointment of the lead plaintiff, the court should not award fees to each of the lawyers, as this would overincentivize duplicative work. Instead, while all of lead counsel's work will likely be compensable,

> ... other attorneys who merely duplicated that work—however noble their intentions, and however diligent their efforts, and however outstanding their product—will not be entitled to compensation. Only those who confer an independent benefit upon the class will merit compensation.
> 404 F.3d at 197.

tionally controlled the common fund cases, to the institutional plaintiffs who now supervise securities class actions," the PSLRA authorizes the lead plaintiff, selected by the court under criteria set forth in 15 U.S.C. § 78u–4(a)(3)(B)(I) and (B)(iii)(I), to choose and retain lead counsel, also subject to court approval under 15 U.S.C. § 78u–4(a)(3)(B)(v). *Id.* at 193, 192.

Observing "significant tension" between the common fund doctrine and the PSLRA, the appellate court pointed out that it had previously held that "the PSLRA vests authority over counsel selection and compensation in the lead plaintiff—not in the court, and certainly not in entrepreneurial counsel who attempt to appoint themselves as representatives of the class." *Id.* at 193. The appellate court opined that the common fund doctrine remains intact during the period prior to appointment of lead plaintiff, i.e., "from the accrual of the cause of action to the appointment of lead plaintiff" (which might include legal services involving "discover[ing] possible fraud at the issuer, investigat[ing] that possible fraud, determin[ing] whether it warrants filing of a complaint, mak[ing] strategic decisions about the form and content of the complaint, draft[ing] the complaint, fil[ing] it, issu[ing] notice to class members, and navigat[ing] the PSLRA's lead-plaintiff procedures"). *Id.* at 193–93, 194. "If an attorney creates a substantial benefit for the class in this period—by, for example, discovering wrongdoing through his or her own investigation, or by developing legal theories that are ultimately used by lead counsel in prosecuting the class action—then he or she will be entitled to compensation whether or not chosen as lead counsel," and "[t]he **court,** not the lead plaintiff, must decide for itself what firms deserve compensation for work done on behalf of the class prior to the appointment of the lead plaintiff." *Id.* at 195

[emphasis added by the Court]. During the preappointment period, the court may substantially defer to lead plaintiff's determination of what work created the benefits to the class, but it may also consider any objections of counsel who have not been included. *Id., citing Bank One Shareholders Class Actions,* 96 F.Supp.2d 780, 790 & n. 13 (N.D.Ill.2000). The Third Circuit concluded that the filing of a complaint by attorneys not subsequently appointed lead counsel should best be viewed as "entrpreneurial efforts" and should not be compensable because

> each firms's complaint is the price of admission to a lottery that might result in it being named lead counsel. If the firm wins the lottery, it stands to make significant fees at multiples of its lodestar. Compensating a firm for filing a complaint and not being named lead counsel would offer free tickets to the lead-counsel lottery, and would thus create incentives for redundant filings.

*Id.* at 196. Nor was the appellate court convinced "that the mere filing of complaints in securities class action ordinarily confers much benefit on the class. Such complaints are as often spurred by news reports or press releases disclosing wrongdoing—or by reports that other firms have filed complaints—as by independent investigation." *Id.* Indeed the PSLRA was enacted in "reaction against a race-to-the-courthouse model of securities litigation in which attorneys appointed themselves class representatives and chose their own figurehead plaintiffs who had no power to select or oversee 'their' lawyers." *Id.* On the other hand, if non-class counsel do their own investigations and discover distinct grounds or new theories for a suit that are later used and not from public reports, they should usually be compensated out of the class's recovery. *Id.* at 196–97. In the unlikely case that the lead counsel do not request fees for these attorneys' work on which lead counsel relied,

"we expect that the court will nonetheless reward earlier attorney's work on behalf of the class." *Id.* at 197.

Once a lead plaintiff is appointed, "the primary responsibility for compensation shifts from the court to that lead plaintiff, subject of course to ultimate court approval. The PSLRA lead plaintiff is the decisionmaker for the class, deciding which lawyers will represent the class and how they will be paid." 404 F.3d at 197.

The Third Circuit concluded that the court should accord a presumption of reasonableness to any fee petition made under a retainer agreement that was entered into at arm's length between properly selected lead plaintiff and lead counsel. 404 F.3d at 199.[28] That presumption can then be rebutted by a showing that the original agreement has been materially altered by unforeseen developments or by the objectors making a *prima facie* case that such an award is "clearly excessive"[29] and should be reviewed under traditional standards. *Id.*

Furthermore, since the goal of the PSLRA is to give the lead plaintiff, and not the court, control over lead counsel, non-lead counsel that seek compensation from the class recovery must submit their request to the lead plaintiff. *Id.* Since the PSLRA "significantly altered the landscape of attorney's fee awards in securities class actions" and because the "lead plaintiff is now the driving force behind the class counsel decisions," the Third Circuit

recommended that a presumption of correctness should thereafter be accorded to the lead plaintiff's decision that a non-lead counsel's work, not made pursuant to an agreement between lead counsel and lead plaintiff, is not entitled to fees to be paid out of the common fund. *Id.* at 180, 181, 199.

As this Court previously stated, it does not believe that the Fifth Circuit would go so far as to accord a presumption of correctness, but would certainly give the Lead Plaintiff's determination considerable weight here, given how effectively it fulfilled the statutory intent of the PSLRA in controlling and monitoring the Enron litigation.

The Third Circuit opined that presumption of correctness for the denial of such fees to non-lead counsel by the lead plaintiff, or, in this case, the weight that might be accorded the decision of a properly selected and effective Lead Plaintiff by the Fifth Circuit, not to cover non-counsel's fees, could be countered in two ways if non-lead counsel meets a very high standard to justify why the court's usual deference to lead plaintiff's managerial decisions should not be exercised: non-lead counsel must show (1) that lead plaintiff has failed in its fiduciary representation of the class (mandated by the PSLRA) because the decision was motivated by some factor other than the best interests of the class or the lead plaintiff did not carefully consider and reasonably investigate non-

---

**28.** *In accord In re Cardinal Health, Inc. Sec. Litigations,* 528 F.Supp.2d 752, 758–59 (S.D.Ohio 2007); *In re EVCI Career Colleges Holding Corp. Sec. Litig.,* No. 05 Civ 10240, *et al.,* 2007 WL 2230177 (S.D.N.Y.2007); *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 466 (S.D.N.Y.2004) ("[I]n class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable"); *In re Lucent Technologies, Inc.*

*Sec. Litig.,* 327 F.Supp.2d 426, 432 (D.N.J. 2004) ("Under PSLRA a fee[ ] award negotiated between a properly-appointed lead plaintiff and properly-appointed lead counsel as part of a retainer agreement enjoys a presumption of reasonableness.").

**29.** The *Cendant* court listed the *Gunter* factors (see footnote 22 of this opinion) as guidelines for determination on rebuttal of whether the fee is clearly excessive. 243 F.Supp.2d at 171.

lead counsel's request; or, even if lead plaintiff has fulfilled its fiduciary duties of loyalty and care, (2) that the denial of fees was erroneous by clearly demonstrating that (a) non-lead counsel reasonably performed the work on behalf of the class, (b) they did so with some reasonable expectation of compensation out of the class's common-fund recovery, and (c) they can and do specifically identify the benefits they independently provided to the class that would not have been provided by the services of lead counsel. *Id.* at 199–200. For 2(a), non-lead counsel must show that (i) they spent hours prosecuting the claim, (ii) lead plaintiff or lead counsel requested the assistance of non-lead counsel, and (iii) non-lead counsel had a reasonable expectation of compensation out of the class's recovery, based on lead counsel's or the court's acquiescence in non-lead counsel's services. *Id.* at 200 & n. 15. For 2(c), non-lead counsel must provide specific proof as to what their efforts were, how they created the benefit, and why the benefit would not have been created absent its efforts. *Id.* at 200. Neither mere monitoring by non-lead counsel of the work of lead counsel nor keeping abreast of the case on behalf of and informing their individual clients are compensable. *Id.* at 201–02.

## II. Findings of Fact:

### A. Fee Agreement and Percentage Method

 The percentage method is properly applied here as a matter of law and the fee agreement observed under the PSLRA because the Court finds that the blended 9.52% fee agreed to by Lead Plaintiff and Lead Counsel at the begin-

ning of the *Newby* litigation (1) is fair and reasonable, (2) is substantially lower than fees awarded in other comparable class actions at the time the agreement was made,[30] and (3) should be enforced for the additional reasons indicated below.

### 1. 9.52% Fee Agreement

The *ex ante* fee agreement here weighs heavily in support of awarding Lead Counsel 9.52% of the net settlement fund. As indicated, the PSLRA authorizes Lead Counsel to select and retain Lead Counsel. As Judge Marbley observed,

> The benefits of an ex-ante agreement between lead plaintiffs and class counsel at the outset of litigation are substantial. In setting fees ex-post, the Court's evaluation of the risk of recovery, the skill of the attorneys, the complexity of the case, and the merit of the settlement or award are infected with hindsight bias. So long as lead plaintiff and lead counsel are of equal bargaining power and they negotiate at arm's length, an ex-ante agreement can more accurately reflect the market value of an attorney's services as applied to the particular facts. Further, agreeing to a fee at the outset will align the interests of the class and the attorneys throughout the litigation. Thus the PSLRA places lead plaintiff, at least ex-ante, in the best position to fix the compensations of lead counsel.

*Cardinal Health,* 528 F.Supp.2d at 758, citing *Cendant,* 264 F.3d at 282.

As explained by the Honorable H. Lee Sarokin, who independently reviewed the petition for award of attorneys' fees here and has provided a Declaration in support

---

**30.** *See* Declaration of H. Lee Sarokin, # 5819 at 13–14 (declaring after reviewing a compilation of fees awarded in the largest securities class action cases that Lead Plaintiff's blended 9.52% request "is not only fair and reasonable when compared to other awards, it is conservative").

*See* also for comparative rates Expert Report of Professor Charles Silver, # 5822 at 56–66 (demonstrating that percentage fee agreement between the Regents and Lead Counsel was low compared with the fee requested or awarded in other class actions).

of Lead Counsel's fee request, contingent percentage fee arrangements are typical in class actions for three reasons: "First contingent percentage fees align the interests of claimants and lawyers by rewarding superior performance. Second they minimize the need to monitor attorneys and to evaluate the reasonableness of their efforts, both of which are time consuming and often difficult to do. Third, they insure that the burden of financing the lawsuit is borne by class counsel rather than the class members. And, as demonstrated in this case, litigation costs can be enormous." # 5819 at 7. He points out that "the contingency arrangement is meant to compensate counsel for the risk undertaken and the result achieved." *Id.*

The Court finds that the fee agreement was negotiated at arm's length between Lead Counsel and General Counsel Office of the Regents of the University of California, a highly sophisticated investor with a substantial stake in the litigation and strong motivation to maximize the recovery for the class (under the fee agreement, over 90% of the settlement fund [31]). The fee agreement served to attract and challenge, by means of an increasing-percentage fee schedule at a lower-than-common contingency fee rate for such cases, one of the top, most experienced, and formidable securities law firms in the country to undertake the largest and most complex securities fraud litigation thus far in the United States. *See also* Supplemental Declaration of the Regents of the University of California in Support of Its Motion for Appointment as Lead Plaintiff and in Response to Surreply of The New York City Pension Funds and The Florida State Board of Administration, Feb, 6, 2002 (Christopher M. Patti), # 252 at 1–2.[32] There is no evidence to the contrary.

As stated, at the time the agreement was negotiated (2000–01), the 9.52 percentage was lower than that awarded in most securities class actions. Helen Hodges' Declaration, # 5818 at ¶ 26, *citing* Michael Orey, *Cashing in On Shareholder Suits– Class Actions are Mounting and So Are Payouts, As Deep Pockets Get Tapped; Should You File?,* Wall St. J., Apr. 25, 2002 (copy in Lead Counsel's Compendium, # 5817, Ex. E) ("[B]ig investors have become increasingly active, using their

---

**31.** In contrast, in *WorldCom* approximately 80% of the recovered funds were distributed to debt claimants with Securities Act claims. # 5930 at 4.

**32.** Patti's Supplemental Declaration makes clear that the Regents was fully aware of the difficulties and unprecedented challenges facing counsel and that the Regents' goal was to achieve the maximum possible recovery for the class if the Regents and Milberg Weiss were named Lead Plaintiff and Lead Counsel, respectively:

> To achieve that overriding objective, we adhered to several principles. First, we sought to negotiate fee percentages that would be substantially lower than those that are commonly agreed to or awarded so that the portion of the total recovery going to the class members would be maximized. At the same time, we recognized that this suit would likely be the largest, most complex, and most difficult securities class action in history. Accordingly, our second principle recognized that the fee agreement had to provide a sufficient fee to create an adequate incentive for counsel to commit the necessary resources to litigate this difficult case, Finally, we recognized that, given Enron's pending bankruptcy, there is no single source of recovery that is likely to be able to provide an acceptable level of compensation for the class and that achieving recovery above certain levels would become increasingly challenging. Therefore, our third principle held that there should be a modest increase in the marginal fee percentage as the recovery increased to provide counsel an adequate incentive to pursue additional sources of recovery. We believe that the fee agreement we have executed meets these criteria and creates the proper incentives for counsel to maximize the class recovery.

clout to drive down attorneys' fees and increasing the payment available for shareholders large and small. The Regents of the University of California, for example, are the lead plaintiffs for claims against Enron; their law firm, Milberg Weiss Bershad Hynes & Lerach, is seeking 8% to 10% of any recovery—about one-third of the customary take."). *See also* Paul S. Atkins, Speech by SEC Commissioner: Remarks before the U.S. Chamber Institute for Legal Reform (Feb. 16, 2006) (Compendium, #5817, Ex. F) ("When talking about the importance and effectiveness of the lead plaintiff provision of the PSLRA, Chairman [Christopher] Cox likes to point to the Enron class action suits.... In the Enron litigation, the court chose the Regents of the University of California as the lead plaintiff. One of the first moves made by the UC Regents was to negotiate a significantly reduced legal fee that resulted in hundreds of millions more dollars for injured investors."); 4 Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 14.6 and n. 9 (4th ed., Database updated June 2007) ("In the normal range of common fund recoveries in securities and antitrust suits, common fee awards fall in the 20 to 33 per cent range."). *See also Schwartz v. TXU Corp. et al.,* Nos. 3:02–CV–2243–K, 2005 WL 3148350, *27 (N.D.Tex. Nov.5, 2005) (finding fee award of 22.2% of the common fund under PSLRA "consistent with and, in fact, significantly less than awards made in similar cases" and providing an extensive list of other cases with higher percentage awards).

Not only were the Regents' negotiators (James Holst, John Lundberg, and Lloyd Lee) experienced lawyers, but the Regents had competent in-house counsel (over 35 at the time the agreement was negotiated, now over 60)[33] with extensive experience in complex litigation, including securities and tobacco actions, as reflected in their submissions in support of the Regents' request to be named Lead Plaintiff. James Holst declared that in December 2001, when the Regents applied for appointment as Lead Plaintiff in this action, "[T] he Office of the General Counsel, on behalf of The Regents, carefully considered the choice of Lead Counsel, and in doing so reviewed the qualifications and resources of a number of class action specialist firms." #5824 at 2. In the highly competitive arena of securities fraud litigation, in which "firms compete fiercely for opportunities to represent large investment funds,"[34] class action expert Professor Charles Silver proclaimed that the Regents is very knowledgeable about prevailing fee rates and not motivated to offer higher fees than the market rate. *See. e.g.,* Expert Report of Professor Charles Silver (#5822 at 82–83; Declaration of H. Lee Sarokin) (#5919 at 6–7).[35]

---

**33.** Expert Report of Charles Silver, #5822 at 35.

**34.** See Expert Report of Professor Charles Silver (#5822) at 47–54 (the Regents' decision to hire Lead Counsel "was reasonable because Lead Counsel offered a superior combination of quality and price" in a deep, competitive market).

**35.** In agreement with Professor Silver, the Court further points to the Declaration of James E. Holst (#5824 at 3–4) about the intentions of the Regents in the arm's length negotiations with Lead Counsel over the fee agreement in the Regents' effort "to maximize the eventual recovery for the ultimate benefit of the Class":

First, we concluded that a fee based on a percentage of the class recovery would more effectively align the incentives of counsel with the interests of the class than a so-called lodestar-based fee calculation. Second, we sought to negotiate a fee percentage that was substantially lower than the prevailing awards in such cases so that the portion of the total recover going to the Class would be enhance. Third, we recognized that in light of the complexity and

Furthermore, the structure of the increasing fee schedule here indicates that the Regents and Lead Counsel were aware of the risks and costs of this litigation and that they considered the possibility of a recovery over $2 billion, but also the enormous obstacles that had to be overcome (*see infra*). The graduated formula in the fee agreement has served the best interests of the class in inspiring counsel to continued zealousness, tenacity, and substantial investment of its own funds, resources, and legal services over this lengthy period even up to and after the United States Supreme Court issued its decision in *Stoneridge Investment Partners, LLC, v. Scientific–Atlanta,* —— U.S. ——, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008), indeed ongoing today.[36] See *infra.*

Moreover, under the agreement between Lead Counsel and the Regents, expenses were to be "netted" (deducted from the whole recovery) before applying fee percentages for fee award to Lead counsel. Holst's Declaration, # 5824, ¶ 9. Several objectors, including that of Mr. Brian Dabrowski through his attorney, Lawrence Schonbrun, have questioned whether the fees are based on the gross or net recovery and complained that the fees were based on the gross recovery. In its Reply, Lead Counsel clarifies that the fee percentage is applied to the "net," not the "gross" recovery:

> Total recoveries of $7,227,390,000 are first reduced by estimated expenses of $45,000,000 for a net recovery of $7,182,390,000. Applying 8% to the first billion, 9% of the second billion and 10% of the balance results in a fee of $688,239,000. *See* Hodges Decl. ¶ 3 & n. 7. $588,239,000 divided by the gross recoveries of $7,227,390,000 generates 9.52%. Thus while for ease of reference, the fee is expressed as a total percentage of the recovery, it is, in reality, calculated on the net. Reimbursement of Lead Counsel's expenses is not part of this motion. The Court has previously approved six expense reimbursement motions and awarded a total of $39 million to plaintiffs' counsel.[37] Counsel estimates that an additional $6 million has been incurred and will be the subject of future reimbursement requests. In sum, Lead Counsel requests the Court award an attorney fee of $688,239,000 plus interest thereon at the same rate that has been earned on the funds recovered for the Class.

# 5907 at 2–3, citing 15 U.S.C. § 78u–4 (a)(6) ("Total attorneys' fees and expenses awarded ... shall not exceed a reasonable

---

difficulty of the litigation, the fee percentage would have to be sufficient to create adequate incentives for the firm to dedicate the substantial resources, possibly over a long period of time, needed to maximize the Class recovery. Finally, we recognized that, given Enron's bankruptcy, there was no single source of recovery that was likely to be able to provide an acceptable level of compensation for the Class and that achieving recovery above certain levels would become increasingly challenging. We also want to avoid a fee structure that would create an incentive for quick, cheap settlements. Therefore, we concluded that the agreement should provide for a modest increase in the marginal fee percentage as the recovery increased to provide counsel an

adequate incentive to pursue additional sources of recovery.

**36.** Lead Counsel has submitted the Declaration of Jonathan W. Cuneo (# 5828), Managing Partner of Cuneo Gilbert and LaDuca, LLP (successor to The Cuneo Law Group, PC) and during this litigation designated by Lead Plaintiff as "Washington Counsel," serving as co-counsel with Lead Plaintiff for the proposed class for Washington D.C.-based services, but directed by Lead Counsel, from December 2001–now. # 5828 at ¶¶ 2, 19, 23

**37.** The six partial reimbursements approved by the Court are instruments # 2366, 4083, 4741, 5172, 5367, and 5761.

percentage of the amount of any damages **and prejudgment interest** actually paid to the class [emphasis added].").

This litigation has been ongoing since the fall of 2001, over six years, and the record attests to a long, difficult fight that justifies honoring the fee agreement's 9.52%.

Helen Hodges' Declaration [38] presents a chart accurately demonstrating significant stages of Coughlin Stoia's prosecution of this litigation.[39] # 5818, ¶ 16 at 10. See also Lead Counsel's proposed findings of fact and conclusions of law (# 5908) at ¶¶ 3–22. Ms. Hodges' Declaration summarizes in great detail most aspects of the firm's work on the Enron litigation. # 5818, ¶¶ 28–210. The record in this action, which is composed of approximately 6,000 entries at this time, also speaks to the vast amount of service performed by all Class Counsel. The Court will not repeat the extensive case history and refers the parties to these sources for a summary.

The two consolidated class action complaints [40] that were filed by Lead Counsel on behalf of the proposed class, charging eighty-two different defendants including multiple Financial Institutions (some of the largest banks in the world), accountants, law firms, and Enron's inside and outside directors, set out, in this Court's view, astonishingly detailed and informed allegations, especially in light of the complicated structured financial transactions,[41] the intricate accounting concealing the fraud, and the inability of Lead Plaintiff to perform formal discovery because of the stay under the PSLRA, 15 U.S.C. § 78u–4. The First Consolidated Complaint (# 441) demonstrates that Lead Counsel had diligently investigated and prepared for this proposed class action before its filing.

---

**38.** Helen Hodges, an attorney at Coughlin Stoia, has worked steadily on this litigation since its inception and has shown herself to be a reliable and credible attorney and officer of the court.

**39.** Indeed the record speaks to the extraordinary efforts made by counsel: as of the end of April 2008, there were 5,961 entries in the *Newby* case alone.

**40.** The original *Newby* class action complaint was filed on October 22, 2001. The First Consolidated Complaint (# 441) was filed on 4/08/02; the First Amended Consolidated Complaint (# 1388) was filed on 5/14/03.

**41.** Examples of these complicated off-the-books transactions, detailed in Lead Plaintiff's complaints and other briefing, to conceal Enron's true debt include prepays (loans disguised as commodity transactions), FAS 125/140 (off-balance-sheet sales of unsalable assets to Enron-controlled Special Purpose Entities) ("SPEs"), minority interests (borrowed funds from minority-owned subsidiaries reported as equity investments by minority investors or cash flow from operations), share trust transactions, tax transactions, related-party transactions, forest products transactions, and the Nigerian Barge transaction.

Attorney Jonathan W. Cuneo, whose firm worked with Lead Counsel on Washington, D.C.-based aspects of the Enron litigation and on collecting and forwarding information, monitoring the SEC and Congress, attending a very long list of Congressional Enron hearings, and assisting in the preparation of *amici* briefs submitted in the *Stoneridge* case, as well as convincing numerous significant entities and individuals to file *amicus curiae* briefs supporting scheme liability, described the intricate web of deceit as follows:

> The Enron fraud and the financial transactions were bewilderingly complex, deliberately designed to be difficult to understand, and multifarious in that they involved large numbers of different types of transactions here and offshore with different names, participants, structures, dates and specific purposes and implicating different highly nuanced principles of financial accounting. Although nearly six years later the players and archetypes and patterns seem familiar, they have become accessible in part through repetitive analysis and exposition. # 5828 at ¶ 28.

## 2. Size and Diversity of the Undertaking

The sheer size, the diversity of Enron securities and investors, and the risks posed by a lengthy duration of such a complex litigation were daunting, especially because under the fee agreement Lead Counsel agreed to advance all costs and to look only to an uncertain recovery for reimbursement of expenses and payment of attorneys' fees in what was bound to be a long and difficult litigation.

At the time this Court appointed the Regents as Lead Plaintiff and approved its selection of Lead Counsel, the fee agreement, which was submitted to the Court as part of the application process, appeared very reasonable. In its February 15, 2002 memorandum and order this Court wrote,

> Higher fees can be warranted by superior services, but the fees in this class action must be reasonable in light of the circumstance and in compliance with the PSLRA's policy to preserve the substantial portion of any recovery for the Plaintiffs. Given the magnitude and complexity of this litigation, the geographical and temporal expanse it covers, the number of governmental and private investigations occurring, and the necessary involvement with the bankruptcy proceeding in New York, the selection of competent, experienced and committed Lead Counsel has even greater import than in normal securities class actions. In reviewing the extensive briefing submitted regarding the Lead Plaintiff/Lead Counsel selection, the Court has found the submissions of Milberg Weiss Bershad Hynes and Lerach LLP stand out in the breadth and depth of its research and insight, Fur-

thermore, Mr. Lerach has justifiably "beat his own drum" in demonstrating the role his firm has played thus far in zealously prosecuting this litigation on Plaintiffs' behalf.

*In re Enron Corp. Sec. Litig.,* 206 F.R.D. 427, 458 (S.D.Tex.2002). Lead Counsel has not disappointed the Regents nor this Court, and the fee agreement clearly motivated Lead counsel to obtain a superb result. It should be honored.

Among Lead Counsel's many legal services, not to mention effective leadership and organization in this litigation on behalf of the class, were spearheading the establishment and coordination of a document depository, the creation of the Deposition Scheduling Committee, and developing a deposition scheduling protocol for oral depositions of fact witnesses, creation of a website for economical and swift service of process and communication among the enormous number of attorneys that appeared in this action, interviews of innumerable witnesses (former Enron, bank, and Arthur Andersen employees and third parties), performance of massive discovery, the taking of more than 370 fact depositions and over 50 expert depositions in a concentrated and orderly fashion,[42] the subpoenaing, gathering and review of over seventy million documents, the submission of extensive briefing on countless issues, many without, or with minimal, precedent or regarding which courts were in substantial conflict, responding to approximately 420 complex motions to dismiss, addressing issues of class certification (for which Lead Counsel participated in a two-day hearing), answering motions for summary judgment, retaining and taking depositions of top-level experts (Defendants alone had 40; Coughlin Stoia had 12[43]) and generat-

---

42. The Declaration of Helen Hodges, # 5818, ¶ 169 at 92–100, states that the parties took 420 fact depositions, lists them, and identifies the Coughlin Stoia attorney(s) in attendance at each.

43. Helen Hodges' Declaration, # 5818, ¶ 7 at 11.

ing expert reports on numerous issues, and, finally, extensive trial preparation. *See, e.g.,* Declaration of Helen Hodges, # 5818, ¶¶ 211–28, at 118–28. At least twelve of Coughlin Stoia's lawyers worked full-time on this litigation at every stage. *Id.* at 6.

Moreover Class Counsel had to cover several venues. For the benefit of the proposed class, Lead Counsel, with the help of bankruptcy experts Genovese, Joblove & Battista, participated in the parallel Enron bankruptcy proceedings in the Southern District of New York, moving for appointment of a trustee, then negotiating for the selection of Neal Batson to serve as the Enron Bankruptcy Examiner, whose resulting reports were of great value to the *Newby* plaintiffs in prosecution of this action, and obtaining a lift of the stay of discovery so documents could be retrieved from Enron. Declaration of John H. Genovese (# 5826) at ¶¶ 8–26; Declaration of Helen Hodges (# 5818) at ¶ 8, ¶¶ 229–37.[44] In still another venue, Genovese, Joblove & Battista also filed a proof of claim and an adversary complaint on behalf of the Regents and the proposed class in the bankruptcy proceedings of LJM2 in Dal-

---

**44.** Lead Counsel has provided evidence to show that it did not merely rely on other investigations to prosecute this case. In her sworn Declaration, Helen Hodges maintains that Coughlin Stoia did not merely rely on Batson's evidence to prosecute this action. After negotiations which resulted in Batson's appointment,

> Batson used our Consolidated Complaint as a "road map" for his investigation. After Batson gathered evidence, the banks asked Judge Gonzalez to deny us access to the evidence and Judge Gonzalez granted that motion. In the meantime, we moved Judge Harmon for and were granted access to the evidence which Batson gathered and which the banks and Enron had. While we used Batson's evidence to streamline our depositions, we didn't stop there. We gathered evidence far beyond what Batson had from the banks, from third parties such as rating agencies and stock analysts, and most notably, from Andrew Fastow . . .

# 5818 at ¶ 8, 6–7. *See also* Lead Counsel's Memorandum (# 5816 at 63).

In John H. Genovese's Declaration (# 5826 at 10–11, ¶¶ 24–25), after describing his firm's work in getting Neal Batson appointed as the Enron Bankruptcy Examiner, Genovese points out,

> While the Examiner Reports in many respects served to validate and confirm the Lead Plaintiff's allegations, the existence of the Reports added further credibility to the Lead Plaintiff's allegations and were of use in a number of ways including, of course, negotiations leading to the Recoveries.
>
> At a minimum, as observed by this Court, the use of deposition transcripts and sworn

statements obtained by the Examiner would streamline depositions and provide impeachment tools in this litigation. While it is hard to quantify the savings obtained in coordinating discovery, the amount spent by the Enron bankruptcy estate to investigate the Enron fraud and provide factual support for Lead Plaintiff's allegations reflected in the Examiner's analysis, documents, discovery and sworn statements can be quantified. Batson and his firm received payment of fees and reimbursement of costs totaling approximately $85 million. Stated another way, work product useful to the Lead Law Firm was produced at a cost to Enron's bankruptcy creditors and not the Class, thereby significantly reducing the lodestar in this litigation.

*See also* Declaration of Professor John Coffee, # 5821 at 24 n. 4 ("Undoubtedly, both Batson and Lead Counsel proved useful to the other, and Lead Counsel's consolidated complaint provided a 'roadmap' for Batson's investigation. But Batson's findings carried no collateral estoppel impact, and defendants also sought to exclude Batson's report from any trial. Moreover, Lead Counsel went far beyond the testimony developed by Batson, for example by deposing witnesses that Batson never interviewed, including Andrew Fastow, credit ratings agencies, and securities analysts. Even if Batson made a contribution to the outcome, he never focused on Lead Counsel's 'scheme to defraud' theory nor had the impact of a prior determination that plaintiffs could rely on for its collateral estoppel impact.").

las, Texas and obtained a recovery of $51.9 million from the debtor's estate (twice as much as the other claimants) even though debtor was bankrupt. Genovese Declaration (# 5826) at ¶¶ 33–50. Lead Plaintiff also participated persistently in settlement negotiations, including mediation a number of times with different mediators. Declaration of Helen Hodges, # 5818, ¶¶ 238–55. After the Fifth Circuit decertified the class on March 19, 2007, Coughlin Stoia pursued the issue of scheme liability under § 10b and Rule 10b–5(a) and (c) to the Supreme Court, both in its petition for certiorari in this action and in the *Stoneridge* case. Lead Counsel also worked for substantial time on a plan of allocation for the settlement fund, a difficult task given the diverse Enron securities involved, some of which lacked pricing data and/or trade volume data. Declaration of Helen Hodges, # 5818, ¶¶ 282–89 at 154–57.

### 3. Evaluation by Professor Coffee

The Court, from its own experience in presiding over this litigation for more than six years, fully concurs with some of the highly qualified experts' assessments of Lead Counsel's remarkable prosecution of this action. In particular, the opinion of Columbia University Professor John C. Coffee, Jr., a prominent authority in the field of class actions and securities litigation, who has often been negatively critical of the performance of plaintiff's attorneys in class actions, particularly securities class actions, over the past twenty five years,[45] has impressed the Court as very instructive and persuasive.

Professor Coffee identifies as "the two most critical factors in an optimal fee award determination: (1) How successful were plaintiffs' counsel when measured against the best possible outcome? and (2) How high a level of risk did they face?" Decl. of John C. Coffee Jr., # 5821 at ¶ 26. Professor Coffee continues, "Put simply, this is a litigation that can only be described in superlatives. To begin with, it represents the largest recovery ever in any class action—not just securities class actions but all class actions," despite the fact that "from the outset, Enron was in bankruptcy and Arthur Andersen was on the brink of insolvency," certification of the class was unresolved until granted by this Court in 2006, and was then reversed by the Fifth Circuit[46]; and the unparalleled amount of the settlement fund "strongly suggests that Lead Counsel performed with an extraordinary level of skill and negotiating prowess." *Id.* at ¶ 2.

Professor Coffee also observes that the fact that three large financial institution defendants "held out" and did not settle "only underlines that the risk was real." *Id.* at ¶ 3. As for Lead Counsel's negotiations with those that did settle for over $2 billion each in what "was arguably the highest stakes legal poker game ever played," Professor Coffee comments, "Few, if any, other plaintiffs' counsel in my judgment could have pulled off such a tour de force" and the achievement "is attributable in almost equal measure to its credibility, creativity and the intensity of its commitment to this case. In my judgment, Lead Counsel is the adversary most feared today by the defense bar in securities litigation, and that reputation played an important role here." *Id.* at ¶ 4.[47] In an

**45.** *See, e.g.,* John C. Coffee, Jr., *Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation,* 106 Colum. L.Rev. 1534 (2006).

**46.** *Regents of University of California v. Credit Suisse First Boston (USA), Inc.,* 482 F.3d 372 (5th Cir.2007), *cert. denied,* — U.S. —, 128 S.Ct. 1120, 169 L.Ed.2d 957 (2008).

**47.** *See also* Expert Report of Charles Silver, # 5822 at 49–51.

"extraordinary investment for one firm to make," Lead Counsel "risk[ed] its own time and money on a novel legal theory, with little precedent to support it, in a case that initially seemed both financially unpromising and difficult to settle," in advancing over $45 million in expenses and 280,000 hours of time.[48] *Id.* at ¶ 5. Moreover, "Lead Counsel was literally litigating against the cream of the American corporate law bar" which "vastly outnumbered" Plaintiffs' counsel,[49] and "defendants had retained many of the leading authorities as their expert witnesses," making plaintiffs' burden "also exceptional." *Id.* The Court concurs with all these observations. Professor Coffee concluded, "To sum up, in my judgment, few other counsel (and perhaps no other) could have obtained this degree of success." # 5821 at 6. In addition, Professor Coffee praises the litigation as "illustrat[ing] the best practices in class action," "a model of transparency" in the negotiation of a fee formula, which would "incentivize their counsel to assume the enormous risks in this case over a potentially indefinite period," by a sophisticated, public, and politically accountable body, the Regents of the University of Califor-

nia, which continues to voice its satisfaction with the arrangement. *Id.* at ¶ 6.

### 4. Comparable Litigation Fee Awards

Professor Coffee's Declaration contains charts and data that demonstrate the dates, settlement funds, and percentage awarded as attorneys' fees in securities and other kinds of class actions reported in various studies to compare the results in the *Newby* litigation. He demonstrates that many more factors must be examined than the amount of the recovery and the percentage of that recovery represented by the fee. He proffers a chart of the largest class action settlements involving "mega-fund" case recoveries of more than $100 million since 1990 and the fee award expressed as a percentage of that recovery. # 5821 at ¶ 22. He concludes that when the settlement funds are below $1 billion, fee awards of 20–25% have been awarded by many courts, although others allow only single digit fees. When the recovery is over the $1 billion line, the percentage of the fee awards decline significantly. *Id.* at ¶ 23. Then he points to the importance of the unexpressed facts underlying the figures.

**48.** *See also* Declaration of James E. Holst, now General Counsel Emeritus of the Regents (# 5824 at 2), which states about the Regents' selection of Lead Counsel: "The objective of this process was to retain outside counsel possessing the financial resources, skill, experience, and track record to obtain optimum results for the Class. The Regents selected [Lead Counsel] ... on the basis of the extensive experience of that firm's attorneys in securities litigation, the resources the firm had available to prosecute the case, and the aggressiveness it had already demonstrated in doing so." He further states that the Regents also selected Lead Counsel for the Dynegy litigation before Judge Lake because "we had acquired extensive experience working with Lead Counsel and had observed first-hand the skill and determination of Lead Counsel and their dedication to the best interests of the class. We had developed an extremely effec-

tive working relationship with Lead Counsel, and our role in supervision and management of every aspect of the Enron litigation had been welcomed by them." *Id.*

**49.** The Court notes that among the many excellent firms involved in the *Newby* litigation were Akin Gump; Boies, Schiller; Cadwalader Wickersham & Taft, LLP; Cleary Gottlieb; Clifford Chance US; Cravath, Swaine & Moore, LLP; Davis Polk; Jones Day; King & Spalding; Keker & Van Nest, LLP; Latham & Watkins, LLP; Mayer Brown LLP; O'Melveny & Myers, LLP; Paul Weiss, Rifkind, Wharton & Garrison LLP; Shearman & Sterling, LLP; Sidley Austin; Simpson Thatcher & Bartlett, LLP; Sullivan & Cromwell, LL;, Susman Godfrey, LLP; Weil Gotschal and Manges; White & Case, LLP; and Williams & Connolly.

For instance, in *WorldCom*, the securities class action litigation closest to *Newby* in the amount of recovery, Professor Coffee reports that the plaintiffs recovered $6.133 billion and that the fees ($336.1 million) amounted to 5.5% of the recovery. # 5821 at ¶ 22. But Professor Coffee distinguishes the two cases: in the *WorldCom* litigation, counsel recovered only 2.9% of the decline in market capitalization, for a total of $6.133 billion; Lead Counsel in *Newby* not only recovered $7.23 billion, 1.1 billion more than in *Newby*, but in percentage of market capitalization loss, 8.3% versus 2.9%. # 5821 at ¶¶ 27–28, including Table 4, chart entitled Comparative Settlement Recoveries/Fee Awards. Professor Coffee calculates that only 20.9% of the recovery in *WorldCom* was distributed to shareholders, with the rest (79.1%) going to note purchasers based on Sections 11 and 12(a)(2) claims under the Securities Act of 1933 against the underwriter defendants. *Id.* at ¶ 29 & n. 3. Thus the *WorldCom* claims were largely strict liability claims. In contrast, the *Newby* Lead Counsel recovered almost six times as much for shareholders, with claims largely under § 10(b), in the face of higher risk where the issuer, Enron, was bankrupt. *Id.* He explains that most of the claims in *WorldCom* were under Sections 11 and 12(a)(2), which "essentially shift the burden of proving non-negligence to the defendants and require no allegation of scienter," while *Newby* was "essentially a Rule 10b–5 action" in which the scienter of each defendant had to be pleaded with particularity and plaintiff must prove reliance.[50] *Id.* at ¶ 30. He also found that "the fraud in *WorldCom* was simple," as was the accounting, while *Newby* "involved the murkiest depths of contemporary accounting

theory," allowing secondary defendants to "more plausibly assert that they had not known of the fraud and could not be expected to have discovered it." *Id.* Each bank defendant involved different facts and different transactions.[51] Moreover, he points out that in the *Dynegy* litigation (H–02–1571, Order Awarding Attorney's Fees and Reimbursement of Expenses, # 5817 (Compendium of Exhibits), Ex. C at 1), Judge Lake approved essentially the same type of 8% to 9% to 10% increasing percentage-of-the-recovery fee formula to the same firm as that requested in this case. # 5821 at ¶¶ 22, 44.

Professor Coffee comments, "Ultimately, the role of an expert witness in a class action fee determination is modest. The ultimate decision belongs to the Court. But expert testimony can inform the court by pointing out relevant comparisons and empirical data." # 5821 at ¶ 7. He fulfills that role not just in his *WorldCom/Newby* comparison, but with objective evidence to demonstrate why Lead Counsel's fee request is reasonable.

First Professor Coffee relies on the "most complete analysis of fee awards in securities class actions" by National Economic Research Associates ("NERA"), an economics consulting firm, to determine whether the percentage agreed to by Lead Plaintiff and Lead Counsel was reasonable at the time the agreement was made. *Id.* at ¶¶ 14–17, citing Frederick C. Dunbar, Todd S. Foster, Vinita M. Juneja, Denise N. Martin, *Recent Trends III: What Explains Settlements in Shareholder Class Actions?* (NERA, June 1995) ("Nera Study"). That NERA study concluded, "Regardless of case size, fees average approximately 32 percent of the settlement." *Id.* at ¶¶ 16–17 (and supporting Table).[52] He also reports the results of a study by

**50.** Lead Counsel points out that only one bank, Citigroup, faced § 10(b) liability in *WorldCom*. *See, e.e.,* # 5931 at 4.

**51.** Lead Counsel explains that this factor affected staffing, requiring "a separate team

complete with senior lawyer leadership for each bank." # 5907 at 59.

**52.** This study has been updated. *See* Denis M. Martin, et al., *Recent Trends IV: What Explains Filings and Settlements in Sharehold-*

Vincent O'Brien, *A Study of Class Action Securities Fraud Cases, 1988–1996 (1996) ("the O'Brien Study"),* which found the average fee to be 32%, and reported some other studies finding as much as 40%. In paragraph 22 of his Declaration, Professor Coffee presents a table of lodestar multiplier data in recent mega-fund litigation since 1990, with recoveries of over $100 million, expressed as percentages that ranged from 1.7% to 30%. In ¶ 24 he produces a table of the largest antitrust class action recoveries, with fee awards ranging from 6.5% to 35.1% In ¶ 27, he reports comparative settlement recoveries, the percentage of market capitalization recovered, and the percentage that constitut-

ed the fee award (for class actions including *WorldCom, AOL Time Warner, Nortel I, Royal Ahold, Dynegy, Raytheon, Waste Management,* and *Global Crossing,*) with fee percentages ranging from 6% to 21.4%.

The following chart can be found in the Declaration of Helen Hodges, # 5818, ¶¶ 292–94 and Exhibit 5.[53] It lists post-PSLRA securities fraud class action cases with settlements at or above $400,000,000, listed in order of the highest settlement to the lowest, before Enron and demonstrates that shows that Lead Counsel's requested 9.52% fee falls below the middle range of other percentage awards, which vary from 1.73% to 21.4%, with the average percentage being 11.61%.

## TOP SECURITIES SETTLEMENTS

| Case Name | Settlement Amount | Lodestar | Fee Award | Fee Award % | Stage of Case Upon Settlement | Pages of Documents Reviewed | Dep-os |
|---|---|---|---|---|---|---|---|
| WorldCom | $6,133,000,000 | $83,183,238.70 | $336,100,000.00 | 5.48% | Various | 10,000,00 | 41 |
| Tyco | $3,200,000,000 | $172,069,355.65 | $464,000,000.00 | 14.5% | Class Cert state | 83,500,000 | 220 |
| Cendant | $3,186,000,000 | $8,000,000.00 | $55,000,000.00 | 1.73% | Class Cert state | 1,000,000 | 0 |

*er Class Actions,:* 5 Stan. J.L. Bus. & Fin. 121, 141 (1999). It also concluded that fee awards averaged approximately 32% of the settlement.

**53.** A shortened version of this chart, including only the top cases, was submitted by Financial Counselors for Enron Plans with their objections to the fee request, # 5869 at 5. The information and these cases are discussed in *In re Tyco International Ltd. Multidistrict Litigation,* 535 F.Supp.2d 249, (D.N.H.2007) (page numbers not yet available). In four of the five most recent megafund settlement cases there are lower percentage fee awards, but *Tyco* stands out in contrast.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| AOL/Time Warner | $2,650,000,000 | $39,973,056.76 | $147,500,000.00 | 5.57% | Merits discovery | 15,500,000 | 0 |
| Nortel I | $1,142,000,000 | $16,655,971.00 | $34,283,259.29 | 3.00% | Class Cert state | 2,000,000 | 12 |
| Nortel II | $1,039,811,504 | $17,429,370.30 | $83,184,920.32 | 8.00% | Class Cert stage | 10,000,000 | 0 |
| Royal Ahold | $1,088,732,241 | $50,858,606.25 | $130,647,868.95 | 12.00% | Class Cert stage | 15,000,000 | 0 |
| McKesson | $960,000,000 | $31,160,000.00 | $74,784,000.00 | 7.79% | Merits discovery | 2,000,000 | 65 |
| Cardinal Health | $600,000,000 | $18,378,123 | $107,580,000 | 18% | Merits discovery | 7,200,000 | 0 |
| Lucent | $517,000,000 | $20,244,296.58 | $87,890,000.00 | 17.00% | Class Cert stage | 3,000,000 | 0 |
| Bankamerica | $484,551,469 | $28,805,990.75 | $86,416,085.14 | 17.83% | expert disc completed | 1,500,000 | 75 |
| Dynegy | $474,000,000 | $10,162,041.75 | $41,359,818.00 | 8.73% | expert disc completed | 1,200,000 | 19 |
| Raytheon | $460,000,000 | $13,160,578.00 | $41,400,000.00 | 9.00% | Trial | 1,000,000 | 45 |
| Waste Mgmt. II | $457,000,000 | $6,842,457.00 | $36,240,100.00 | 7.93% | Motion to Dismiss | 700,000 | 12 |
| Adelphia | $455,000,000 | $33,686,468.00 | $97,370,000.00 | 21.40% | Amended Complaint | 1,500,000 | 0 |
| Global Crossing | $448,000,000 | $28,242,915.18 | $72,470,000.00 | 16.04% | Merits Discovery | 270,000 | 0 |
| Freddie Mac | $410,000,000 | $35,353,394.50 | $82,000,000.00 | 20.00% | Class Cert stage | 6,700,000 | 78 |
| Qwest | $400,000,000 | $18,547,453.65 | $60,000,000.00 | 15.00% | Class Cert stage | 9,000,000 | 60 |
| Totals | $24,105,095,214 | $632,753,317 | $2,038,226,051 | | | 171,070,000 | 627 |
| Average | $1,339,171,956 | $35,152,962 | $113,234,781 | 11.61% | | 9,503,888 | 37 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Enron (proposed) | $7,227,390,000 | $127,000,000.00 | $688,000,000.00 | 9.52% | Various | 70,000,000 | 370 |

The Court finds that this chart makes clear that a number of quite variable factors are relevant to the issue of reasonableness, not merely the actual amount of the fee or the percentage of the settlement fund it constitutes, but also considerations such as the stage of the litigation, the number of documents reviewed, and the number of depositions taken. These in turn are affected by factors not on the chart, including the number of parties involved, the number of causes of action and

their legal complexity, the length of the class period, and the variety of different kinds of securities covered. The comparison justifies the requested fee award in a number of categories: the unmatched size of the recovery ("the most critical factor"), the late stage of the litigation, and the extensive document and deposition review.

In addition, there are copies of orders of fee awards in these top securities cases attached to the Hodges Declaration as Exs. A–O. She also provides a chart comparing settlements in non-securities class actions, where the percentage ranges from 6.51 to 35%. *Id.* at ¶ 294. Again, Lead Plaintiff's requested 9.52% is not out of the range of reasonableness.

In sum, the Court finds that Lead Plaintiff has met its burden to demonstrate that the 9.52% fee is fair and reasonable in comparison with those awarded in similar litigation.[54]

## B. Alternatively, Lodestar Cross–Check

As noted, the Court believes that the percentage method is the proper one for determining a fee award in a common fund case under the PSLRA where a properly chosen Lead Plaintiff at the beginning of the case has negotiated an arm's length fee agreement with Lead Counsel. Furthermore, all the policy reasons for utilizing the percentage method in common fund cases apply with extra force here where the billing records of Class Counsel firms for more than six years are voluminous.

Nevertheless, should this Court's determination be appealed and should the Fifth Circuit decide that the lodestar method should have been used, as either a cross-check or as the only means by which to determine a reasonable fee award, this Court provides the following analysis. The Court's review of the *Johnson* factors not only supports the requested award under the lodestar method, but also the reasonableness of the fee under the agreement.

### 1. The Lodestar

For purposes of a lodestar determination (*id.*, ¶¶ 295–96), the Declaration of Helen Hodges also presents two charts: (1) one summarizing the time expended by attorneys and paraprofessionals at Coughlin Stoia in this litigation (248,803.91 hours resulting in a firm lodestar of $113,251,049) (*Id.*, Ex. 1); and (2) one summarizing the time spent by Lead Counsel

---

**54.** This Court further observes that in *Shaw v. Toshiba America Info. Sys., Inc.,* 91 F.Supp.2d 942, 972 (E.D.Tex.2000), Judge Heartfield wrote,

> Empirical studies show that, regardless whether the percentage method of the lodestar method is used, fee awards in class actions average around one-third of the recovery. The evidence concerning fee awards in mega-fund cases is more limited since there are fewer such cases to study. However, this court is aware that awards of fifteen percent (15%) of the recovery or more are frequently awarded in these cases. Several mega-fund settlements in the Fifth Circuit and Texas have involved fees of fifteen percent (15%) or more. *See In re Shell Oil Refinery,* 155 F.R.D. 552 (E.D.La.1993) (eighteen percent (18%) of $170 million); *In re Combustion,* 968 F.Supp. 1116 (W.D.La.1997) (thirty-six percent (36%) of $127 million); *In re Lease Oil Antitrust Litigation (No. II),* 186 F.R.D. 403 (S.D.Tex. 1999) (twenty-five percent (25%) of more than $190 million); *Weatherford Roofing Co. v. Employers National Insurance Co.,* No. 91–05637–F, 116th Judicial District (Dallas) (thirty percent (30%) of $140 million); *see also In re NASDAQ Market–Makers Antitrust Litig.,* 187 F.R.D. 465 (S.D.N.Y.1998) (awarding fee of fourteen percent (14%) of $1 billion). Given these guiding principles and the size of the class settlement at issue in this case this Court concludes that fifteen percent (15%) is the appropriate percentage for application of the percentage method in this case.

and co-counsel, as well as each firm's total lodestar, collectively 289,593.35 hours for an overall lodestar of $131,971,583.20, over six years (Ex. 2). Moreover, pursuant to a Court order, Lead Counsel has filed, in two parts, a Compendium of Time Records (# 5959 and 5960, with an Addendum, # 5991), which Lead Counsel states are contemporaneous and not reconstructed.[55] To these records several supplemental objections have been filed (# 5962 (Lawrence Schonbrun on behalf of Brian Dabrowski), # 5963 (Peter Carfagna on behalf of Rita Murphy Carfagna & Peter A. Carfagna Irrevocable Charitable Lead Annuity Trust U/A DTD 5/31/96), # 5967 (Rinis Travel Service Inc. Profit Sharing Trust U.A. 06/01/1989 and Michael J. Rinis, IRRA), # 5964 (George S. Bishop, Jill R. Bishop, Lon Wilkens, and Betty Willkens)), and Lead Counsel has filed a response (# 5974) to these additional challenges. Co-counsel[56] have also submitted Declarations in support of their fee and expense requests. *See, e.g.,* # 5799, 5800, 5813, 5825, 5826, 5827, 5828, 5829, 5830, 5831, 5832, 5833, 5834, 5835. This Court does not profess to have scrutinized every entry in the records, but has scanned them, focusing on various specific parts, to get a general idea of counsel's billing practices in this litigation.

▮ The requested average or blended hourly rate for Coughlin Stoia is $456 per hour. # 5818, ¶ 296. To compensate for delay in receiving fees, counsel have properly used their current billing rates. *Missouri v. Jenkins*, 491 U.S. at 283–84, 109 S.Ct. 2463. They seek fees for 289,593.35 hours, for a lodestar of $131,971,583.20, and a multiplier of 5.2.

As evidence demonstrating this hourly rate is in accord with prevailing market rates for big firms in this forum, the Declaration of Lead Counsel's attorneys' fee expert, Kenneth Moscaret, who has served as a fee consultant and expert witness on the reasonableness of legal fees and the propriety of attorney billing practices since 1991 and advised on over 150 large fee disputes,[57] relying on December 2007 survey of the *National Law Journal* ("*NLJ*")[58] (# 5911 at 14–17 and Ex. F),

---

**55.** *See* # 5974 at 1.

**56.** Lead Counsel's aggregate fee request includes fees submitted by the following: Berger & Montague, P.C.; Joseph A. McDermott, III; Beirne, Maynard & Parsons, LLP; Law Offices of Bernard M. Gross, P.C.; Schwartz, Junell, Greenberg & Oathout, LLP; Scott + Scott LLP; The Bilek Firm; Cuneo Gilbert & LaDuca; Genovese Joblove & Battista; Wolf Popper; and Shapiro Haber & Urmy LLP. See Hodges Declaration, # 5818, Ex. 2 for chart identifying hours and lodestar of each firm. Each of the firms has filed some form of a fee petition with supporting documentation.

**57.** # 5911 at 1–8.

**58.** Mr. Moscaret explains that the *NLJ*, "perhaps the leading legal newspaper in the U.S.," issues this survey annually and he considers it "the most authoritative survey of its kind in the legal marketplace." # 5903 at 14. (Mr. Moscaret's qualifications, detailed in his Declaration, demonstrate to the Court that he

is highly qualified to testify about attorneys' fees and market rates.) He states that it is "the *only* published survey in the country, to my knowledge that identifies specific big law firms by *name* in specific cities, and discloses their specific rates for partners and associates." *Id.*

Among other courts that this Court has found that have relied in part on one of these annual *NLJ* surveys as evidence of prevailing hourly rates in their community for similar services by lawyers of reasonably comparable skill, experience and reputation are the following: (1) *Yurman Designs, Inc. v. PAJ, Inc.,* 125 F.Supp.2d 54, 58 (S.D.N.Y.2000), *aff'd,* 29 Fed.Appx. 46 (2d Cir.2002); (2) *Yamanouchi Pharmaceutical Co., Ltd. v. Danbury Pharmacal, Inc.,* 51 F.Supp.2d 302, 305 (S.D.N.Y. 1999), *dismissed under Fed. R.App. P. 42,* 230 F.3d 1377, 2000 WL 125737 (Fed.Cir.2000) (Table, Text in Westlaw, No. 99–1521, 99–1522); (3) *Howes v. Medical Components, Inc.,* 761 F.Supp. 1193, 1196 (E.D.Pa.1990); (4) *Harb v. Gallagher,* 131 F.R.D. 381, 386 (S.D.N.Y.1990); (5) *Purdy v. Security Savings*

presents a chart (*id.* at 15–16) that Mr. Moscarat created showing the rates charged by the big firms in the Houston/Dallas area that were listed in the annual survey.[59]

| NAME OF LISTED LARGE TEXAS LAW FIRM (Houston/Dallas) | PARTNER RATES 2007 | ASSOCIATE RATES 2007 |
|---|---|---|
| Andrews Kurth 396 attorneys/Houston | $400–$795 | $210–$460 |
| Gardere Wynne Sewell 284 attorneys/Dallas | $350–$715 | $220–$425 |
| Locke Liddell & Sapp 421 attorneys/Dallas (now Locke Lord Bissell Liddell) | $375–$900 | $190–$390 |
| Strasburger & Price 178 attorneys/Dallas | $225–$560 | $200–$395 |
| Thompson & Knight 414 attorneys/Dallas | $370–$730 | $205–$370 |
| Winstead 306 attorneys/Dallas | $345–$620 | $180–$360 |
| **OVERALL AVERAGE RATE RANGES AMONG LISTED FIRMS** | **$344–$720** | **$200–$400** |
| Coughlin Stoia Rate Ranges | $335–$725 [60] (partners/of counsel) | $195–$505 (associates/ contract attorneys) |

Moscaret maintains that this chart [61] shows that (I) Lead Counsel's partner/of in the securities class action litigation field" and (2) because Moscaret assumed [but did not know] that "the *NLJ* survey's big firm partner rates were based upon the hourly rates charged by the ***vast majority of partners*** in those listed firms." # 5903 at 16 n. 15.

& *Loan Ass'n*, 727 F.Supp. 1266, 1272 (E.D.Wis.1989); and *Padgett v. Com'rs, Somerset Co.*, No. Civ. HAR–85–3190, 1989 WL 49159, *6 n. 5 (D.Md. May 2, 1989).

In their Reply (# 5907), Lead Counsel cite the following opinions by courts finding that the *NLJ* "is a reliable and appropriate source in assessing reasonable hourly rates": *Entertainment Software Ass'n v. Granholm*, No. 05–73634, 2006 U.S. Dist. LEXIS 96429, at *7–8 (E.D.Mich. Nov. 30, 2006); *Chin v. Daimler-Chrysler Corp.*, 520 F.Supp.2d 589, 608–09 (D.N.J.2007); and *Citizens Ins. Co. of America v. KIC Chemicals, Inc.*, 2007 WL 2902213, **6–7, 2007 U.S. Dist. LEXIS 73201, at *18–19 (D.Mich. Oct. 1, 2007).

59. These law firms are the only large firms in Houston and Dallas that were listed in the 2007 survey.

60. Mr. Moscaret did not include "William Lerach's 'superstar' $900 per hour" (1) because Moscaret "considered it an aberration compared to the rest of Lead Counsel's partner rates in this case" even though that rate might be "Lerach's true market rate in 2007

61. As another source of comparison in addition to Mr. Moscaret's *NLJ*-based chart of the hourly rates of top Texas firms, the Court has examined the submissions of the Houston, Texas Co–Class Counsel in support of their fee requests. The rates of Coughlin Stoia, though acting as Lead Counsel rather than local counsel and although a larger firm, are not very different, indeed generally within the same range. The Bilek Law Firm, L.L.P., reports hourly partner rates ranging from $400 to $600, while an associate charges $200 per hour and a paralegal rate is $125. # 5827 at 6. Federman & Sherman requests attorneys' fees ranging from $375 to $550 per hour, and paralegal fees at $145.00. # 5835, Ex. 1. Schwartz, Junnell, Greenberg & Oathout, LLP, requests partner fees between $495 and $595 per hour, associates between $225 and $275 per hours, and paralegals, $150 per

counsel rates fit squarely within the prevailing rates at big firms in Houston/Dallas; and (ii) Lead Counsel's associate/contract attorney rates are within the range of reasonableness for prevailing associates at big firms in Houston/Dallas. Mr. Moscaret explains that he included some of Lead Counsel's "of counsel" attorneys in the same category as partners because these attorneys had partner-level skills and law practice experience. *Id.* at 15. Moreover, with few exceptions, the vast majority of its contract attorneys in this case had associate-level skills and experience, so he placed them in the associate rate category.[62] *Id.*

For example, Mr. Moscaret points to the following contract attorneys as very skilled, experienced, partner-level attorneys who had previously worked as associates at Coughlin Stoia and who did not require as much supervision as younger contract attorneys.

First, Shawn Hays, admitted to the California bar in 1988 and had previous trial experience, took more than thirty fact depositions in the underlying case and took some of defendants' experts' depositions. # 5911 at 40; see also # 5909 (Supplemental Declaration of Helen Hodges) at 4, 22–23; see also Lead Counsel's Reply, # 5907 at 27.

Second, Rajesh Mandlekar, admitted to the California bar in 1998, was initially in solo practice, where he represented plaintiffs in several class actions, then became an associate with the firm from September 2001–05, and then rejoined the firm on a contract basis to work on the *Enron* litigation. # 5911 at 40; # 5909 (Supplemental Declaration of Helen Hodges) at 4–5; # 5907 at 27. Mandlekar had jury trial experience in a securities fraud class action against a Fortune 500 company in 2004, moved to Lead Counsel's Houston office for this litigation, prepared opposition briefs to defendants' summary judgment motions in 2006, worked on settlement strategy with some defendants, and was listed in the joint pretrial order as second or third chair on Lead Counsel's trial team. # 5911 at 40; # 5903 at 40; # 5907 at 27; # 5909 at 4–5.

Another contract attorney, Jerrilyn Hardaway, a Texas-licensed, former antitrust litigator in Houston, proficient in computer systems and technology, with Coughlin Stoia partner Paul Howes created Lead Counsel's internal document/deposition management protocols for the dozens of law firms participating in the case around the country, and built and managed the ESL website for service on all participating law firms. # 5903 at 45; # 5909 at 23–25. She also drafted and ne-

---

hour. # 5830, Ex. A. Beirne, Maynard & Parsons, LLP's attorneys appear to request from $225 to $350 per hour, while the paralegal bills $165–$170 per hour. While these local counsel firms are highly respected, none provides "services by lawyers of reasonably comparable skill, experience and reputation" as Coughlin Stoia. *Blum v. Stenson*, 465 U.S. at 895–96 n. 11, 104 S.Ct. 1541.

**62.** Lead Counsel represent their average hourly rate for partners is $630; for associates, $437; for of counsel and special counsel, $643; for contract attorneys, $346; with an average rate for lawyers of all levels of experience and paralegals, $456. Exhibit 1 of Helen Hodges's Declaration states that $18,109,738 of the claimed lodestar was generated by contract attorneys. Ex. F to # 5875. The Bishop Objectors speculate, without evidence, that most of these contract attorneys presumably worked in the case-specific Houston litigation center, with no continuing education, mentoring or other investment by the firm in their professional development. Objectors also complain that rates for several associates and contract attorneys are substantially higher than the rates for certain partners. Three partners billed at rates of less than $400 per hour, while fourteen associates and four contract attorneys billed at rates of $400 per hour or higher. The Court finds that Mr. Moscaret's Declaration explains and justifies these rates.

gotiated what became the Document Discovery Order, participated substantially in document review and organization, and prepared for, took and defended depositions. *See also* # 5909 (Supplemental Declaration of Helen Hodges) at 4–5; see also # 5907 at 26–27.

Helen Hodges identifies another contract attorney in the New York Office of Milberg Weiss, Allen Hobbes, who worked on this case at the beginning, reviewing SEC filings, media reports, the Powers Report and Congressional hearing transcripts. # 5909 at 5. He worked with Lead Counsel attorneys in San Diego and New York, analyzing facts regarding the structure of investment banks and researching anticipated legal issues; he then drafted discovery requests to the investment banks and to the Enron board of directors and prepared witness files for depositions. *Id.* He also researched and drafted oppositions to motions to dismiss, worked on the document database with partner Paul Howes and Ms. Hardaway, worked on a parallel case against JP Morgan Chase in Judge Rakoff's court in New York. *Id. See also* # 5907 at 27–28.

Mr. Moscaret also explains that the great majority of Lead Counsel's contract attorneys were recent graduates from the University of Houston Law Center, who all passed the Texas Bar exam and were recruited, interviewed and hired directly by Coughlin Stoia partner Paul Howes, and thus were junior associates who required and were accorded extensive supervision and control, especially by Mr. Howes. # 5903 at 40–44 (describing in detail Mr. Howes' supervision and mentoring of these attorneys in Lead Counsel's Houston office), 45–47.[63]

This Court notes that the hiring of a contract or temporary attorney is a common practice in law firms today.[64] *See, e.g., Takeda Chemical Industries, Ltd.,* Nos. 03 CIV 8253(DKC), 04 CIV 1966(DLC), 2007 WL 840368, *7 (S.D.N.Y. March 21, 2007) (Cotes, J.) ("In complex litigation, contract attorneys are routinely used by well-established law firms who supervise their work."). A contract attorney is one hired "to work on a single matter or a number of different matters, depending upon the firm's staffing needs

**63.** In their Reply, # 5907 at 25–26, Lead Counsel states,

> In the middle of intensive document review and depositions, but prior to expert depositions, ten of the contract attorneys, each of whom billed 1900 or more hours, were added to the team prosecuting the case. They were hired and directly supervised by Coughlin Stoia partner Paul Howes in the Houston trial office. They performed the same tasks that associates with their level of experience did. They reviewed and analyzed documents to assist in fact depositions. They researched issues of law for briefs and trial preparation. They pulled documents requested by our experts. They took turns attending the Lay/Skilling criminal trial and researched evidence issues under the supervision of Roger Adelman, who is a very senior trial attorney brought in to assist in trial preparation. They researched and drafted portions of the pre-trial mo-

> tions, including the *in limine* motions. Throughout their time as contract attorneys, they responded to requests for assistance from Paul Howes and from the rest of the "core" team of attorneys who were in San Diego.... The only difference between them and regular associates with the firm was that they were hired for a limited time—specifically to prepare the *Enron* case for trial.

*Id.,* citing Hodges Supp. Decl. ¶ 7.

**64.** Objectors Debra Lee Silverio (# 5849), Peter Carfagna's Objections on Behalf of the Rita Murphy Carfagna & Peter A. Carfagna Irrevocable Charitable Lead Annuity Trust U/A DTD 5/31/96 (# 5852, 5963), and George S. Bishop, Jill R. Bishop, Lon Wilkens, Betty Willkens (# 5875) complain at length about the use of contract attorneys and support staff and the inclusion of their hours in the lodestar and multiplier calculations.

and whether the temporary attorney has special expertise not otherwise available to the firm. . . . . Economics is the principle reason for emergence of lawyer 'temping' because it permits a firm to service client needs during particularly busy periods by engaging an experienced attorney, without incurring the expense of hiring a permanent employee." George C. Rockas, *Lawyers For Hire and Associations of Lawyers: Arrangements that Are Changing the Way Law is Practiced,* 40 DEC B. B.J. 8 (November/December 1996). One who objects to their use should analyze "the types of tasks they performed in this case and whether their use in fact resulted in efficiencies. . . . [Bobjector] has failed to show that it was inappropriate for [plaintiff's] counsel either to use contract professionals in this case or to use them to the extent it did.". *Takeda,* 2007 WL 840368, at *7. The Court finds that the objectors here failed to do so.

The Court further finds that Lead Counsel has provided specific factual evidence that demonstrates that a number of its contract attorneys were experienced, skillful counsel, on the level of partner or senior or junior associate, and that the others were carefully supervised and mentored while engaged in legal work. Thus the Court finds that the objections by George S. Bishop, Jill R. Bishop, Lon Wilkens, Betty Willkens (# 5875), Peter Carfagna (# 58520), and Debra Silverio (# 5849) to Lead Counsel's use of contract

attorneys and the inclusion of their fees in the lodestar are without merit.

 Furthermore, "[t]oday it is not uncommon for an employing law firm to pay the temporary lawyer at one rate and charge that lawyer's services to the client at a higher rate that covers overhead and a contribution to firm profits." Kathryn M. Fenton, *Use of Temporary or Contract Attorneys.* 13–FALL Antitrust 23, 24 (1998). *See also* Moscaret Declaration, # 5903 at ¶¶ 66–68. As for the complaints that Coughlin Stoia charged a higher rate for contract attorneys than it paid them, under ABA Formal Opinion No. 00–420, an attorney may bill the contract attorney's charges to the client as fees rather than costs when " 'the client's reasonable expectation is that the retaining lawyer has supervised the work of the contract lawyer or adopted that work as her own.' " *In re Wright,* 290 B.R. 145, 153 (Bkrtcy.C.D.Cal. 2003), citing ABA Formal Opinion No. 00–420. Here Lead Counsel has presented evidence that the "associate-level" contract attorneys, all of whom were licensed to practice by the relevant bar, were very carefully supervised, especially those who were newly licensed in Houston.

While there is not much case law addressing the question whether the charges of contract lawyers and paralegals may be billed separately as attorney's fees at a higher rate than the law firm pays them,[65] the reasoning in the Supreme Court's interpretation of 42 U.S.C. § 1988,[66] a fee-

---

**65.** Lead Counsel's average hourly rate for contract attorneys is listed as $346. Exhibit 1 of Helen Hodges's Declaration states that $18,109,738 of the claimed lodestar was generated by contract attorneys. Ex. F to # 5875.

The Bishop Objectors argue that contract attorneys are typically paid between $25–45 by their employers, who in turn bill the client law firms approximately $50 per hour per attorney. According to Exhibit F, the hourly rate requested by Lead Counsel for the listed contract attorneys ranged from $195 to $500,

adding up to $18,109,738 of the claimed lodestar. The Bishop Objectors maintain that only the actual cost of these contract attorneys should be billable to the class, that these costs should be "expenses," not included in the lodestar and not subject to a multiplier.

**66.** Section 1988 provides in relevant part,

In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. § 1681, *et seq.],* . . . [or] title VI of the Civil Rights Act

shifting statute, in *Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463 (1989) (affirming in a desegregation case the district court's compensation of "the work of paralegals, law clerks [67] and recent law graduates at market rates for their services, rather than at their cost to the attorneys"), appears to this Court to support an affirmative answer for any reasonable fee award in a common fund case if the particular facts regarding their services justified such billing. Justice Brennan, writing for the majority, observed that it is "self-evident" that "reasonable attorney's fee" as used in § 1988 "should compensate the work of paralegals, as well as the of attorneys." *Id.* Given the established rule that a reasonable attorney's fee is "one calculated according to prevailing market rates in the relevant community," i.e., "'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation,'" Justice Brennan opined that the same principle should apply to the "'increasingly widespread custom of separately billing for the services of paralegals and law students who serve as clerks.'" *Id.* at 285–86, 109 S.Ct. 2463. The high court noted that "separate billing appears to be the practice in most communities today." *Id.* at 289 & n. 11, 109 S.Ct. 2463. *See also In re Tyco International, Ltd.*, 535 F.Supp.2d 249, 272 (D.N.H.2007) (Compendium, # 5817 at Ex. P) ("An attorney, regardless of whether she is an associate with steady employment or a contract attorney whose job ends upon completions of a particular document review project, is still an attorney. It is therefor appropriate to bill a contract attorney's time at market rates and count

these time charges toward the lodestar."); *Sandoval*, 86 F.Supp.2d at 609 (fees of contract attorneys and paralegals are separately compensable based on prevailing market rates for the kind and quality of their services, and included in the lodestar), *citing Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229; *De-Hoyos*, 240 F.R.D. at 325 (fees for legal assistants, paralegals, investigators and non-secretarial support staff are included in the lodestar). Regardless of whether the attorney includes the paralegal's charges in his own hourly rate or bills them separately, the court must examine those charges against the prevailing market rate for comparable paralegals' services. 491 U.S. at 286, 109 S.Ct. 2463. *See also Sandoval v. Apfel*, 86 F.Supp.2d 601, 610 (N.D.Tex.2000) (discussing *Missouri v. Jenkins* and stating, "The determining factor for whether law clerk and paralegal fees can be compensated at separately-billed market rates depends on the practice of the relevant market"). Finally, and important here, the Supreme Court "reject[ed] the argument that compensation for paralegals at rates above 'cost' would yield a 'windfall' for the prevailing attorney." *Missouri v. Jenkins*, 491 U.S. at 286, 109 S.Ct. 2463. It noted that it knew of no one who "ever suggested that the hourly rate applied to the work of an associate attorney in a law firm creates a windfall for the firm's partners or is otherwise improper under § 1988 merely because it exceeds the cost of the attorney's services. If the fees are consistent with market rates and practices, the 'windfall' argument has no more force with regard to paralegals than it does for associates."

---

on 1964 [42 U.S.C. § 2000d et seq.], . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . .

**67.** The "law clerks" in *Missouri v. Jenkins* were "generally law students working part time." 491 U.S. at 277, 109 S.Ct. 2463. Moreover, the Supreme Court referred to law clerks and paralegals collectively as "paralegals." *Id.* at 284, 109 S.Ct. 2463.

*Id.* Moreover, "[b]y encouraging the use of lower cost paralegals rather than attorneys wherever possible", permitting market-rate billing of paralegal hours "'encourages cost-effective delivery of legal services ....'" *Id.* at 288, 109 S.Ct. 2463. The Court finds that the same reasoning applies to contract attorneys and that prevailing counsel can recover fees for their services at market rates rather that at their cost to the firm.

Mr. Moscaret also investigated why the upper end of Lead Counsel's associate/contract attorney rate range ($505) was higher than the average upper-end rate ($400) for associates at big firms in Houston and Dallas, although still, in his opinion, within the range of reasonableness. *Id.* at 16–17. He reports,

I discovered the following facts:

(a) there were 16 Lead Counsel associates/contract attorneys overall who billed at rates in excess of $400, which was less than one-in-three (*i.e.,* 28%) of the total group of 57;

(b) there were 11 Lead Counsel associates/contract attorneys who billed at rates from $300–$400 per hour, or about one-in-five (*i.e.,* 19%) of that total group of 57;

(c) however, of greatest significance to me, there were 30 Lead Counsel associates/contract attorneys who billed at rates from **only** $200–$300 per hour, which was **more than half** (*i.e.,* 53%) of that overall group of 57

.... From the above data, it was clear that nearly three-fourths of all Lead Counsel associates/contract attorneys (*i.e.,* billed at rates **below** the average upper-end rate of $400 per hour for associates) at big firms in Houston/Dallas .... More importantly, **over half** of all Lead Counsel associates/contract attorneys actually billed at the **lower** end (*i.e.,* from $200–$300 per hour) of the big-firm associate rate range for Hous-

ton/Dallas .... I concluded that, on balance and viewed broadly, Lead Counsel's associate/contract attorneys rates were reasonable in relation to the big-firm Houston/Dallas market .....

*Id.* at 17.

Moscaret also examines the fee request for "efficient" case staffing, i.e., using as few attorneys as necessary doing as much of the legal work on a case as possible. # 5903 at 23. In a large complex case like this one, he looks for "a tight compact litigation team of attorneys doing the majority of the work on the case," i.e., "core" attorneys billing at least 75% of the hours on the case. *Id.* at 24. His investigation found that 67.4% of the total attorney hours (204,687.06) were performed by a "core" Coughlin Stoia litigation team of 14 partners, associates and contract attorneys, "close enough" to the 75% threshold for him to recommend that Lead Counsel be given the benefit of the doubt regarding reasonableness and efficiency of its overall case staffing. *Id.* at 24–25. He also identifies and discusses in detail other indicia demonstrating reasonableness and efficiency of overall staffing in this litigation, including an appropriate mix of attorneys for the demands of a complex litigation, reasonable delegation of work flow, continuity of case staffing, the hiring, use, supervision and control of contract attorneys. *Id.* at 25–47.

As noted, the lodestar is calculated by multiplying number of hours reasonably expended by an appropriate, reasonable hourly rate in the community for such legal services rendered by attorneys of comparable skill, experience, and reputation. The lodestar may then be adjusted by application of the *Johnson* factors. As observed earlier, "novelty and complexity of the issues," "the special skill and experience of counsel", the "quality of the representation," and "the results obtained" from

the litigation are presumably already encompassed in the lodestar and therefore should generally not be used to enhance the award; the Fifth Circuit has held that "[e]nhancements based upon these factors are only appropriate in rare case supported by specific evidence in the record and detailed findings by the courts.'" *Walker*, 99 F.3d at 771, *citing Alberti v. Klevenhagen*, 896 F.2d 927, 936 (enhancements based on these four factors are only appropriate in rare cases supported by specific evidence in the record) (*citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air ("Delaware Valley I")*, 478 U.S. 546, 564–65, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)) (*quoting Blum v. Stenson*, 465 U.S. 886, 898–900, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). *See also DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 323–24 (W.D.Tex.2007) ("[I]t is permissible to adjust a lodestar by *Johnson* factors considered within the original lodestar calculation if the case is rare and exceptional and if 'supported by both specific evidence on the record and detailed findings by the lower courts.'") (*citing Shipes*, 987 F.2d at 320).

## 2. Application of the Johnson Factors

### a. *time and labor required*

*Johnson v. Georgia Highway Express, Inc.* instructs, "The trial judge should weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities." Before becoming a judge, this Court had twelve and a half years of trial experience involving complex oil and gas and energy litigation at Exxon Corporation. Subsequently the Court served as a state court judge for one and a half years, and has been on the federal bench for eighteen and a half years. While a District Judge, the Court has also sat by designation on the Fifth Circuit Court of Appeals several times. During its tenure as a federal judge, this Court has presided over numerous complicated cases in varied areas of law, including patent, construction contract, criminal RICO, Constitutional issues, and federal securities violations. This Court has personally overseen this entire litigation, and because of its experience as both a lawyer and a judge, for purposes of a reasonable fee award the Court believes it is competent and in a unique position to assess the time, staffing, skill, and commitment that was necessary to bring this complex, highly contentious, securities-fraud lawsuit involving highly qualified lawyers representing very sophisticated individuals and entities, including seven of the largest financial institutions in the world.

Helen Hodges' Declaration, # 5818 at ¶¶ 18, 18. 295, 296 and Exs. 1 & 2, states that up to and including December 15, 2007, Coughlin Stoia expended 248,803.91 hours, which, added to the hours expended by co-class counsel, equaled 289,593.35, multiplied by the requested hourly rate of $456, yields an overall lodestar of $131,971,583.20. The Court finds that Ms. Hodges' Declaration accurately details the progression of this action. *Id.*

Although this litigation has been ongoing for over six years, the substantial record (demonstrated by approximately 6,000 entries on the *Newby* docket sheet as of this time), the sheer number of responses to motions to dismiss and motions for summary judgment, often addressing cutting edge legal issues, the extensive briefing and demanding, heightened standards applied to each, not to mention the multitude of other motions, and the technical and factual complexity of the issues demonstrate that Lead Counsel has vigorously, tenaciously, and efficiently prosecuted this suit. Lead Counsel also expended enormous energy and effort on class certification issues on the district court level,

before the Fifth Circuit, and before the United States Supreme Court in both this action and the related *Stoneridge* case. Moreover, it was preparing for imminent trial when the Fifth Circuit decertified the *Newby* class. Those delays that have occurred have been occasioned not by Lead Counsel, but by the numerous related criminal prosecutions of Defendants or by the Court and its small staff's being overwhelmed by the submissions of so many highly competent attorneys on behalf of so many and such varied Defendants regarding such a vast array of complicated issues, many with little or no precedent.

Coughlin Stoia reports that its lawyers and support staff spent over 247,000 hours prosecuting this case. Hodges Decl., # 5818 at ¶ 17. Among their many diligent and skilled efforts in pursuing as large a recovery as possible for the proposed class, the Court notes that they drafted two massive consolidated class action complaints that thoroughly impressed this Court in the detail, breadth and depth, of their allegations, reflecting extraordinary investigatory effort, especially in light of the stay on formal discovery and the complexity of the scheme. They timely responded to numerous, complex motions to dismiss and motions for summary judgment from varied defendants with very different concerns and defenses and prevailed on most. Needless to say, the fact and expert discovery in this action was extensive, but was tightly controlled and was expertly and professionally handled by nearly all participating counsel. Lead Counsel played a significant role in orga-

nizing that discovery, coordinating the Deposition Scheduling Committee, establishing the deposition scheduling protocol, and establishing document depositories in Houston and in New York, where the Enron bankruptcy proceedings were also monitored.

Coughlin Stoia represents under oath that it did not "over-staff" the case, with just one attorney attending most of the fact depositions. Hodges Declaration, # 5818 at ¶ 169 (charting all depositions and Coughlin Stoia attorneys attending them).[68] Nor did they duplicate work already done in the government's and Bankruptcy Examiner Neal Batson's investigations, but instead used those results to streamline their depositions and reduce the number of hours they otherwise would have spent. Genovese Decl. at ¶ 25. *See also* Declaration of Kenneth M. Moscaret (# 5903 at 43–44, ¶ 77(e)) (Lead Counsel's expert on reasonableness of attorneys' fees and propriety of billing practices) ("I saw Lead Counsel usually sent only *one* attorney, less often two attorneys, to virtually every one of the several hundred fact depositions taken in the case. This kind of lean deposition staffing showed impressive restraint by Lead Counsel. Because fact depositions were such a costly, time-consuming aspect of this case, the lean deposition staffing was one strong indicia to me of generally acceptable litigation management practices and a reasonable attitude toward billing on the part of Lead Counsel."). See also Hodges Decl., # 5818 at ¶¶ 169, 214; Lead Counsel's Reply, # 5907

68. Objectors Larry Fenstad and Dorothy McCoppin assert that "it was apparently not uncommon for three or more attorneys from Lead Counsel to attend each deposition". # 5868 at 10 (all objections made by Fenstad and McCoppin are joined by class member Nasser Pebdani, # 5877). Ms. Hodges lists the hundreds of depositions taken (# 5818 at 92–100 and 119–20), of which only two were attended by three Coughlin Stoia attorneys; most were attended by only one firm attorney. Lead Counsel labels as "simply false" the statement by Objectors Larry Fenstad and Dorothy McCoppin objection. # 5907 at 19, citing Hodges Declaration, # 5818 at ¶¶ 169 (including chart of all depositions), ¶ 214 (chart of expert depositions).

at 19 (of the 472 depositions listed in Helen Hodges' Declaration, "there are only **two** where three lawyers appeared" and "no depositions where more than three attorneys from Lead Counsel appeared," while *"only one* attorney from Lead Counsel appeared at most of them.").

This Court finds that in this six-plus-year, complex litigation, it would have been impossible to prosecute this action without a large number of attorneys, sometimes with multiple attorneys, appearing at the same court hearings or depositions. Indeed the number of counsel appearing for the Defendants was substantially higher, proportionately, at these events. Lead Counsel inevitably used a number of professional staffers, but the evidence reflects it was a well organized group, a "core" team that followed the litigation through, avoiding having to bring newcomers "up to speed," and distributed work appropriate to different levels of experience and expertise. Given the sophisticated and complex nature of this action, the Court finds that Lead Counsel's heavy use of experienced and skilled partner-level attorneys was appropriate.[69] The Court finds that the evidence does not indicate overstaffing, but instead reflects a most efficient use of staff.

Judge Sarokin, who has had significant experience in such matters, commented, "I would have expected the lodestar amount to be significantly higher, which to me, demonstrates Lead Counsel was extremely efficient in handling this case, for which they should be rewarded-not penalized" by a reduction in the requested multiplier. Sarokin Decl., # 5819 at ¶ 33. This Court agrees that Lead Counsel has achieved a top quality result with speed, efficiency, skill, and vigorous advocacy in a litigation of extraordinary complexity and risk, and that the lodestar request is reasonable.

The time-and-labor factor is usually encompassed within the lodestar and therefore not used to enhance the lodestar. Nevertheless, that factor under the facts here certainly does support as reasonable an award in accord with the 9.52% agreement made at the beginning of the litigation.

b. *novelty and difficulty of the issues*

It is undisputed, and the record of this case demonstrates clearly, that the issues here, both factual and legal, were extremely complex and very frequently novel or had minimal precedent, and that what authority existed was frequently in conflict. Such difficulties "generally require more time and effort on the attorney's part. . . . . [H]e should not be penalized for undertaking a case which may 'make new law.' Instead, he should be appropriately compensated for accepting the challenge." *Johnson,* 488 F.2d at 717. Moreover, in the course of this litigation, various binding, higher-court decisions on issues such as causation, pleading, or proof at the class certification stage made Lead Plaintiffs' pursuit of a recovery, and indeed, individual investors' securities actions under the PSLRA generally, increasingly difficult. The most obvious example is the main theory of the case under § 10(b) and Rule 10b–5(a) and (c), scheme liability based on conduct of mostly secondary parties, the only deep pockets available here. That the viability of this theory, which was supported by the SEC and thirty-three State

---

**69.** Objector Debra Lee Silverio (# 5849) complains that over 37% of time billed by Coughlin Stoia was incurred by only five senior partners (Box, Hodges, Howes, Lerach and Park) whose rates ranged from $600 to $900 per hour. The Court finds that the complexity of this litigation required substantial involvement of experienced and knowledgeable attorneys. Moreover, as discussed, the use of a core group of attorneys throughout the litigation was cost-efficient.

Attorneys General, was challenged all the way to the Supreme Court in the *Stoneridge* case, where it was resolved by a 5–3 split in favor of defendants, with Justice Breyer not participating and with a strong dissent written by Justice Stephens, reflects the uncertainty and the significance of the issue. The number and nature of *amicus curiae* briefs that were filed in *Stoneridge* by prominent authorities, experts, and public servants, including the thirty-three State Attorneys General, attest to the considerable disagreement regarding the reach of the statute and Rule 10b–5 and demonstrate that Lead Plaintiff's was not a frivolous pursuit. Though only partially successful, Lead Counsel are to be commended for their zealousness, their diligence, their perseverance, their creativity, the enormous breadth and depth of their investigations and analysis, and their expertise in all areas of securities law on behalf of the proposed class. The difficulty and the risk, to be discussed *infra,* warrant a substantial fee award.

### c. *skill required to perform legal services properly*

"The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." *Johnson,* 488 F.2d at 718.

Leaving aside the complexity of the legal and factual issues, to which the record in this case attests, and the heightened pleading standards imposed on these securities claims, the Court finds that the fraud here was so skillfully concealed by Defendants that it took years for top experts to unravel the complicated transactions and obfuscations. Moreover, the extraordinary number and variety of parties and witnesses involved, spread across the country if not the world, required yeoman efforts to investigate, locate, interview, and depose. Of course the size of the recovery, $7.227 billion, almost entirely from second-ary-actor banks because of the bankruptcy of Enron and, in essence, the dissolution of Arthur Andersen LLP, speak to extraordinary litigating and negotiating skill, perseverance, power, and influence of Class Counsel. Furthermore, they had to litigate against a large number of the best firms in the country for multinational financial institutions, which had essentially unlimited resources.

The Court finds that in the face of extraordinary obstacles, the skills, expertise, commitment, and tenacity of Lead Counsel in this litigation cannot be overstated. Not to be overlooked are the unparalleled results, $7.2 billion in settlement funds, which demonstrate counsel's clearly superlative litigating and negotiating skills. These qualities, constantly challenged by highly experienced and skilled defense attorneys from the best firms in the country, are subsumed in the lodestar. Nevertheless, counsel's skill in conjunction with the eighth *Johnson* factor, the amount involved and results obtained, support as highly reasonable the 9.52% percentage fee in the agreement.

### d. *preclusion of other employment*

Lead Counsel states that the time spent on this case could have been devoted to other matters. As observed by Judge Sarokin, "[B]ased on the time commitment of plaintiff's counsel, as evidenced by the hours they have provided and the quality of the attorneys involved, it is apparent that Lead Counsel and their co-counsel were committed. With the time commitment involved, it would have been virtually impossible not to forego other work in order to prosecute this case with the vigor that is evidenced in the pleadings and declarations I have read." # 5819 at 16.

This factor supports the requested percentage fee here. Nevertheless, for purposes of the lodestar check, the Court

finds that this factor is subsumed in the lodestar, with the exception of one area: the substantial financial burden on Lead Counsel, pursuant to the agreement with the Regents, to advance what became $40 million in expenses [70] without any guarantee of recovery of fees for such an extended period, had to affect the firm's ability to take and subsidize other cases. This substantial risky financial commitment supports use of a multiplier.

### e. *customary fee*

A customary fee pursuant to a fee agreement in an action brought under the PSLRA that results in a common fund is a "reasonable" percentage of the recovery. The Court has determined from the evidence that the negotiated 9.52% was a reasonable fee in a securities class action at the time the agreement was made, indeed lower than that awarded in most contingency class actions.

As for a lodestar cross-check, the Fifth Circuit has opined, "A reasonable hourly rate is determined with reference to the prevailing market rate in the relevant legal community for similar work. . . . While the hourly rate must be 'adequate to attract competent counsel,' the 'measure is not the rates which lions at the bar may command.' " *Coleman v. Houston Independent School District*, 202 F.3d 264, 1999 WL 1131554 (5th Cir.1999) (Table) (available on Westlaw), *citing Leroy v. City of Houston*, 906 F.2d 1068, 1079 (5th Cir. 1990). The Court has found the requested hourly rate reasonable under the prevailing rate in the Houston legal community based on evidence provided by Mr. Moscaret and local Co–Counsel. From its own

familiarity with the litigation as well as its perusal of the billing records submitted by Lead Plaintiff, it also finds the lodestar reasonable, given evidence in the record of lean staffing and efficient distribution of tasks to appropriate level staff. The Court, like Judge Sarokin, expected a higher lodestar.

This Court considers Coughlin Stoia "a lion" at the securities bar on the national level. Lead Counsel's outstanding reputation, experience, and success in securities litigation nationwide were a major reason why the Regents selected the firm. While that factor may not support increasing the hourly fee beyond prevailing local levels for plaintiffs' lawyers with similar experience and practice, it does serve to justify an upward adjustment if the local customary fees were substantially lower than the fee Coughlin Stoia easily commands in the securities market nationally. This Court finds that there is no comparable Houston firm on par with Coughlin Stoia in securities class action litigation. Because Lead Counsel's fearsome reputation and successful track record undoubtedly were substantial factors in Lead Counsel's obtaining these extraordinary recoveries at a time when the reach of § 10(b) was being challenged by financial institutions and others in courts around the country, the Court finds the customary fee factor warrants application of a multiplier.

### f. *whether the fee is fixed or contingent*

Regardless of whether the percentage in the fee agreement is honored or the Court awards a fee under the lodestar method, it is undisputed that Class Counsel have worked on a contingency. If Class Coun-

---

**70.** Regarding expenses, between August 2004 and November 2007, years into the litigation, Lead Counsel requested and the Court approved, as reasonable and necessary, partial expense reimbursements of approximately $39.5 million from "Expense Funds" established within the overall settlement fund for Lead Counsel's and co-counsel's ongoing expenses, such as investigators, court reporters, hotels, transportation, document storage, etc. # 2366, 4083, 4741, 5172, 5367, and 5761.

sel were not successful, they risked losing everything. They invested enormous numbers of hours of service and dollars "up front."

As discussed above, the holding in *Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449, that enhancement of the lodestar by a multiplier based on the contingent nature of a fee is not allowed when fees are awarded to plaintiffs' counsel under fee-shifting provisions of statutes, does not apply to common fund cases.

As discussed *supra*, the contingent fee agreement placed the financial risk, which was substantial, completely on Lead Counsel and their co-counsel. Declaration of H. Lee Sarokin, # 5819 at 15, Indeed, Professor Coffee states that the approximately 280,000 hours expended by the Regents' attorneys and the advancement of over $45 million in expenses "[i]n all likelihood ... represents the largest investment ever made in a single securities class action. More importantly, this investment of time and money was not made by a broad consortium of plaintiffs' firms all sharing the risk. Rather, of the total lodestar, which I understand to be in excess of $127.5 million, the Coughlin Stoia firm (and its predecessors) accounted for over $112 million of this amount (or nearly 90%) ... entirely at its own risk, without any promise or hope of reimbursement unless it was successful in high stakes and high risk litigation." # 5821 at 5. Given the complexity, the uncertainty of the law, the legal hurdles, the number and variety of defendants, the multifarious types of fraud, the size and caliber of the defense, and the length of this litigation, the Court finds that not only is the 9.52% fee request reasonable, but a "deal."

Moreover the Court finds that the exceptional obstacles to recovery that were present here, discussed *infra*, and the remarkable success obtained by Lead Counsel's skill and experience make this a "rare and exceptional" case warranting the application of the requested 5.2 multiplier under a lodestar cross-check or enhancement under a lodestar analysis.

First, there was no obvious deep pocket source available from which to seek any recovery. Issuer and primary violator Enron Corporation was in bankruptcy. Professor John C. Coffee points out in his Declaration (# 5821 at ¶¶ 2, 30, and 31) that in most of the "mega-fund" class action settlements, the issuer defendants (including Tyco International, Royal Ahold N.V., Nortel, AOL Time Warner, McKesson, HBOC, Lucent, Bank of America, Dynegy, Inc., Raytheon Co., and Waste Management, Inc.) were solvent and able to pay large settlement amounts. He further notes that "securities class actions are seldom filed when the issuer is bankrupt." # 5821 at ¶ 30, citing Cornerstone Research, *2006: A Year in Review* (2006) at 19 (reporting that no securities class actions were filed subsequent to the issuer's bankruptcy in 2006 and only 8 such lawsuits were filed in 2005). Furthermore, Enron's auditor, Arthur Andersen, LLP, was criminally prosecuted and convicted, and despite the Supreme Court's reversal of that conviction based on jury instructions, was ultimately reduced to a small operation unable to pay any significant amount for the recovery. Numerous individual officers and directors of Enron were also criminally prosecuted and their assets seized by the government, eliminating additional potential recovery. Others had limited resources.

Enron's D & O policies were "wasting" insurance policies: they covered directors and officers for defense and litigation costs as they were incurred, as well as for payment of any settlement or judgment against them. Under such policies, as the litigation goes on, payment of defense costs can drain the fund, leaving little or

no money for coverage of settlements or judgments against these defendants.[71] Enron's D & O insurance policy coverage was $350 million dollars, amount was significantly depleted by competing demands defense fees for its officer and director defendants, many of whom were also sued by the SEC, by Enron's estate in the Bankruptcy Court, and by the government in criminal actions, not to mention by the *Tittle* ERISA plaintiffs. Indeed these competing actions further threatened to reduce the recovery from any defendant by the *Newby* plaintiffs. Recovery under these insurance policies was additionally hampered by the policies' exclusions from coverage of "deliberate and dishonest acts." As a result of all these factors, third parties were the only remaining sources for a significant recovery.

Moreover, the PSLRA and recent court interpretations of the statute made the risk of dismissal substantial, even from the initial pleading and from pre-discovery motions to dismiss. *See generally* Declaration of H. Lee Sarokin, # 5819 at 12–13.

The heightened pleading standards of the PSLRA incorporate Rule 9(b)'s fraud pleading standard (the plaintiff must specify the alleged fraudulent statement, the speaker, when and where the statements were made, and why they are fraudulent), require the complaint to identify each misleading statement and explain why it is misleading, and, if the allegation is made on information and belief, to assert with particularity all facts on which that belief was founded. 15 U.S.C. § 78u–4(b)(1); *ABC Arbitrage v. Tchuruk,* 291 F.3d 336, 349–50 (5th Cir.2002). In addition to these heightened pleading requirements and in-

creasing the difficulties of bringing suit, the PSLRA, 15 U.S.C. § 78u–4(b)(3)(B), mandates a stay on "all discovery and other proceedings" with narrow exceptions until after resolution of motions to dismiss. The plaintiff must also plead particular facts establishing a strong inference of scienter, i.e., intent to deceive or severe recklessness. *Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 407, 408 (5th Cir.2001). While these heightened pleading requirements apply to any securities case, they were unusually difficult to meet here in light of the complex accounting and sophisticated transactions that characterized Enron's fraudulent scheme and which took experts years to unravel. Pleading challenges (and ultimately burden of proof) increased during the course of this litigation with the Supreme Court's opinions in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (it is insufficient to allege that the price of the securities was inflated on the day of purchase; plaintiff must allege facts showing loss causation, i.e., that the defendant's material misrepresentation caused the plaintiff's actual economic loss), and *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (to plead a strong inference of scienter the plaintiff must not only plead with factual particularity, but also consider competing inferences and show that a strong inference of scienter is more than merely plausible or reasonable, indeed cogent and at least as compelling as any opposing inference).

Lead Plaintiff's ability to demonstrate liability of secondary actors was severely restricted by the Supreme Court's holding

---

**71.** *See, e.g., Liles v. Del Campo,* 350 F.3d 742, 745 (8th Cir.2003) (in a wasting policy "the value of the policy diminishes as funds are paid out .... Ongoing defense costs will continue to deplete the policy, and continued litigation threatens to drain the fund com-

pletely"); *IPSCO Steel (Alabama), Inc. v. Blaine Const. Corp.,* 371 F.3d 141, 144 (3d Cir.2004) (in a wasting policy, the "costs of defending legal actions could be deducted from the total amount of available coverage").

in *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), that there is no aiding and abetting liability under § 10(b).[72] Given this bar, Lead Plaintiff pursued and fought zealously for a novel theory of scheme liability under § 10(b) and Rule 10b–5(a) and (c) against the financial institutions based on acts and conduct of scheme participants, not only on material misrepresentations and omissions where there is a duty to disclose. This scheme liability theory was recognized by a few courts, i.e., the Ninth and Third Circuits and district courts in the Second Circuit and the Fifth Circuit, but not by the Fifth Circuit, itself, which had limited the reach of § 10(b) and Rule 10b–5 to a material misrepresentation or omission where there is a recognized duty to disclose.[73] *See, e.g., Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040 (9th Cir.2006), *vacated and remanded for further proceedings sub nom. Avis Budget Group, Inc. v. California State Teachers' Retirement Sys.*, —— U.S. ——, 128 S.Ct. 1119, 169 L.Ed.2d 945 (2008), *vacated and remanded for further proceedings pursuant to Stoneridge, Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir.2008); *Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 610 (6th Cir.2005); *In re Parma-lat Sec. Litig.*, 376 F.Supp.2d 472 (S.D.N.Y.2005); *In re Global Crossing Ltd. Sec. Litig.*, 322 F.Supp.2d 319 (S.D.N.Y.2004); *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392 (S.D.N.Y.); *SEC v. Hopper*, No. Civ. H–04–1054, 2006 WL 778640, *11–12 (S.D.Tex. Mar.24, 2006). It was also supported by the SEC. Moreover, the number of *amicus curiae* briefs in support of this theory submitted by prominent individuals and groups to the Supreme Court in the *Stoneridge* case indicates it was not a frivolous argument. *See, e.g.,* Declaration of Jonathan Cuneo (# 5828) at ¶¶ 56, 57, 59 (stating that *amicus curiae* briefs in support of scheme/conduct liability were filed in the *Stoneridge* litigation by (1) 30 State Attorneys General under joint leadership of the Texas Republican Attorney General and the Ohio Democratic Attorney General; (2) the North American Securities Administrators Association ("NASAA"), a national organization of state SEC's; (3) the Council of Institutional Investors, "the most important, prestigious investors' organization in the world, representing 130 pension funds with $3 trillion in assets"; (4) the American Association of Retired Persons ("AARP");[74] (5) House Financial Services Chairman Barney Frank and Judiciary Committee Chairman John Conyers, Jr.;

---

**72.** *See also* Expert Report of Professor Charles Silver, # 5822 at 55 ("The vast majority of the money comes from secondary defendants, the hardest parties to reach.").

**73.** *See, e.g., Regents of University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 384 (5th Cir.2007) (" '[D]eception' within the meaning of § 10(b) requires that a defendant fail to satisfy a duty to disclose material information to a plaintiff."), *cert. denied*, —— U.S. ——, 128 S.Ct. 1120, 169 L.Ed.2d 957 (2008); *Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657, 661 (5th Cir. 2004), at 661 (" 'To state a private securities fraud claim under § 10(b) and Rule 10b–5, a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstate-ment or an omission (2) of material fact, (3) made with scienter (4) *on which plaintiff relied* (5) that proximately caused [the plaintiff's] injury.' "), *quoting Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406–07 (5th Cir.2001) (emphasis in original).

**74.** Attorney Helen Hodges reports that thirty-three State Attorneys General participated in the *amicus curiae* brief. # 5818 ¶ 14, at 9. She declares that Coughlin Stoia worked hard and successfully to persuade NASAA, the Council of Institutional Investors, and Change to Win (a major labor organization), the AARP, the Consumer Federation of America, and several other large public pension funds and investor organizations to file *amicus* briefs in support of the defrauded investors. # 5818, ¶ 14 at 9.

(6) a bi-partisan group of former SEC officials, including President Bush appointees Chairman William Donaldson and Commissioner Harvey Goldschmid and President Clinton appointee Chairman Arthur Levitt, Jr.; and (6) although rejecting a request from the SEC to file such a brief after White House intervention, when the Solicitor General did file an *amicus* brief, it "adopted our view of fraudulent scheme liability," "said the Courts of Appeals, the Fifth and Eighth Circuit, were wrong on this liability issue," but "urged that 'eyeball' reliance by the victims on the conduct of the behind-the-scenes schemer was necessary for recovery.").

The United States Supreme Court in *Stoneridge Investment Partners, LLC, v. Scientific–Atlanta,* — U.S. —, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008), examined the issue of "when, if ever, an injured investor may rely upon § 10(b) to recover from a party that neither makes a public misstatement nor violates a duty to disclose but does participate in a scheme to violate § 10(b)." 128 S.Ct. at 767. The Supreme Court concluded, "Conduct itself can be deceptive"; there need not be "a specific oral or written statement before there could be liability under § 10(b) or Rule 10b–5." *Id.* at 769. It did not totally reject the scheme liability theory based on conduct, but suggested that to satisfy the reliance and causation elements of a § 10(b) claim, the deceptive conduct must have been disclosed to the public, and investors must have relied on it in purchasing or selling their securities. *Id.* at 770 (concluding that in the case before it, "respondents' deceptive acts, ... which were not disclosed to the investing public, are too remote to satisfy the reliance requirement.") *Id.*

As an additional substantial hurdle for Lead Counsel in deciding to pursue this case, the Fifth Circuit is a difficult venue in which to plead and prosecute securities class actions based on § 10(b) claims. For example, unlike many other courts the Fifth Circuit has rejected the group pleading doctrine. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 363–65 (5th Cir.2004) (group pleading doctrine "cannot withstand the PSLRA's specific requirement that the untrue statement or omissions be set forth with particularity as to each defendant" and "conflicts with the scienter requirement"). Many of the Financial Institution Defendants issued analysts' reports. The Fifth Circuit has made pleading § 10(b) liability based on such reports very difficult: to hold a corporation liable for such a report, the plaintiff must allege particular facts demonstrating not only why the statements in the report are false, but facts raising a strong inference of scienter (intent to deceive, manipulate, or defraud, or severe recklessness) in the individual who wrote the report. *Southland,* 365 F.3d at 366. As another example, despite the United States Supreme Court's long established rule that courts cannot "conduct a preliminary inquiry into the merits of a suit" on class certification,[75] in order to invoke a fraud-on-the-market presumption of reliance and to satisfy the loss causation element, the Fifth Circuit has decided that by the class certification stage of the litigation, the plaintiff bears the burden of demonstrating by a preponderance of all admissible evidence that the stock price actually moved because of the defendants' alleged misrepresentation or corrective disclosure. *See, e.g., Oscar Private Equity Investments v. Allegiance Telecom, Inc.,* 487 F.3d 261, 269, 264–66 (5th Cir. 2007) (at class certification for plaintiffs arguing for a presumption of reliance under the fraud on the market theory, "[w]e now require more than proof of a material

---

**75.** *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

misstatement; we require proof that the misstatement *actually moved* the market."), *citing Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657, 663, 665, 666 (5th Cir.2004) ("to trigger the presumption [of reliance] plaintiffs must demonstrate that ... the cause of the decline in price is due to the revelation of the truth and not the release of unrelated negative information," i.e., they must show that the stock price actually moved because of the defendant's alleged misrepresentation or corrective disclosure); *Unger v. Amedisys, Inc.* 401 F.3d 316, 323 (5th Cir.2005) (requiring "a complete analysis of fraud-on-the-market indicators" at class certification stage, including proof of market efficiency relating to the following nonexhaustive list of factors: the average weekly trading volume expressed as a percentage of total outstanding shares; the number of securities analysts following and reporting on the stock; the extent to which market makers and arbitrageurs trade in stock; the company's eligibility to file SEC registration Form S-3; empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in th stock price; the company's market capitalization; the bid-ask spread for stock sales; and float, the stock's trading volume without counting insider-owned stock.); *Nathenson v. Zonagen*, 267 F.3d 400, 414 (5th Cir.2001). Furthermore, in *Greenberg*, the plaintiff must not only show that the stock's price was affected by revelation of the falsity of earlier false statements, but also "(1) that the negative 'truthful' information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline." 364 F.3d at 666.

Furthermore, certification of a class was an uphill battle from the start in the Fifth Circuit, even though securities fraud actions are frequently viewed as appropriate for class prosecution. The Fifth Circuit is wary of the power of class actions and requires a plaintiff to prove more at pretrial stages of the litigation, as summarized in its recent pronouncements in *Oscar Private Equity*, 487 F.3d at 267 ("We cannot ignore the *in terrorem* power of certification, continuing to abide the practice of withholding until 'trial' a merit inquiry central to the certification decision, and failing to insist upon a greater showing of loss causation to sustain certification, at least in the instance of simultaneous disclosure of negative news.... [A] district court's certification order often bestows upon the plaintiffs extraordinary leverage, and its bite should dictate the process that precedes it.").[76] In decertifying the class in *Newby*, the Fifth Circuit stated, "The necessity of establishing a classwide pre-

**76.** As evidenced in the record, the appellate court reversed this Court's certification of the *Newby* class, ruling that there was no *Affiliated Ute* presumption of reliance on the bank defendants' behavior or omissions because the banks had no duty to investors to disclose the allegedly fraudulent nature of their transactions, and there was no fraud-on-the-market presumption of reliance because plaintiffs did not allege that the bank defendants made any public and material misrepresentations. *Regents of University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1120, 169 L.Ed.2d 957 (2008). It concluded that plaintiffs had only alleged aiding and abetting in asserting that the banks' transactions allowed Enron to commit fraud by misstating its financial condition. *Id.* at 386. It further rejected as too broad the rule of the SEC adopted by this Court that primary liability attaches to any party that engages in a transaction with the principal purpose and effect of creating a false appearance of revenues. *Id.* at 386–87.

sumption of reliance in securities class actions makes substantial merits review on a Rule 23(f) appeal inevitable," *inter alia* because "class certification may be the backbreaking decision that places 'insurmountable pressure' on a defendant to settle, even where the defendant has a good chance of succeeding on the merits." 482 F.3d at 393. Indeed, the Fifth Circuit's decertification of the *Newby* class and rejection of the scheme liability theory make even more remarkable the exceptional settlement recovery through the litigating and negotiating skills and hard work of Coughlin Stoia. *See* Declaration of Judge Sarokin, # 5819 at 16 ("The adverse class certification ruling by the Fifth Circuit demonstrates the outstanding nature of the $6.6 billion recovery against [Citigroup, JP Morgan Chase, and CIBC] given that [the fraudulent scheme/conduct liability] theory was rejected by the appellate court.").

Another legal risk-related deterrent to taking on this action, especially given the involvement of so many parties in the Enron debacle, is the PSLRA's judgment reduction/proportionate liability provisions for § 10(b) claims. 15 U.S.C. § 78u–4(f). Section 78u–4(f)(2)(B) limit damages against a defendant "solely for the portion of the judgment that corresponds to the percentage of responsibility of that [defendant]" unless he knowingly violated the law, under which circumstance he would be jointly and severally liable for all the damages § 78u–4(f)(2)(A). Moreover, in effect it provides non-settling defendants with a judgment credit through the proportionate share formula. § 15 U.S.C. § 78u–4(f)(7)(B). The evidence required to establish first which parties are primarily liable, to which plaintiffs each defendant is liable, whether the defendant knowingly violated

the law, then proportionate liability where plaintiffs do not show a knowing violation, and then judgment reductions would be extensive and make prosecution extremely difficult.[77]

In sum, the risk factor not only supports the reasonableness of the 9.52% fee agreement, but warrants application of a significant multiplier for a lodestar analysis.

### g. *time limitations imposed by client or the circumstances*

While the Court is not aware of time limitations imposed by the Regents, given the number, nature, and size of the Defendants in this consolidated-and-coordinated-case litigation the Court itself imposed a very tight and demanding docket control schedule in this case, from the filing of the complaints, two rounds of motions to dismiss and responses in opposition, discovery and the Deposition Protocol. Lead Counsel performed admirably throughout.

### h. *amount involved and the results obtained*

It is undisputed that the $7.2 billion recovery for the benefit of the class is the largest in a securities class action, indeed of any class action, in history. *See, e.g.,* Declaration of H. Lee Sarokin, # 5819 at 14.

The United States Supreme Court and the Fifth Circuit have held that " 'the most critical factor' in determining the reasonableness of a fee award is the degree of success obtained." *Farrar v. Hobby,* 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), *quoting Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Migis v. Pearle Vision, Inc.,* 135 F.3d 1041, 1047 (5th Cir.1998) (". . . . Where recovery of private damages is the purpose, . . . consideration to the

---

**77.** The Court finds a remarkable commitment by Lead Counsel, especially when the view of commentators across the country that the

class was unlikely to recover more than a few cents on the dollar. *See, e.g.,* Expert Report of Professor Charles Silver, # 5822 at 42–43.

amount of damages awarded as to the amount sought represents the primary means to evaluate that concern.").

Thus the Court finds that the extraordinary recovery under extremely challenging circumstances not only supports the reasonableness of a 9.52% fee award, but also justifies, for a lodestar calculation, application of a significant multiplier.

### i. The experience, ability, and reputation of the attorney

The experience, ability, and reputation of the attorneys of Coughlin Stoia is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country. Indeed that factor was the main reason why the Regents hired Class Counsel. Coughlin Stoia's track record of significant victories is unparalleled and justifies the high hourly fees which they charge. After noting the extraordinary amount of time and money invested by Lead Counsel in an action based "on a novel legal theory, with little precedent to support it in a case that initially seemed both financially unpromising and difficult to settle," Professor Coffee proclaimed,

> [E]ven if other counsel could have developed the same original legal theory (and this is uncertain), only a law firm with Lead Counsel's reputation for zealous advocacy could have convinced the defendants that this case would be carried to trial (at whatever cost it took) and represented too great a risk for them not to settle. In addition, Lead Counsel was litigating literally against the cream of the American corporate law bar.... To sum up, in my judgment, few other counsel (and perhaps no other) could have obtained this degree of success.

Coffee Declaration, # 5821 at 5–6, ¶ 5.

Here too, the Court finds that the ninth *Johnson* factor supports the reasonableness of the 9.52% fee agreement.

### j. undesirability of the case

The quantity of lawsuits relating to Enron filed, the number of highly qualified law firms filing them, the enormous publicity surrounding the Enron debacle, and the support of the suit by the community locally and nationally, other than big business, attest to the desirability of the newsworthy *Newby* litigation. So do the number of class members and attorneys that applied for appointment as Lead Plaintiff and Lead Counsel, respectively.

Nevertheless, the risk of little or no recovery was high in the absence of any deep pocket defendant that had made a material misrepresentation or omission and the Lead Plaintiff's reliance on a novel theory for liability under § 10(b) and Rule 10b–5(a) and (c). Furthermore the cost of pursuing the named Defendants for such a long period was too great to be born by many firms.

The undesirability or financial risk supports the reasonableness of the fee agreement.

### k. nature and length of the professional relationship with the Regents

Before the Regents retained Coughlin Stoia in December 2001, Lead Plaintiff had never worked with Coughlin Stoia, but their joint efforts on this case were so effective and smooth that the Regents hired Coughlin Stoia to serve as Lead Counsel on the subsequent *Dynegy* litigation, where the fee agreement was structured similarly to the one here, at a slightly lower percentage (7.752%) for a much less complex action, and which Judge Lake enforced. The Regents also hired Coughlin Stoia to represent the Regents in an individual securities suit against AOL Time Warner, in which the Regents negotiated a 14.5% fee and received $200 million net of the fees. This increasing

relationship evidences the Regents' satisfaction with Lead Counsel's work and supports the reasonableness of the fee request.

### l. awards in similar cases

The result of a comparison of this case with others depends on how comprehensive a view one takes of post-PSLRA securities class actions, in particular of megafund class actions.

A review of more than just the five most recent mega-fund cases demonstrates that the requested fee award is below those standardly granted in this area of law. In addition to the evidence previously cited in this opinion, see, e.g., In re Charter Communications, Inc. Sec. Litig., No. MDL 1506, 4:02–CV1186 CAS, 2005 WL 4045741, *13–14 (E.D.Mo. June 30, 2005) (and cases cited therein) (20% fee falls below the average of fee awards and many megafund fee awards have exceeded 20% in securities class actions). Through experts and citations to various cases, Lead Counsel has presented evidence that in the broad or long view, the percentage of the settlement fund requested for fees in this case is not only reasonable, but well below most of those awarded in securities class actions generally.

Professor Coffee submits a chart of the largest class action settlements involving "mega fund" recoveries (over $100 million) since 1990, with their fee awards expressed as a percentage of recovery, to demonstrate that the agreed to 9.52% here is not only within the range, but quite low, and therefore very reasonable. Coffee Declaration, # 5821 at 16–18, Table 2. Professor Coffee also discusses a well known study, Stuart J. Logan, Dr. Jack Moshman, & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Reports 167–234 (March–April 2003) ("Logan Study"), in which the authors' data on fee awards in all class actions generally suggested that there had been an increase in the average percentage awarded as fees: in 1990 in their first study they found that in 404 cases the average percentage awarded was 14.8%, while in 2003, including those original 404 cases they found the average percentage to be 18.4%. # 5821 at 20. See also Cardinal Health, 528 F.Supp.2d at 765 & n. 11.[78]

Professor Coffee also addresses use of a lodestar cross-check to insure that a percentage fee award is reasonable. Observing that if we take the cumulative lodestar asserted here, over $127.5 million, and divide it into the requested fee award of approximately $688 million, the resulting lodestar multiplier would be 5.39%. Professor Coffee concludes that this number is "only marginally higher than the 4.50 average multiplier in settlements over $100 million." # 5821 at ¶ 32. He further reports that in Logan, Moshman & Moore, Jr., "Attorney Fee Awards in Common Fund Class Actions," 24 Class Action Re-

**78.** In Cardinal Health, in 2007 Judge Marbley summarized the Logan study:

The authors undertook a survey of the common benefit fee awards entered by state and federal courts between 1973 and the present, in 1120 cases. The authors also parsed the common benefit fee awards by size of recovery, type of case, and time of award. Among other things the authors found that: (1) when measured as a percentage of the total recovery, common benefit awards (including both fees and expenses) averaged:

(a) 18.4% across all 1,120 cases, (b) 15.1% across the 64 cases where the recovery exceeded $100 million, and (c) 16.1% across the 10 mass tort cases.

528 F.Supp.2d at 765. Judge Marbley looked to other post-PSLRA cases as a guide to determine a reasonable percentage of the fund for an attorneys' fee award and concluded that an appropriate fee would be between 15% to 20% of a $600 million settlement fund that provided a high percentage recovery for shareholders. Id.

ports 169 (March–April 2003), in cases where recovery was over $100 million, 4.5 was the average multiplier. *Id.* Moreover "multipliers above 4 have become relatively common over the last dozen years." *Id.* In support, in ¶ 33 in "Table 5: Recent Multipliers," he lists cases in which multipliers ranged from 3.97 to 9.3. *Id.* at ¶ 34 (and cases cited therein). Furthermore, "there has been a general recognition that multipliers in the range of 3 to 4.5 have become relatively 'common' " in cases with recoveries over $1 billion. *Id., citing In re NASDAQ Market–Makers Antitrust Litig.,* 187 F.R.D. 465, 489 (S.D.N.Y.1999) (awarding a 3.97 multiplier and finding fee awards of 3 to 4.5 to be "common"); *In re Sumitomo Copper Litig.,* 74 F.Supp.2d 393, 399 (S.D.N.Y.1999) (awarding a 27.5% fee on $134.6 million commodities fraud settlement and finding a 3 to 4.5% multiplier to be common); *In re Visa Check/MasterMoney Antitrust Litig.,* 297 F.Supp.2d 503 (E.D.N.Y.2003) (approving a 3.5 multiplier in a multi-billion dollar settlement that remains the largest antitrust class action settlement on record); and *Maley v. Del Global Technologies Corp.,* 186 F.Supp.2d 358, 368–69 (S.D.N.Y.2002) (finding a multiplier of 4.65 to be within the standard range in the Second Circuit.). Given the extraordinary risk in this case, he recommends that a multiplier in the 5–6 range would be justified, especially since "defendants have successfully resisted plaintiffs' attempts to reach trial." *Id.* at ¶ 35.[79]

In Lead Counsel's Memorandum (# 5816 at 60 n. 47), Lead Counsel cites several cases, copies of unpublished opinions included in the Compendium, where multipliers greater than 5 have been approved: *Waste Management, Inc. Sec. Litig.* ("*Waste Management I*"), H–99–2183, slip op. at 64 (noting the award of 7.9% of the settlement fund as fees was pursuant to parties' agreement and substantially lower than fees regularly awarded in the Fifth Circuit and approving a multiplier of 5.3) (Ex. B); *In re Cardinal Health,* 528 F.Supp.2d 752, 768 (S.D.Ohio 2007) (award of 18% and multiplier of 6) (Ex. Q); *In re Charter Communications, Inc. Sec. Litig.,* No. 4:02–CV–1186 CAS, 2005 U.S. Dist. LEXIS 14772, *56, 2005 WL 4045741 (E.D.Mo. June 30, 2005) (20% of $146,250,000 settlement fund and multiplier of 5.6); *Roberts v. Texaco, Inc.,* 979 F.Supp. 185, 198 (S.D.N.Y.1997) (16.66% of $115 million common fund and multiplier of 5.5); and *In re RJR Nabisco, Inc. Securities Litig.,* No. 88 Civ. 7905, 1992 U.S. Dist. LEXIS 12702, 1992 WL 210138 (S.D.N.Y. Aug. 24, 1992) (awarding 30% of $72.5 million with multiplier of 6.0). *See also Di Giacomo,* 2001 WL 34633373, at *10 (30% of $29.5 million fund and multiplier of 5.3).

The Court also notes that the Third Circuit in *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294 (3d Cir.2005), remanded the case for determination of an attorney's fee award after a partial settlement of a securities fraud action. The district court subsequently awarded a fee constituting 25% of the settlement fund, approximately $31.7 million, and found it reasonable even though it resulted in a lodestar multiplier of 6.96, because it involved the largest

---

**79.** This Court observes that Judge Marbley in *In re Cardinal Health Inc. Sec. Litig.,* 528 F.Supp.2d at 768, thoughtfully applied a multiplier of six:

> In this case, however, the Court is not uncomfortable with deviating from the normal range of lodestar multiplier, at least to some extent. Given the outstanding settlement in this case and the noticeable skill of counsel, a lodestar multiplier greater than the average would not be unwarranted or unprecedented.... Though [a multiplier of six times] is significantly above average, the Court finds this award reasonable under the circumstances.

recovery on record against an auditor in a securities fraud action ("a historic victory"), because counsel obtained unprecedented results without relying on the product of any official investigation, because the case was extremely complex and "victory at trial would have been, at best, remote and uncertain," and because counsel performed with great skill. *In re Rite Aid Corp. Sec. Litig.*, 362 F.Supp.2d 587, 590 (E.D.Pa.2005). Here, the amount recovered is greater, Lead Counsel has proffered evidence that it provided a roadmap for Bankruptcy Examiner Neal Batson's investigation in the Enron bankruptcy and contributed substantially to it, the case was even more complex, and counsel's representation was of the highest caliber.

Another of Lead Counsel's experts, Professor Silver, provides a chart showing the sliding scales (tying higher percentages to higher levels of recovery) agreed to in other cases prosecuted by Lead Counsel or one of its predecessors; they range from 14% to 27%, considerably higher percentages than that agreed to here. # 5822 at 57–58 (Table 5). He also submits a Table of Fees agreed to by institutional investors in other cases which objectors have cited as having reasonable fees; in all but one, the percentages promised exceed those agreed to by the Regents and Lead Counsel. *Id.* at 58–59 (Table 6). In addition Professor Silver cites two academic studies of post-PSLRA class actions in support of his view that the Regents' promised fee is not only reasonable, but "well below average for cases led by public institutional investors"): (1) Stephen J. Choi, Jill E. Fisch, and A.C. Pritchard, *Do Institutions Matter? The Impact of the Lead Plaintiff Provision of the Private Securities Litigation Reform Act*, 83 Washington U.L. Quarterly 869 (2005) (finding that fees averaged 30% of recovery in cases led by investors and private institutions and 25% in cases led by public institutions); and (2) Michael A. Perino, *Markets and Monitors:*

*The Impact of Competition and Experience On Attorneys' Fees in Securities Class Actions*, St. John's University School of Law, Legal Studies Research Paper Series, Paper # 05–0034 (Dec.2005) (studying "a random sample of 244 post-PSLRA securities fraud class actions entered into between April 1997 and May 2005, inclusive" and finding a mean fee of 20% in cases with public pension funds as lead plaintiffs. *Id.* at 59–60. Professor Silver also proffers a chart of fee awards in class actions generally, only some of which are securities suits, with settlements exceeding $100 million; the fee award percentages range from 25% to 36%. *Id.* at 62 (Table 7). Finally Professor Silver discusses two empirical studies of class actions generally: (1) Thomas E. Willging, *et al., Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 16 (1996) ("Willging Study"); and (2) Theodore Eisenberg and Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27. 75 (2004) ("E & M Study"). The Willging Study at 69 reported a remarkably consistent median fee award in class actions ranged from 27–30%. # 5822 at 63. The E & M Study, which included a larger, more diverse, and more recent group of cases, found that as the recoveries increased in size, fee percentages declined. *Id.* at 64. Professor Silver provides diagrams of fee awards, excluding expenses, from that study that demonstrate (1) in cases involving recoveries of $84 million or more, the average fee award equals slightly less than 20% of the recovery, with the rage defined by the first standard deviation extending upward to 27%; and (2) in cases with recoveries over $190 million, the mean is above 10% and a first standard deviation extends above 20%. Lead Counsel's requested 9.52% falls below the mean that the E & M Study

reports for the largest class settlements using either of these datasets. *Id.* at 65–66.[80]

Arguing that public policy supports granting the requested fee award in *Enron*, Professor Coffee quotes from Judge Denise Cote, *In re WorldCom, Inc. Sec. Litig.*, 388 F.Supp.2d 319, 359 (S.D.N.Y. 2005), and argues that her "comments apply at least as well here, where in my judgment, the risk was substantially higher":

> Public policy also supports the approval of this fee request. The size of the recovery achieved for the class which has been praised even by several objectors-could not have been achieved without the unwavering commitment of Lead Counsel to this litigation. Several of the lead attorneys for the Class essentially devoted years of their lives to this litigation, with the personal sacrifices that accompany such a commitment. If the Lead Plaintiff had been represented by less tenacious and competent counsel, it is by no means clear that it would have achieved the success it did here on behalf of the Class. In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives. After all, this litigation was conducted on an entirely contingent fee basis, and Lead Counsel paid millions of dollars to fund the litigation. While some significant recovery in a case of this magnitude may seem a foregone conclusion now, the recovery achieved here was never certain. It is only the size of the Citigroup and Underwriters' Settlements that make this recovery so historic, and it is likely that less able plaintiffs' counsel would have achieved far less.

*Id.* at ¶ 48. This Court finds these comments highly applicable to the instant case.

The Honorable H. Lee Sarokin, having independently reviewed Lead Plaintiff's and the attorneys working with the firm demonstrating that they spent approximately 280,000 hours at a time cost of $127 million and incurred expenses of approxi-

**80.** This Court observes that in *In re Cabletron Systems, Inc., Securities Litig.*, 239 F.R.D. 30 (D.N.H.2006), in a thoughtful discussion of different methods of awarding attorneys' fees, Judge Smith examined the same five statistical analyses of attorneys' fee awards in complex class actions, in particular in securities class actions (the Logan Study, the NERA Study, the Willging Study, the E & M Study, and the O'Brien Study). Although professing that he was "without the technical expertise or time to [fully] parse the available data," Judge Smith determined that the Logan Study found that "on average, attorneys' fees (plus judicially awarded expenses) equaled 18.4 percent of the settlement fund": that the NERA Study "concluded that fee awards averaged approximately 32 percent of the settlement"; that the Willging Study "indicated that the mean and median fee award was between 24 and 30 percent of the net monetary distribution to the class"; that the O'Brien Study concluded that from April 1993 to September 1996 "the average fee award to plaintiffs' counsel in securities cases amounted to 32 percent of the settlement fund"; and that the E & M Study, which "compiled and analyzed data contained in all previous studies of class action awards," "determined that the median fee in securities class actions is 25 percent, while the median fee in non-securities common fund cases is 30 percent." *Cabletron*, 239 F.R.D. at 41–42. Judge Smith decided to follow the Seventh Circuit's "market-oriented approach" and "craft a fee award approximating the result of an arm's length negotiation in real market conditions," and he used these percentages as part of his review to "arrive at a POF fee award that is well grounded in market-based information and it is therefore reasonable." *Id.* at 40–41.

This Court notes that Lead Counsel's requested 9.52%, without expenses included, is far below these percentages.

mately $45 million, found that "the hours spent on the case were necessary and reasonable in light of its complexity, importance, novelty, amount of motion practice, discovery and work involved in prosecuting a case for almost six years.... These figures are entirely appropriate in a complex and protracted case of this magnitude. In fact, I would have expected the lodestar amount to be significantly higher, which, to me, demonstrates Lead Counsel was extremely efficient in the handling of this case, for which they should be rewarded-not penalized." # 5819 at 14.

Moreover, as Professor Charles Silver remarked,

> The possibility that Lead Counsel exceeded The Regents' expectations by recovering $7 billion does not make the fee unreasonable. It just shows that the recovery is outstanding, which presumably delights all investors, and that Lead Counsel's outstanding work, which The Regents repeatedly acknowledge, will generate a superior fee. This is how contingent fee arrangements are supposed to work: lawyers who do better for their clients also do better for themselves.

# 5822 at 46. He quotes Judge Easterbrook in *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir.2001), in urging against capping fees in megafund cases at 10%: "Private parties would never contract for such an arrangement because it would eliminate counsel's incentive to press" for greater recoveries and would encourage cheap settlements. # 5822 at 67.

This Court notes that while some commentators argue that as the settlement recovery gets larger, the fee award percentage should decrease "because the magnitude of the recovery in many instances is due to the size of the class and 'has no direct relationship to the efforts of counsel,' "[81] Judge Barbadoro in the *Tyco* litigation presented the other side of the public policy coin on such a downward sliding scale with regard to the case before him:

> In this case, countervailing public policy considerations weigh against any reduction of the POF award. This was an extraordinarily complex and hard-fought case. Co–Lead Counsel put massive resources and effort into the case for five long years, accumulating nearly $29 million in yet-to-be reimbursed expenses and expending more than 488,000 billable hours (constituting a lode-star of over $172 million) on a wholly contingent basis. But for Co–Lead Counsel's enormous expenditure of time, money, and effort, they would not have been able to negotiate an end result so favorable for the class. Because Co–Lead Counsel's continued, dogged effort over the past five years is a major reason for the magnitude of the recovery, and because this case could not have reached a similarly satisfactory resolution earlier, public policy favors granting counsel an award reflecting that effort.

*Tyco*, 535 F.Supp.2d at 249[16].[82] Judge Barbadoro added,

> Without a fee that reflects the risk and effort involved in this litigation, future plaintiffs' attorneys might hesitate to be similarly aggressive and persistent when faced with a similarly complicated,

---

81. *In re Tyco International Ltd. Multidistrict Litig.*, 535 F.Supp.2d 249 (D.N.H. Dec.2007) (page numbers not yet available for pin citation), *citing In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions*, 148 F.3d 283, 339 (3d Cir.1998), *cert. denied*, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999), and *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302 (3d Cir.2005).

82. Page numbers not yet available for pin citation. Slip opinion is available at Compendium, # 5817 Ex. P.

risky case and similarly intransigent defendants.[83] ... But for cases like this one, in which a satisfactory settlement only became possible after years of hard-fought motion practice and searching discovery, it would be against public policy for me to set an unreasonably low POF award that would encourage future plaintiffs' attorneys to settle too early and too low. Additionally, approving this fee award is unlikely to open the floodgates to ever-higher levels of attorney compensation. Few cases will involve the combination of incredible legal and factual complexity, high risk, massive lodestar, and multi-billion-dollar recovery that characterized this case. Accordingly, I find it would be inappropriate to artificially reduce the percentage award based on the size of the recovery alone.

*Id.* This Court finds the same rationale is applicable to Class Counsel's extraordinary commitment here, where the complexity, duration, and risk were even higher than in *Tyco*.

Even from a narrow view of only the five most recent mega-fund cases, the percentage fee award in the *Tyco* litigation (14.5%) was greater than the 9.52% requested here. Moreover, in *Tyco* the company and the accountants were available and able to pay a judgment, so counsel did not have to pursue secondary actors through novel theories, making the risk here much greater. Lead Counsel has also shown that here there were more than 150 depositions over the number taken in *Tyco*. In addition, unlike this litigation in which Coughlin Stoia shouldered most of the economic risk of prosecuting the case, three firms shared such a burden in *Tyco*. *See, e.g.,* # 5907 at 60. Similarly, the Court has previously compared this case with *WorldCom* and identified the greater difficulties and the greater success here for shareholder class members.

In sum, in its lodestar cross check of the 9.52% fee agreement, the Court finds that while there are no other "similar" cases when one examines all the circumstances of the litigation, the requested lodestar is reasonable for this efficiently prosecuted case and a multiplier of 5.2 is warranted, given the unmatched size of the recovery, the obstacles and risks faced by Coughlin Stoia from the beginning, and the skill and commitment exhibited by counsel.

## III. Remaining Objections From Class Members and Attorneys

### A. Non–Objector Public Pension Funds

 Lead Counsel points out that in other mega-cases, public pension funds have objected to the attorney fees request. Lead Counsel's Reply, # 5907 at 1 and n. 2 (listing examples). Here, however, it is remarkable that not a single pension plan fund has objected to the fee request. Furthermore, only one institutional investor, the Fiduciary Counselors acting on behalf of the Enron Savings Plan and the Enron

---

**83.** Lead Plaintiff's expert on economic analysis of litigation and settlement, Professor Bebchuk, opines,

> [A] sliding [decreasing] schedule has it backwards. A sliding schedule provides counsel with a higher percentage of those initial settlement dollars that are relatively easy to obtain—and with a lower percentage of those dollars at high settlement levels that are relatively more difficult to extract. The sliding schedule thus concentrates the "firepower" of incentives in exactly the

wrong places. Most importantly, a sliding schedule # 5820 at 11. He concludes that "the goal of inducing investments by counsel would best be served by an increasing schedule ... [which] spends more compensation dollar on additional settlement dollars at higher settlement values that are relatively more difficult to achieve and for which stronger incentives can make a significant difference." *Id.* at 11–12.

Stock Option Plan ("ESOP"), has voiced objections (discussed *infra* ) to the fee request. *Id.* at 1. This Court finds that general acceptance of the requested fee amount by all the pension funds and all but one institutional investor strongly supports the reasonableness of enforcing the fee agreement.

### B. Objections To Issues Not Previously Addressed

#### 1. General Objections Made by Multiple Parties[84]

Several objections to the failure of counsel to provide time records have been cured. Lead Counsel have submitted their billing records (# 5959 and 5960)[85] pursuant to Court order and the objectors have had an opportunity to review them and to file additional objections.

A few letters from class members have complained of the small amount of money they will receive per share compared with the price they paid when they bought their Enron securities. In comparison to that small recovery, they find the amount of Lead Counsel's request for fees and expenses excessive.

Although the estimated losses to the Class exceed $40 billion, the Court finds that the settlement fund ($7.2 billion, and for Plaintiff class members, an average of at least $6.79 per share according to the disclosure in the Notice to the Class,[86] of their Enron investments) is remarkable in the face of the great obstacles to any recovery in this litigation. The typical recovery in most class actions generally is three-to-six cents on the dollar. *See, e.g., Cardinal Health,* 528 F.Supp.2d at 764, *citing* Elaine Buckberg, *et al., Recent Trends in Shareholder Class Action Litigation: Bear Market Cases Bring Big Settlements,* 8 (NERA, Feb. 2005). Thus despite significant impediments, the individual recovery here is beyond that range. Moreover 90% of the common fund here goes to the class members. Thus the Court overrules the objection.

#### 2. Individual Objections

##### a. Debra Lee Silverio

■■■ Debra Lee Silverio (# 5849) objects to Lead Counsel's average hourly rate of $457 per hour for all participants, including paralegals and associates.

The Court would point out that a blended hourly rate of all the firm's legal staff is commonly used in preparing fee requests. *See, e.g., Rite Aid,* 396 F.3d at 306 and nn. 14 and 15 (the billing rate should be a "blended billing rate that approximates the fee structure of all the attorneys who per-

---

84. A number of objectors have made conclusory complaints, e.g., that the requested fees are excessive or the multiplier too high, without offering any specific reasons, comparisons or established standards by which to measure the objection. For example, Mr. Fenstad and Ms. McCoppin assert the size of Lead Counsel's fee request "should shock the conscious [*sic* ] of this court." # 5868 at 7.

The Court addresses only those objections that are specific, not previously addressed, and supported by evidence or authority.

85. Supplemented by an Addendum (# 5991) with the time records of Chitwood Harley Harnes LLP and Cunningham Darlow LLP. Under these firms' agreement with Lead Counsel, their fees will be awarded from the amount the Court grants Lead Counsel and will not increase the burden on the class.

86. As pointed out by counsel, that number "assumes that everyone who can submits a claim. Given the number of different types of securities covered by the plan of allocation and the number of individuals and entities in the Class (about 1.5 million) it is highly unlikely that 100% of those eligible will make claims. Necessarily, the average distribution per share will go up under these circumstance[s]. But the math aside, the bottom line is that, given the risks and complexities in this case, the recovery is historic." # 5907 at 49.

formed legal work on the case"); *In re Cabletron Systems, Inc., Sec. Litig.*, 239 F.R.D. 30, 37 (D.N.H.2006) ("The lodestar method multiplies the hours reasonably spend by counsel by either a single blended hourly rate or several such representative rates for partners, associates, and paralegals . . . ."); *Fisher Scientific Inter., Inc. v. Modrovich*, No. Civ. A H–03–0467, 2005 WL 3348901, *10 (S.D.Tex.2005) (using blended rate for core team of senior partners, junior or mid-level partners, experienced associates, associates, and legal assistants).

Furthermore, Lead Counsel has also pointed out that the average hourly rate results from at least two factors: the rates charged and the staffing decisions made based on the complexity of the case. # 5907 at 60. Thus a rate "reflects the level of expertise and staffing mix required to achieve success in the face of the effort required and the complexity of that specific case." *Id.* The Court agrees with Lead Counsel that here the substantial risks, identified earlier, and the unquestioned complexities of this litigation, not to mention the high caliber teams of defense attorneys, required more experienced and specialized staffing and prosecution than the usual case, inevitably reflected in a higher hourly rate than in some other cases. As discussed previously, the Court finds Lead Counsel has adequately justified the rates that were charged for different members of the team.

Silverio, along with others, cites *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Albany*, 484 F.3d 162, 169, 164 (2d Cir.2007),(abandoning the term "lodestar" in favor of "presumptively reasonable fee," determined by considering all relevant factors including the *Johnson* factors and finding a reasonable hourly fee), i.e., "the rate a paying client would be willing to pay", *amended and superseded on denial of rehearing*, 493 F.3d 110 (2d Cir.2007), *amended and superseded*, 522 F.3d 182, 184, 192 (2d Cir.2008) (touchstone inquiry is "what a reasonable, paying client would be willing to pay," noting "the Supreme Court's emphasis on the need to use the approximate market rate for an attorney's service in calculating the presumptively reasonable fee," and opining that "the district court (unfortunately) bears the burden of disciplining the market, stepping into the shoes of the reasonable paying client, who wishes to pay the least amount necessary to litigate the case effectively").[87]

The Court responds that *Arbor Hill* was not a contingency-fee case in which risk and choice of a more qualified and expensive attorney that might optimize the likelihood of success must be assessed *ex ante* and not in hindsight; *Arbor Hill* was a "prevailing" party statutory-fee case based on the Voting Rights Act of 1965, 42 U.S.C. § 1973c, and reasonable fees under 42 U.S.C. § 1983, in which an attorney would be granted fees based on only the claims on which he prevailed at the going market rate. This Court has discussed at length the different factors and rationales informing the two types. *See also infra* discussion of Bishop Objectors. Moreover, Silverio has not cited, nor has the Court found, any court in the Fifth Circuit that followed *Arbor Hill*.

**b. Peter Carfagna's Objections on Behalf of the Rita Murphy Carfagna & Peter A. Carfagna Irrevocable Charitable Lead Annuity Trust U/A DTD 5/31/96 (# 5852, 5963)**

Peter Carfagna complains that Coughlin Stoia and all class counsel failed to include information about the identities of those

**87.** Larry Fenstad and Dorothy McCoppin, joined by class member Nasser Pebdani, # 5877, also argue the fee should be reduced under *Arbor Hill*.

submitting time requests, i.e., whether they were partners, associates, law clerks, paralegals, secretaries, contract attorneys, etc. Billing rates or total charges are not provided for some, while others are listed only by initials. Thus it is impossible to determine whether time claimed should be included in the lodestar calculations.

Lead Counsel finds this criticism "just plain wrong" and points to the relevant submissions: # 5818 (Hodges) at Ex. 1; # 5827 (Bilek) at 6; # 5835 (Federman) at Ex. 1; # 5828 (Cuneo) at Ex. B; # 5826 (Genovese); # 5835 (Greenberg) at A; # 5831 (Gross) at Ex. 1; # 5825 (Shapiro and Finkel) at Ex. 1; and # 5833 (McDermott) at Ex. 1 and # 5834 (Savitt), both for Berger & Montague, PC. *See also* # 5932 (Tartt) at Ex.B. The Court agrees. *See also* # 5909 (Hodges' Supplemental Declaration).

Carfagna challenges a few specific entries.[88] There are two entries on the first time sheet (at $240 per hour) for two hours each on the same day (August 13, 2001) for "printing SEC documents" # 5959 (2001 records) for T. Ron Gosling. Carfagna charges that these entries are an example of duplication, and he questions how often this occurs later in the records if it occurs in the first entry.

The Court finds this charge of duplication is pure speculation and emphasizes that the SEC played a central role in this litigation, in other related securities class actions, and in SEC enforcement cases against Defendants in this class action, and that the Court's test for scheme liability came largely from the SEC. There would

necessarily be numerous documents to be examined and a determination of which would be relevant and should be copied. The objection is overruled.

On page 1 of tab 2, of Coughlin Stoia's 2001 records, Carfagna objects to entries by Darren J. Robbins, whom Carfagna presumes is a partner since he billed at $650 per hour,[89] who claims to have spent four hours on September 12, 2001, 6 hours on September 13, 2001, and 6.5 hours on September 14, 2001, 6.75 hours on September 18, 2001, and 5.25 hours on September 19 in reviewing "first call" "media" and "SEC." Carfagna characterizes 29.50 hours on reviewing media "a bit excessive." # 5963 at 3. The Court disagrees. Numerous commentators began questioning Enron as a "secretive black box" early in 2001. After Jeffrey Skilling's abrupt resignation and the return of Kenneth Lay as CEO of Enron in August 2001, a flood of information addressing Enron's financial condition came out through the media. Moreover, as noted, the SEC was central to the development of Lead Counsel's case. Throughout this litigation the parties have frequently cited key articles in various major journals from 2000–2002, raising key questions about concealed financial information regarding Enron and providing unsettling disclosures about Enron's conduct that led to its collapse and bankruptcy.

Carfagna also complains that Robbins then spent 34.75 hours on September 24–27, 2001 drafting the Complaint against Enron. *Id.* at 2. Carfagna asks whether it is reasonable for a person to spend almost 65 hours doing this work at $650 per hour;

---

**88.** Lead Plaintiff's cursory dismissal of Carfagna's "criticisms of specific time entries by specific time keepers," as "display[ing] a stunning lack of knowledge about the myriad tasks required (and the amount of time it takes to perform them) to manage and effectively prosecute a case of this magnitude",

was not helpful to a lodestar examination. # 5974 at 13.

**89.** The Court notes that the records reflect that Darren J. Robbins was a partner at Milberg Weiss and participated in the litigation when Mr. Lerach, from the same firm, entered the fray.

with the requested 5.4 lodestar, this amounts to $228,150 for a draft of a complaint that was later reviewed by others who incurred additional charges. The Court disagrees and points out, as reflected in so many of its orders, how extremely difficult it is to plead a viable complaint under § 10(b) without any discovery and with the heightened standards of the PSLRA, not to mention the complexity and secrecy of Enron's fraudulent scheme, and that attorneys highly skilled in securities fraud class actions would be required. It also explains the necessity of Robbins' researching media articles to obtain more facts.

As another example, although Coughlin Stoia states that "time expended by certain Coughlin Stoia shareholder relations personnel who have spent a substantial amount of time responding to Enron Shareholder inquiries over the past six years was not included in the lodestar submitted with the January 4, 2008 filing, the time of those shareholder relations personnel *is* in the time records at tab 2 and the summary at tab 1." Compendium at n. 2. In the time record there is an entry on both January 5 and on 6, 2004 for Rick Nelson for exactly one hour ($240 each) of "shareholder calls." Tab 2 at 7. Carfagna questions whether Nelson spent exactly one hour on each of the two days on these calls. Carfagna further suggests that if *actually* expended, such time should be the cost of doing business at the firm and should not be included in lodestar calculations. The Court believes that most attorneys charge fees for the hours spent in consulting with their clients, and any firm filing a securities class action against Enron would have many of them in this class action, with a number of class representatives that required even more than usual contact. Two hours in consultation with shareholder/class members is hardly excessive on its face. This objection appears frivolous and petty to this Court and it is overruled.

Carfagna also questions the expenditure of even hourly amounts of time and seemingly duplicative hours and work of Michelle Ciccarelli and Patrick W. Daniels during September and October of 2001. # 5963 at 4. He complains the Ms. Ciccarelli repeatedly (7 times) documented hours calling clients to discuss the factual and legal basis of the case and calls to the custodian and attorneys to determine loss and analyze damages. Given the size and complexity of this action, and the fact that counsel were struggling to gather enough information to file a securities fraud class action, the Court overrules this objection. Carfagna further complains the Mr. Daniels made on two days for exactly twelve hours each day an entry for "prepar[ing] a chart on Enron Insider Trading; prepar[ing] and draft[ing] Complaint on Enron; meeting with clients in LA and Burlingame Re: Enron," and two more days for twelve hours each "research[ing] and compil[ing] Insider Trading; review 10Q and 10K's: prepare Insider Trading detail request; meeting with potential clients to discuss and explain case." Again the Court finds these objections meritless. Carfagna suggests in addition that if these two are contract attorneys, their time should be included as an expense and not included in the lodestar calculation and thus not subject to a multiplier. The Court has previously addressed the issue of contract attorneys.

Out of six years of contemporaneous time records submitted by Coughlin Stoia, Carfagna targets five entries that he characterizes as secretarial or ministerial functions that should not be included in the lodestar calculation and that make him question the entire submission. The Court has reviewed records for that year, as well as others, and concludes that Carfagna's

few targeted entries, which are vague, are very atypical of the vast number of entries in the time records which nearly always provide very specific identification of the matters being addressed. Carfagna points to an entry on January 6, 2004 when Frantz Michaud billed a quarter of an hour for "processed mail, docketed, diaried case information and dates into the M.A." at $185 per hour, to be included in the lodestar calculation ($999 with multiplier). The Court finds this service to be sufficiently legal in nature to qualify for inclusion in the lodestar. On June 7, 2004, Rory C. Dowd billed four hours at $135 per hour ($2,916 with multiplier) for stapling and chronicling documents. Chronicling documents could well require legal knowledge. On June 12, 2004, Desiree L. Gilbert billed 3 hours at the rate of $240 per hour ($3,888 with multiplier) for "batch printing of PDF files." The Court is unable to find such an entry and therefore overrules the objection. On January 29, 2004 Risa Castro billed 5 hours at $240 per hour ($6480 with multiplier) for organizing and putting away plaintiff's documents. Such a task would require legal knowledge and skill so the Court overrules this objections. Carfagna does highlight that on April 26, 2004, Bradley P. Louis charged one hour at $210 for "mov[ing] boxes" ($1,134 with multiplier). The Court cannot see any justification for including this entry in the lodestar, no less for it to be subject to a multiplier, and Lead Counsel has offered none. Thus the Court concludes that the lodestar should be reduced by one hour and $210 and the requested total fee with multiplier should be reduced by $1,134.00. Because the Court is applying a lodestar check to evaluate the percentage fee under the fee agreement, and not a lodestar analysis, this amount, by itself, is too small to be significant.

Carfagna also argues that Jerrilyn Hardaway's time records suggest that she "has little, if any, need for sleep, nourishment, or bathroom breaks" because her June 2004 report indicates she worked extremely long days for a total of 392 hours, billing the Class, with multiplier, $166,600. # 5963 at 6. A review of Coughlin Stoia's June 2004 time records, # 5959 and 5960, tab 2 at 369–455, reveals that a number of crucial depositions of representatives of the financial institutions, Enron and Arthur Andersen occurred during that month. *See also* Helen Hodges' Decl., # 5818 at ¶ 169. The record further indicates that Jerrilyn Hardaway was a key player in this litigation and in these depositions. Her billing entries (tab 2 at 371, 374 378–79, 380, 384, 387, 390–92, 395–96, 398–99, 403–04, 406, 409–10, 412, 417, 423, 424, 426, 433, 434, 440, 441, 448, 449) are often for "long" days (a number for 16–18 hours), and they are very specific as to what she spent the time on. In addition to extensive and constant work on the website and databases, she was deeply involved in preparation for very large number of depositions and discussions about them with both Coughlin Stoia and outside counsel. None of the entries with the number of hours claimed strike this Court as unreasonable. Thus the Court overrules this objection.

As for redundant attorney time, Carfagna points to the single deposition of Billy Bauch of CIBC on June 9, 2004, regarding which G. Paul Howes billed $17, 915 (with multiplier) for 16.5 hours, Anne L. Box billed $45,360 (with multiplier) for 14 hours, and John Lowther billed $34,047 (with multiplier) for 13 hours, for a total of $137,000. # 5963 at 6.

The Court observes that in this objection Carfagna is trying to turn on its head Lead Counsel's express declaration, as evidence of its lean staffing, that of the 472 depositions taken, "there are only *two* where three lawyers appeared" and "no depositions where more than three attor-

neys from Lead Counsel appeared," while *"only one* attorney from Lead Counsel appeared at most of them." Lead Counsel's Reply, # 5907 at 19, citing Helen Hodges' Declaration, # 5818 at ¶ 169 (chart of all depositions taken and Coughlin Stoia attorneys attending), 214. A review of Lead Counsel's time records, Tab 2 at 393, 394, 400, 401, demonstrates that Ann Box attended only a portion of the first day of the two-day deposition of Bauch because for part of her billing on that day she also reviewed documents and prepared for the deposition of Jennifer Bishko, an employee of Citigroup, which Ann Box **took alone** during the next two days; indeed she may have needed some part of the Bauch deposition to prepare for Bishko's. *Id.* at 394; Helen Hodges' Declaration, 5818 at ¶ 169. The billing entries of Paul Howes (Tab 2 at 393, 401) and John Lowther (*id.* at 394, 400), reveal that Lowther was assisting Howes, in particular for pulling and providing the numerous documents that Howes would need during the deposition. The claims against the financial institutions, were complex and sophisticated, and Coughlin Stoia might reasonably have decided that the rare combined presence in this litigation of two or more attorneys at a deposition was necessary. The Court overrules the objection.

Finally Carfagna targets the first page of time records (covering November 12–21, 2001) submitted by Schwartz, Junell, Greenberg & Oathout, LLP [90] for over $54,000 (with multiplier) of time spent by "RBG" relating to whether the firms should get involved in this case, attempting to find appropriate plaintiffs, and other pre-engagement activities that should not be compensable. He maintains time-keeping should begin when a firm is retained, not in trying to find a client and determine what role it might play in the litigation. # 5963 at 6–7.

A review of the record makes clear that Roger Greenberg's early billings for his and his firm's (now Schwartz, Junell, Greenberg & Oathout, LLP's) services are related to one of the deluge of suits filed in the wake of disclosures of Enron's financial distress in October–November 2001 and the genesis of what became the *Newby* class action. *Newby* was filed on November 22, 2001 by attorneys from Cunningham, Darlow, LLP and Shapiro, Haber & Urmy, LLP as the first action arising out of the Enron collapse, and thus for purely procedural reasons became the "lead case" for subsequently filed actions that were consolidated into it. The top page of Greenberg's time records (# 5960 at Tab 3) expressly states the hours he claims are related to the Amalgamated Bank matter, i.e., which shortly became a separate Enron-related class action which Greenberg filed on December 4, 2001, *Amalgamated Bank, Individually and on Behalf of All Others Similarly Situated v. Lay, et al.,* H–01–4198, in this district. It, along with numerous other Enron-related actions, was consolidated with *Newby* on December 12, 1001. # 23 in H–01–4198; # 17 in H–01–3624. Bill Lerach and James Jaconnette, both of Milberg Weiss, were admitted by court order to appear as attorneys of record, with Greenberg, for representation of Plaintiff Amalgamated Bank on behalf of the putative class on December 17, 2001. # 40 in H–01–3624. (The contested time records, Tab 3 at 2–3, reference frequent communications between Greenberg and Milberg Weiss attorneys in November and early December 2001.) A number of motions for appointment as Lead Plaintiff were filed as early as December 21, 2001, including one by Amalgamated Bank and the Regents of the University of California with other Movants (# 67). In February, the Regents was appointed as Lead Plain-

---

**90.** Tab 3 of the time records for non-Lead co- counsel, # 5960.

tiff and Milberg Weiss was approved as Lead Counsel, # 294, with Schwartz Junell serving as Co–Liaison Counsel for Milberg Weiss in the putative class action. Thus Roger Greenberg's work went directly into investigating and developing what became the *Newby* class action with the firm that then became Lead Counsel, Milberg Weiss, for Lead Plaintiff and the proposed class. His fees for services that benefitted the class are therefore compensable. Indeed on December, 5, 2001, in H–01–4198, Greenberg, on behalf of Amalgamated Bank, filed an *ex parte* motion for temporary restraining order and to show cause why a preliminary injunction [91] should not be entered (1) freezing and/or imposing a constructive trust over insider trading proceeds of twenty-nine individual Enron defendants from their sales of Enron stock from October 19, 1998 to November 27, 2001 to prevent dissipation or concealment of those profits and to preserve them to satisfy any future equitable award entered by the court, (2) requiring an accounting of these insider trader proceeds, and (3) permitting limited expedited discovery under § 21D(b)(3) of the PSLRA, 15 U.S.C.

§ 78u–4(b)(3)(B) (# 7 in H–01–4198), that was joined by a number of other plaintiffs and parties. Although the Court ultimately denied the request for an injunction because evidence in the record thus far was not sufficient to support imposing one, it did conclude in the class's favor that the Court has the authority to issue such a prejudgment restraint on Defendants' assets since Plaintiff's complaint had sought both legal damages and equitable restitutionary remedies of constructive trust, accounting, and disgorgement for breach of fiduciary duty and because Amalgamated Bank's complaint had asserted a cognizable claim. # 111 in H–01–3624.

 The test for payment of legal fees incurred by non-Lead Counsel before appointment of Lead Plaintiff and approval of its choice of Lead Counsel under the common fund doctrine is whether the attorney's services provided an independent benefit to the class beyond that conferred by Lead Counsel. *Cendant II*, 404 F.3d at 191. Here, however, Greenberg's work, in conjunction with Milberg Weiss, which became Lead Counsel, fed into and was es-

---

**91.** Roger Greenberg's original declaration, # 5830 at 2, explains that he

> was intimately involved in this litigation from the initial stages, seeking an injunction on behalf of the putative plaintiffs (Amalgamated Bank, then Regents) as the initial attempt to protect the interests of the putative class, ... in seeking a freeze on the transfer of bank funds and a prohibition against document destruction, all of which was occurring *instanter*. This required urgent and late night meetings with Lead Counsel, drafting pleadings "on the fly," public document review and research, follow[ed] by numerous emergency depositions and hearings. The breadth of the case was not totally known at this point but would, in short time, become apparent and appalling.

The first page of his billing records, Tab 3 to # 5960, clearly refers to this intense investigation leading up to filing the *Amalgamated Bank* action and then motion for the TRO,

involving research, news media disclosures about Enron, discussions with attorneys about types of claims that could be brought and possible plaintiffs for representation, the status of other cases being filed, generally relating to preparation for filing suit and strategy. That investigation, according to Lead Counsel, revealed evidence of fraud massive insider selling by Enron officials before material adverse information about Enron was disclosed to the public in October 2001. Thereafter the filing of the request for a TRO (1) freezing and imposing a constructive trust over insider trading proceeds, (2) requiring an accounting of insider trader proceeds, and (3) permitting limited expedited discovery (because of the stay imposed by the PSLRA) of suspected offshore partnerships and illicit straw entities used to effectuate fraud (# 7 in H–01–4198), subsequently resolved in *Newby*, was of great importance for the class. Helen Hodges discusses it in her Declaration, # 5818 at 26–28.

sential to building the *Newby* action case representation of the class. Thus the common fund doctrine ("that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees") is the applicable law and the hours reported by Greenberg are compensable if reasonable. *Cendant II*, 404 F.3d at 187.

Carfagna asks the Court to sustain his objections, have another hearing on attorneys' fees and expense reimbursement, permit "a full range of discovery, including depositions, as to the propriety of these fees and expenses." The Court, in its discretion, not only does not find that additional procedures necessary, but they would add to the costs and prolong this litigation even more.

### c. Brian Dabrowski's Objections (# 5856, duplicated in 5872; 5890; 5891; and 5962)

Mr. Dabrowski, through his attorney Lawrence Schonbrun, wants the Court to appoint (1) a guardian to protect the class's interest by investigating in detail all the circumstances surrounding the fee agreement and the engagement of experts Coffee, Silver, Bebchuk, and Sorkin, (2) expert (auditor/forensic accountant), and (3) a magistrate or special master to oversee the fee proceeding, etc. Carfagna's supplemental objections to Lead Counsel's compendium of records requests that Lead Counsel provide additional information, or that the Court appoint a special master to review the time sheets, or for additional time for Objectors to review the time records. Larry Fenstad and Dorothy Lancaster McCoppin (# 5868) ask the Court to refer the lodestar data to an independent firm for analysis, audit, and review.

Lead Plaintiff's response argues that it is not beyond the objecting class's ability,

and certainly not beyond this Court's ability, aided by its familiarity with all phases of this litigation, to examine the records and, using Helen Hodges' Declaration as a guide, to determine whether the fee request is reasonable. Furthermore Lead Plaintiff urges that Carfagna's and all the other objectors' "request for more time to nit pick the time records submitted, unaccompanied by a specific basis or even any description of what efforts they undertook to review the records in the time allotted, should be denied." # 5974 at 13. The Court agrees. Judges standardly review motions for approval of attorneys' fees and time records. The Court further finds that Lead Plaintiff has submitted more than sufficient information for a determination of a reasonable fee.

Moreover, while Federal Rule of Civil Procedure 23(h)(4) permits the Court in class actions to refer issues relating to the amount of a fee award to a special master or magistrate judge in accordance with Rule 54(d)(2)(D), it is discretionary with the Court. The same is true for a guardian.

■ This Court does not find appointment of a guardian, accountant or special master necessary here, since the Court's personal oversight of all aspects of this case provides a strong basis for evaluating counsel's fee request. More important, the Court points out that under the structure of the PSLRA, the Lead Plaintiff itself serves the role of guardian for the class members' interests, from choosing and "retaining" class counsel, with Court approval, to monitoring Lead Counsel and all action in the litigation. As observed by Professor Silver, appointment of a guardian is "at odds with the PSLRA" and would "undermine the Lead Plaintiff by empowering someone else to second guess its judgments." # 5906 at 10–11. The evidence submitted by Lead Counsel provides

sufficient detail about the arm's length fee agreement between sophisticated and competent parties and demonstrates that the Regents amply and vigorously fulfilled their role as protector of the class from the beginning to this point in this litigation. Indeed, in this Court's oversight of this litigation for more than six years it has been continually impressed by the Regents' informed and full involvement in all aspects of the case. Moreover, this Court also serves as a fiduciary of the class in determining attorneys' fees and acts to protect the class. *Rite Aid,* 396 F.3d at 307–08, citing *Cendant,* 264 F.3d at 231 ("[T]he District Court acts as a fiduciary guarding the rights of absent class members[.]"), *Gunter,* 223 F.3d at 201 n. 6, and *In re Wash. Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1297 (9th Cir.1994); *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 280–81 (7th Cir.2002) ("We and other courts have gone so far as to term the district court in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries."); *Third Circuit Task Force Report,* 108 F.R.D. at 251 (The court "must monitor the disbursement of the fund and act as a fiduciary for those who are supposed to benefit from it, since typically no one else is available to perform that function."); *Cendant,* 264 F.3d at 255 (Because of the conflict between class members who want to maximize their recovery and class counsel who seek to maximize their fees, "an agent must be located to oversee the relationship .... Traditionally that agent has been the court."). Moreover, such an appointment would not only be redundant, but would further increase costs and delay distribution to the class. *In re NASDAQ Market–Makers Antitrust Litig.,* 187

F.R.D. 465, 481 (S.D.N.Y.1998) (denying Schonbrun's request for appointment of a special class guardian), citing *In re Intelligent Electronics Sec. Litig.,* No. 92–CV– 1905, 1997 WL 786984, \*10 (E.D.Pa. Nov.26, 1997) ("The appointment of a class guardian would only further increase costs, extend indefinitely the time before distribution to the class and further needlessly complicate the procedures."); *In re World-Com, Inc. Sec. Litig.,* 02 Civ. 3288(DLC), 2004 WL 2591402, \*22, 2004 U.S. Dist. LEXIS 22992, \*75–76 (S.D.N.Y. Nov. 12, 2004) ("There is certainly no need to retain an independent guardian to undertake a further review of Lead Counsel's time records. Such an appointment would further reduce the amount of money available to distribute to the class, would be redundant of the work already performed by Lead Plaintiff, and is of little value in light of ... the retainer agreement which is the basis for calculating this award.").[92]

As for an auditor, there is no statutory requirement that an auditor be appointed. Professor Silver has declared that he knows of no case in which a violation of due process has been found because an auditor was not appointed (*id.* at 4 n. 2), nor has this Court found one. Moreover, because the Regents and Lead Counsel entered into a contingent percentage fee agreement, which the Court considered when it evaluated and approved Lead Plaintiff's choice of Lead Counsel, it finds that an auditor is not necessary. Furthermore Lead Counsel has hired a recognized fee expert, Mr. Moscaret, to review the fee request in detail. Mr. Moscaret concluded that Lead Counsel's hourly billing rates "are ***comparable*** to prevailing attorney rates in 2007 for large law firms in the

---

92. In his supplemental amended objection (# 5890 and 5891), Dabrowski goes into greater detail about the investigations he wants the class guardian to perform. Be-cause the Court does not find such an appointment necessary, nor such detailed investigations warranted, it does not discuss these proposals further.

Houston/Dallas 'forum' legal marketplace" and thus reasonable, and that is "staffing, mix of attorneys, and delegation of work by senior attorneys to junior attorneys" were "reasonable, customary, and consistent with generally-acceptable billing practices by law firms in major, complex litigation." Moscaret Declaration, # 5911 at ¶¶ 25, 28. As for expenses, Professor Silver points out sensible reasons why Lead Counsel is incentivized to be especially thrifty: (1) because contingent fee lawyers forfeit their expenses if they lose, they tend to be frugal; (2) the fee agreement discouraged wasteful spending by requiring Lead Counsel to advance all expenses; and (3) the Regents had the experience and capacity to review Lead Counsel's expenses internally and did so. *Id.* at 5.

Indeed, Helen Hodges, in her sworn Supplemental Declaration # 5909 at 1), points out,

> Because we are a plaintiffs' firm paid only on a contingency basis—*i.e.*, only if we win—we have consistently maintained "lean" staffing. We simply can't afford to over-staff cases. Nor can we afford to duplicate work. Unlike most defense firms, our billable hours do not necessarily result in getting paid. We are paid for getting results. And it is in our own self interest to get results with the least outlay of resources in terms of attorney time because we are paying our attorneys as we go.

Ms. Hodges then explains in detail the firm's staffing during the course of the litigation, identifying and explaining when and why additional staff had to be added and their role, but pointing out that a core group of attorneys worked almost exclusively on the case throughout the six years, providing the firm with the advantage of "institutional" knowledge and avoiding having to bring newcomers "up to speed on an ever-burgeoning case" while battling attorneys from large firms with no

restrictions on the number of counsel representing defendants. # 5905. See also Moscaret Declaration, # 5911 at ¶¶ 47–50, 61–65. The Court finds the continuity of staffing through this core group of attorneys contributed substantially to the efficient prosecution of this litigation. Moreover, its review of Lead Counsel's time records convinces the Court that hours spent were quite reasonable in light of the size, complexity, and length of this litigation.

Mr. Dabrowski also maintains that special rules apply to billion-dollar recoveries. Where extraordinarily large recoveries of more than $75 million are had, he argues, courts must stringently weigh the economies of scale in fixing an appropriate percentage, and fee awards of 6–10% are common in this large scale context. H. Newberg, *Newberg on Class Actions,* Common Fund Fee Awards (3d.1992) (§ 20.9 "Deviation in Exceptional Cases," at 95). Dabrowski also cites the "increase-decrease" rule in the Third Circuit Task Force Report, 108 F.R.D. at 256 (fee awards that involve a sliding scale dependent on the ultimate recovery for which the percentage of the funds devoted to attorneys' fees will decrease as the size of the funds increases).

As this Court has indicated, while a few courts have adopted the view that the percentage of fee awards should decrease as the recovery increases, especially in megafund cases, this is not the majority view. Nor is there any prohibition of an *ex ante* agreement with an ascending fee schedule to incentivize counsel or an increased award by the court. *See, e.g., Rite Aid,* 396 F.3d at 303 (" 'This position [that the percentage of recovery devoted to attorneys fees should decrease as the size of the overall settlement or recovery increases] ... has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an

incentive to settle cases too early and too cheaply.' "), *quoting In re Cendant,* 264 F.3d at 284 n. 55; *In re Ikon Office Solutions, Inc., Sec. Litig.,* 194 F.R.D. 166, 196 (E.D.Pa.2000) (court saw "no principled basis for reducing the requested award by some arbitrary amount" simply because of the size of the recovery "when every other factor ordinarily considered weighs in favor of approving class counsel's request of thirty percent"; a sliding scale fee schedule, "by which counsel is awarded ever diminishing percentages of ever increasing common funds ... tends to penalize attorneys who recover large settlements"). This Court finds, based on evidence submitted by Lead Counsel and its own research, that the 9.52% fee requested here, based either on the fee agreement or on an enhancement of the lodestar, is within the range of reasonableness and is warranted by Class Counsel's reasonable number of hours expended and extraordinary success against extremely difficult odds in a lengthy litigation challenged by top-level defense counsel.

Dabrowski further claims there is no pre-Enron case supporting a fee using an ascending scale of percentages other than dictum in *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166 (E.D.Pa.2000).[93] The Court points out that there are several such cases in the last few years, however-

er. *See, e.g., In re Auction Houses Antitrust Litig.,* 197 F.R.D. 71, 80–81, 84 n. 55 (S.D.N.Y.2000) (a pre-Enron case) (discussing advantages and disadvantages of decreasing and increasing fee schedules and concluding that an increasing schedule was more appropriate in that case); and two post-Enron cases, *Schwartz v. TXU Corp.,* Nos. 3:02–CV–2243–K, 2005 WL 3148350 (N.D.Tex. Nov.5, 2005) (after a lodestar cross-check applying *Johnson* factors, enforcing a graduated fee arrangement resulting in a 22.2% fee for a recovery of $149,750,000 under PSLRA); and *In re Dynegy, Inc. Securities Litig.,* H–02–1571, Order Awarding Attorney's Fees and Reimbursement of Expenses, # 5817 (Compendium of Exhibits), Ex. C at 1, which has been cited frequently in the briefing.

Dabrowski additionally complains that no mention is made of the allocation of attorneys' fees among the thirteen law firms that are seeking fees from this award and objects to allowing class counsel to receive a lump sum and then to secretly decide how the fee will be divided.[94]

In response to this complaint of nondisclosure of the fee arrangement, Lead Counsel points out that its request for an aggregate fee award, to be divided by lead counsel among co-counsel is the same procedure that the Fifth Circuit approved in

---

**93.** Dabrowski cites several cases that support a descending sliding scale as the amount of settlement grows. *See, e.g., VISA U.S.A., Inc. and MasterCard International,* 396 F.3d at 122–23; *In re Bristol–Myers Squibb Sec. Litig.,* 361 F.Supp.2d at 233, 235.

**94.** He seeks information about agreements or understandings regarding the sharing of fees among the 13 law firms comprising Class Counsel, some of whom are charging hourly rates as high as $607. # 5890 at 38.

Dabrowski also complains that there is no information on the terms of the separation agreement between William Lerach and Lead Counsel that affect what becomes of the fee

award here. Jeannette Dreisbach has also complained about awarding fees to convicted criminal William Lerach. # 5873 at 2–3.

Lead Counsel has responded with what the Court finds is more than adequate briefing demonstrating the propriety of any fee sharing with Mr. Lerach before and after he left the firm and after his indictment, guilty plea, and sentencing. See # 5864 (Statement by Coughlin Stoia), # 5867 (Supplemental Statement of the Regents), 5904 (Declaration of James C. Harrison), 5905 (Declaration of Professor Roy D. Simon), # 5918 (Affidavit of Vincent Johnson), and # 5907 at 68–75. No one has submitted a brief controverting Lead Plaintiff's submissions.

*Longden v. Sunderman,* 979 F.2d at 1101, which affirmed the district court's granting the petition of class counsel, Susman Godfrey, on behalf of all class counsel, for fees benefitting the class as a whole ("district court acted well within its discretion in awarding an aggregate sum to the Susman Attorneys that was based on their collective efforts, leaving apportionment of that sum to the Susman Attorneys themselves.") [95]; *Forbush v. J.C. Penney Co.,* 98 F.3d 817, 824–25 (5th Cir.1996). Here thirteen firms involved in the representation of Lead Plaintiff have joined together in the fee request. Coughlin Stoia states that Coughlin Stoia is responsible for more than 85% of the time expended and its contribution, alone, generates a multiplier of less than six. # 5974 at 9, citing Declaration of John C. Coffee Jr. (# 5821 at ¶ 35: "Thus, whether or not a multiplier in the 5–6 range would be justified in most cases, it is justified in this case ...").

Nevertheless, even with deference due to Lead Plaintiff and Lead Counsel's decisions under the PSLRA in this class action, this Court ultimately has an obligation not only to ensure that the fees are reasonable, but to see that they are "divided up fairly among plaintiffs' counsel." *High Sulfur Content Gasoline,* 517 F.3d at 227–28 ("The court's duty to review attorneys' fees is no less compelling in common fund cases, like this case, where a separate fund to pay attorneys' fees is created as part of the class action settlement."). This Court observes that when one of the attorneys in *Longden* objected to Susman's cal-

culations and filed her own petition for fees, the district court awarded her a separate sum, although less in amount than she requested, to be taken out of the lump-sum award for all attorneys.[96] *Longden,* 979 F.2d at 1101; *High Sulfur Content Gasoline,* 517 F.3d at 233 ("*Longden* highlights the district court's duty to scrutinize the allocations of a fee award *when an attorney objects to his co-counsel's fee award recommendations.* It does not stand for the proposition that courts can delegate their duty to allocate a fee award to a committee of interested attorneys who have reached no agreement among themselves and then approve the allocation after a perfunctory review. [emphasis added by the Court]").

Lead Plaintiff, in its response to supplemental objections (# 5974 at 9), argues, "Since the 13 firms have joined together in requesting a percentage-of-the fund recovery, the allocation of such award has no relevance to the award itself." The Court would further point out that each of the other Co–Class Counsel firms has provided information about their attorneys, their hourly rates, and their lodestars for this litigation (# 5825–35) and contemporaneous records. Furthermore no objector has submitted any evidence of secretive or *ex parte* conduct here. Co–Class Counsel were permitted to file any objections and to speak freely about the fee allocation at the Fairness Hearing. Thus given the transparency and due process provided here, the Court finds Dabrowski's objection of non-disclosure lacks merit.

---

**95.** In *High Sulfur Content Gasoline,* 517 F.3d at 227 the Panel wrote,

In this circuit, a district court can in its discretion appoint a committee of plaintiffs' counsel to recommend how to divide up an aggregate fee award. *Cf. Longden v. Sunderman,* 979 F.2d 1095 (5th Cir.1992). But the appointment of a committee does not relieve a district court of its responsibility to closely scrutinize the attorneys' fee allo-

cation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards.

**96.** In *Longden,* the Fifth Circuit affirmed, holding that the district court acted well within its discretion in both awards. *Longden,* 979 F.2d at 1101; *High Sulfur Content Gasoline,* 517 F.3d at 233.

Dabrowski urges that if the Court uses the percentage approach, Lead Counsel should not be allowed to make any additional fee requests. The Court concludes that if Lead Counsel succeed in obtaining any further settlements, they are entitled to request fees from that additional common fund, too.

Dabrowski presents a laundry list of objections, summarized *infra*, but provides no authority that Lead Counsel is required to provide detailed information relating to each of his demands or ignores the evidence in the record. Dabrowski also objects that there is no description of the extensive arm's length negotiation, despite substantial evidence in the record that this Court has already cited; that prior to *Newby* the Regents had never acted as a representative plaintiff in a securities class action, but ignores the experience the Regents has generally in sophisticated litigation; that there is no mention of any consultants or experts who assisted the Regents in negotiating the fee; that there is no mention of efforts made by Lead Plaintiff in management and oversight of billing practices, staffing practices, and work allocation practices of Lead Counsel and co-counsel[97]; that there is no mention of the background, education or experience of the individuals who negotiated the fee (Holst, Lundberg, and Lee)[98] or of the expectations of the University about the size of the recovery, the duration of the litigation, or how the figures of the sliding scale were determined; that there is no information on how the Regents decided to seek Lead Plaintiff status, how the Regents became involved with Milberg Weiss, and who decided to select Milberg Weiss without competitive proposals from other firms[99]; that there is no explanation of how the agreement, which required Lead Counsel to advance all funds necessary to cover expenses, was changed to allow them to be reimbursed for their expenses and not collect their fees from various settlements that comprise the settlement fund; that there is no mention of how retired Judge Lawrence Irving came initially to be retained to monitor the litigation or the circumstances under which he thereafter joined Coughlin, Stoia; that there is no mention of the twelve co-counsel firms that are seeking fees despite the Regents' claim that one of their criteria for selecting Milberg Weiss was to have a single law firm handling the case; that there no mention of why the Milberg Weiss law firm was retained without any agreement as to the fee it would charge (Hodges Decl., Ex. 3, Letter of 12/18/01); that there is no explanation why Lead Counsel can charge current rates when they chose to delay receiving their fees from settlements obtained as early as 2003[100]; that there is no discussion of fee agreements between other

**97.** *See* Supplemental Declaration of Helen Hodges, # 5909 at 7–28, providing substantial background and areas of focus of Lead Counsel's attorneys.

**98.** This charge is unfounded. *See, e.g.,* Expert Report of Professor Charles Silver, # 5822 at 37–45, for information regarding these and others involved in the negotiations.

**99.** This allegation is also incorrect. As noted *supra,* James Holst's Declaration states that in December 2001, when the Regents applied for appointment as Lead Plaintiff in this action,

"[T]he Office of the General Counsel, on behalf of The Regents, carefully considered the choice of Lead Counsel, and in doing so reviewed the qualifications and resources of a number of class action specialist firms." # 5824 at 2.

**100.** As noted earlier, one established method of compensating for a long delay in paying for attorneys' services is to use their current billing rates in calculating the lodestar. *Missouri v. Jenkins,* 491 U.S. 274, 283–84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).

plaintiffs and law firms who sought to become the representative plaintiff; that there is no explanation for the accuracy of the *Dynegy* fee scale and the inaccuracy of the *Newby;* and that there is no explanation of how the Regents determined the amount of money that would provide necessary incentive to ensure that Lead Counsel would devote sufficient resources to the litigation. The Court finds these "picky" objections are largely to matters for which proof is not required or for which it has been provided and addressed in this order. Moreover, as indicated earlier in this opinion, Lead Counsel has adequately demonstrated that the Regents was a sophisticated Lead Plaintiff with substantial legal expertise who entered into an arm's length agreement with a renowned securities class action firm that incentivized counsel to push through a extremely complicated, long, and risky litigation, with constant and competent oversight by the Regents, to achieve a highly successful result for the benefit of the class.

Dabrowski insists that calculating a multiplier based on time expended preparing arguments without legal merit for a trial that never took place, i.e., the time between the last settlement and the Fifth Circuit decision reversing class certification, should not be included in the lodestar. The Court notes that until the Supreme Court issued *Stoneridge,* there was no certainty that Lead Plaintiff's scheme liability would or would not be recognized as viable. Moreover, the fact that it was drastically limited by the high court only demonstrates the risk and highlights the success of Lead Counsel in obtaining the settlements that it did. A multiplier is used to reward exceptional success and skill in the face of high risk and difficulty.

Dabrowski further complains that the fee award should not be paid in its entirety before the class receive their settlement distributions. Larry Fenstad and Dorothy McCoppin object that the fees should be paid in installments, until completion of the administrative process and payment of all claims to the class members and submission of all administrative reports to the court.[101] # 5868 at 11. The Court finds these objections lack merit. *In re AT & T Corp.*, 455 F.3d 160, 175 (3d Cir.2006) (rejecting objection that a portion of the attorneys' fees should be withheld pending payment of claims to all members because there is no evidence that thus far diligent class counsel would stop working on behalf of the class once their fees were paid).

**d. Objections by Rinis Travel Service Inc. Profit Sharing Trust U.A. 06/01/1989 and Michael J. Rinis, IRRA ("Rinis Objectors") (# 5866, 5967)**

The Rinis Objectors urge the Court to take judicial notice of data collected by the

---

**101.** Objectors do not cite to authority that would support installment payments under the circumstances here. Professor Silver, Lead Counsel's expert, calls the argument "odd":

> In my experience, class counsel's fees have been delayed when the value of a settlement could not be known. That would be true, for example, in a "claims made settlement where it was not known how may claims would be allowed or in a coupon settlement where it is not known how may coupons would be cashed". No such uncertainty exists here. The settling defendants paid cash for their releases, and class members will receive all the money that remains in the fund after fees and expenses are paid. Unclaimed funds, should there be any, will not revert to the defendants...... If there is some need to incentivize Lead Counsel to assist with claim filing (unusual in securities fraud causes) or to motivate the Claims Administrator (also unusual), the Court has the power to do this. However, I am not sure what the need is since no Objector has identified a compelling one.

Supplemental Expert Report, # 5906 at 15–16, ¶ 7.

United States Department of Justice, known as the *Laffey* Matrix,[102] as evidence of prevailing market rates for attorneys and paralegals/law clerks of varying experience in the Washington D.C. area from 2003–2008 for determining "reasonable" fee: http://www.usdoj.gov/us ao/dc/Divisions/Civil_Division/Laffey_Matrix_7.html. Under that matrix, the current market billing rates in the District of Columbia and, adjusted for the locality, in the Los Angeles area are as follows:

| Experience | 2007–08 in D.C. | in L.A. |
|---|---|---|
| 20+ years | $440 | $455 |
| 11–19 years | $390 | $404 |
| 8–10 years | $315 | $326 |
| 4–7 years | $255 | $264 |
| 1–3 years | $215 | $222 |
| Paralegals and Law Clerks [103] | $125 | $129 |

Applying these data, the Rinis Objectors calculate that William Lerach's hours (8,513.60) times the hourly rate of $455

**102.** The *Laffey* Matrix originated in *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354 (D.D.C.1983), *rev'd on other grounds*, 241 U.S.App. D.C. 11, 746 F.2d 4 (1984). The matrix is a chart compiled each year (all the way back to 1981) by the Civil Division of the United States Attorney's Office in the District of Columbia and presents a schedule of hourly rates for attorneys of different levels of experience in the Washington D.C. area. It is used by federal courts, particularly in that district, to determine reasonable attorneys' fees awards in cases where there is a statutory entitlement. It provides rates for five different levels of experience, corresponding to "junior associates" (1–3 years after law school graduation), "senior associates" (4–7 years), "experienced federal court litigators" (8–10 and 11–19 years), and "very experienced federal court litigators" (20 years or more). *See generally Lively v. Flexible Packaging Ass'n*, 930 A.2d 984 (D.C. Aug.23, 2007) (accepting *Laffey* Matrix as one of a number of legitimate ways of calculating attorney's fees where a prevailing party is statutorily entitled to attorneys' fees). It is available at http://www.usdoj.gov/usao /dc/Divisions/Civil_Division/Laffey_Matrix_7.html. Under the *Laffey* Matrix, the current market billing rates in the District of Columbia and Los Angeles area are as follows:

**2007–08**

would result in lodestar of $3,873,688, approximately half of the claimed lodestar. The claimed lodestar was thus already doubled to get the $900/hour rate, and if the Court applies an additional 5.4 multiplier, it would result in an actual multiplier of 10.8. The Rinis objectors concede that any fee should reflect the risk of no recovery, but insist that risk also limits the multiplier to the risk factor, i.e., a 50% chance of recovery implies a multiplier of 2, a 75% chance of recovery implies a multiplier of 1.5, and so on. The multiplier sought here implies that a chance of recovery was less than 20% (a 1 in 5 chance), which they maintain is highly unlikely or Coughlin Lerach would not have taken on the case. They further object that the requested fee does not take into account the economies of scale in mega-fund cases.

| Experience | in D.C. | in L.A. |
|---|---|---|
| 20+ years | $440 | $455 |
| 11–19 years | $390 | $404 |
| 8–10 years | $315 | $326 |
| 4–7 years | $255 | $264 |
| 1–3 years | $215 | $222 |
| Paralegals and Law Clerks | $125 | $129 |

*See, e.g., In re Chiron Corp. Securities Litigation*, No. C–04–4293 VRW, 2007 WL 4249902, *6–7 (N.D.Cal. Nov.30, 2007).

**103.** The Bishop Objectors argue that the rates charged for paralegals should be in line with rates in their local legal markets as well as with the *Laffey* Matrix. Lead Counsel billed work by paralegals at $160–$270 per hour; noting the requested amounts were out of sync with the *Laffey* Matrix, Bishop Objectors argue that a reasonable rate would be $130 per hour, for a lodestar of $2,891,187, constituting $2,526,527 less than the requested lodestar for paralegals. The Bishop Objectors also contend that Lead Counsel has failed to meet its burden of proof to demonstrate what the prevailing market rate for attorneys is and that their requested hourly rate is reasonable for attorneys of their size, specialty and background in this District. They complain that Coughlin Stoia's requested hourly rates are above those indicated in the *Laffey* Matrix and should at minimum be reduced to the levels of those established in *Chiron*.

Lead Counsel's expert, Mr. Moscaret, insists that the *Laffey* Matrix, supported by some objectors, should not be used to determine reasonable rates here. # 5903 at 20–25. Not only has the Fifth Circuit never adopted the Laffey Matrix to determine reasonable attorney's fee rates, but he cites federal court decisions declining to apply it. *Id.* at 21, *citing Perez v. Cozen & O'Connor Group Long Term Disability Coverage,* No. 05cv0440 DMS (AJB), 2007 WL 2142292, *2, 2007 U.S. Dist. LEXIS 53996, *6 (S.D.Cal. May 27, 2007) (*Laffey* Matrix approach here would be contrary to Ninth Circuit law requiring the court to use the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience and reputation, none of which does the *Laffey* Matrix take into account); *Housing Rights Ctr. v. Sterling,* No. CV 03–859 DSF (Ex), 2005 WL 3320738, **2–3, 2005 U.S. Dist. LEXIS 31872, at *10–11 (D.D.Cal. Nov. 2, 2005) ("The *Laffey* Matrix also does not comport with the reality of Los Angeles firm billing practices" because it sets a single rate for several years' experience while "[t]here is much more variance from year to year in Lost Angeles"). Moscaret makes important points in arguing that the *Laffey* Matrix is too simplistic, with its "one-rate-fits-all approach, for major, complex litigation for several reasons". It "lumps all attorneys with 20–plus years of experience into the same rate bracket, and assigns the *same* uniform rate to each attorney in that bracket," despite significant disparities in experience and status. *Id.* at 21–22. He also contends that the *Laffey* Matrix is also contrary to federal case law in lodestar cases, which requires the district court to award to the petitioning attorney fees in accordance with the prevailing rate that other attorneys of comparable skill, experience and reputation would charge for similar work in the relevant market place. *Id.* at 22. Last, Mr. Moscaret asserts that the "one-rate-fits-all" approach

is especially inequitable for paralegals, who are all awarded the same rate, regardless of whether a paralegal has one or twenty years of experience, or whether he worked in routine litigation versus major, complex litigations, or whether the paralegal is certificated. He points out that the judge in *Chiron,* on which objectors rely, stated as a key reason why he used the *Laffey* Matrix that counsel did not produce evidence showing that its requested rates were representative of the relevant market or systematically compiled. *In re Chiron Corp. Sec. Litig.,* No. C–04–4293 VRW, 2007 WL 4249902, *6, 2007 U.S. Dist. LEXIS 91140, at *18 (or 2007 WL 4249902) (N.D.Cal. Nov. 30, 2007).

This Court observes that this not a statutory fee-shifting case, the type to which the *Laffey* Matrix applies. Moreover, this Court agrees that not only is there no case in the Fifth Circuit that has applied the *Laffey* Matrix to determine reasonable fees, but the Fifth Circuit has clearly endorsed an alternative approach, the twelve-factor *Johnson* test, for that purpose. It also requires the fee petitioner to produce evidence demonstrating the reasonable hourly rate in the community for such legal services rendered by attorneys of comparable skill, experience, and reputation. *Alberti v. Klevenhagen,* 896 F.2d at 936.

Rinis Objectors also challenge Lead Counsel's argument of risk, and point out that the Defendants had settled before the Fifth Circuit dismissed Deutsche Bank. Even earlier a partial settlement had with negotiated with Defendant Arthur Andersen Worldwide Societe Cooperative (AWSC) and some of its member firms, with the stipulation dated August 29, 2002, approved by the Fifth Circuit in *Newby v. Enron Corp., et al.,* 394 F.3d 296 (5th Cir.2004). Part of that settlement provided that $15 million be set aside to pay for

future litigation expenses—that fund greatly reduced the risk to class counsel in pursing this litigation, and therefore the multiplier should be adjusted downward. As the Court discussed *supra*, risk is measured at the start of the litigation and not in hindsight.

In their supplemental objections (# 5967), accompanied by a motion for and order directing counsel to file and serve within two weeks a summary by law firm of what software was used by each firm to track and generate the time or billing records submitted, and CDs or DVDs of the data in electronic format with the metadata stripped, objectors reiterate their earlier objections and complain that it is unclear whether Coughlin, Stoia used time tracking software [104] and whether time was reconstructed on a spread sheet.

As noted, Coughlin Stoia has made clear that their time records were contemporaneous, not reconstructed. Lead Counsel objects to their request for software, DCs or DVDs because they provide no reason why they need this information, no discussion of their review of the records that were filed, nor any explanation why they need the additional information. Lead Plaintiff states that the time records were entered into the Court's docket and on www.esl3624.com in .pdf format, and the vast bulk of the records are searchable in that format. A number of programs are available to the objectors to convert the .pdf to a different format, such as

spreadsheets. The Court agrees that Lead Plaintiff has made the records sufficiently available to render the objectors' complaint meritless.

### e. Objections of the Enron Savings Plan and the Enron Stock Ownership Plan (# 5869, duplicated # 5879, supported by Declaration of Marc I. Machiz, # 5881)

Fiduciary Counselors, acting on behalf of the Plans, submits a "Mega Settlements Chart" identifying the settlement amount, the fee award, the % of the settlement that the fee represents, the multiplier, the hours, and the average hourly rates in the recent mega fund cases, listed in order of largest to smallest recovery: *WorldCom, Tyco, Cendant, AOL, Nortel* (2007), *Royal Ahold,* and *Nortel* (2006).[105] # 5869 at 5. The Court refers the parties to the Declaration of Helen Hodges (# 5818, Ex. 5) which has the same and additional mega settlements, gives more information about stage, number of documents reviewed, depositions taken, and a broader view in an attempt to justify the higher fee; it is included in this opinion at pages 84–86 and the Court has discussed it and the variety of factors that create the final lodestar and multiplier, as well as comparisons among the various mega-fund cases.

At the same time Fiduciary Counselors states that it "believes that it is more useful to compare Coughlin Stoia's rates with rates charged by other attorneys spe-

---

**104.** Lead Counsel responds that it is not sure what is meant by "time tracking software" but states that it uses a program called "Elite" to record and maintain time records. # 5974 at 14.

**105.** *In re WorldCom Inc. Sec. Litig.,* 388 F.Supp.2d 319 (S.D.N.Y.2005); *In re Tyco Int'l, Ltd. Multidistrict Litig.,* 535 F.Supp.2d 249 (D.N.H.2007) (Ex. 3 to # 5869); *In re Cendant Corp. Litig.,* 243 F.Supp.2d 166 (D.N.J.2003); *In re AOL Time Warner, Inc.*

*Sec. and ERISA Litig.,* No. 02 Civ. 5575(SWK), 2006 U.S. Dist. LEXIS 78101 (S.D.N.Y. Sept. 28, 2006); *In re Nortel Networks Corp. Sec. Litig. ("Nortel 2006"),* No. 05–mdl–1659 (S.D.N.Y. Dec. 26, 2006) (Ex. 4 to # 5869); *In re Royal Ahold N.V. Securities & Erisa Litig.,* Civ. No. 03–MD–1539, 2006 WL 3313777, 2006 U.S. Dist. LEXIS 85722 (D.Md. Nov.2, 2006); and *In re Nortel Networks Corp. Sec. Litig. ("Nortel 2007"),* No. 01–CV–1855 (RMB), slip op. (S.D.N.Y. Jan 29, 2005) (Ex. 5 and Ex. A to # 5869).

cializing in complex litigation ... given Coughlin Stoia's experience" than to use that in the relevant legal market. # 5869 at 11 n. 14. Nevertheless, this Court notes that the Fifth Circuit uses the relevant local legal market.

**f. George S. Bishop, Jill R. Bishop, Lon Wilkens, and Betty Willkens' ("Bishop Objectors' ") Objections (# 5875, 5964)**

Dabrowski, the Bishop Objectors, and the Wilkens Objectors argue that it is axiomatic that time spent pursuing unsuccessful claims should be excluded. *Hensley*, 461 U.S. at 439, 103 S.Ct. 1933. Thus counsel's effort to reverse the Fifth Circuit's opinion in *Regents*, 482 F.3d 372, and to influence the outcome in the *Stoneridge* appeal to the United States Supreme Court had nothing to do with the current settlements, came years afterward, produced nothing of value to the settlement class, and should not be reimbursed.

The Court finds Lead Counsel's reply to be on point: "They ignore the fact that pursuit of what they characterized as a 'flawed theory' resulted in the vast bulk of the recovery here and that the SEC, 33 Attorneys General and the Ninth Circuit agreed with the 'flawed theory.' Moreover, it was the diligent and creative prosecution against *all* the banks that made the record result possible." # 5907 at 24. Furthermore Lead Counsel provides a reasonable explanation why it did not stop the fee clock from running once the settlements here were negotiated:

> ... [T]he $6.6 billion in settlements from three banks that were approved by this Court in 2006 were not final until October 25, 2007, when the Davis appeal was resolved. And Silvercreek's appeal from the BofA settlement was briefed in 2007 and will likely be heard in April 2008. Moreover, during 2007 and continuing to today, Lead Counsel has been working on the plan of allocation and other issues related to the prior settlements. The fact-intensive work on plaintiff's damages analyses which commenced during the fact-discovery phase and continued in 2006 in expert discovery and 2007 in trial preparation, was the foundation for the plan of allocation.... Furthermore, even in fee-shifting cases, courts compensate the prevailing party for unsuccessful claims that arose from a core set of common facts....

# 5907 at 24.

This Court first would point out a key distinction between awards based on fee-shifting statutes and awards based on a common fund. In *Hensley*, the Supreme Court addressed a fee award in a civil rights action under 42 U.S.C. § 1988, which, like many fee-shifting statutes, gives the court discretion to award reasonable attorney's fees to a "prevailing party," *Hensley*, 461 U.S. at 438–40, 103 S.Ct. 1933. The Supreme Court wrote,

> We hold that the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988. Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

*Id.* at 440, 103 S.Ct. 1933.

With regard to a fee award for successful, but not for unsuccessful, claims, this Court believes that the distinction between

an award under a fee-shifting statute and one under a common fund is important. The fee-shifting statutes were intended to "encourag[e] the private prosecution of certain favored actions, by requiring defendants who have violated plaintiffs' rights to compensate plaintiffs for the costs they incurred to enforce those rights." *See, e.g., Florin v. Nationsbank of Georgia, N.A.,* 34 F.3d 560, 562–63, (7th Cir.1994), *citing Skelton v. General Motors Corp.,* 860 F.2d 250, 251–53 (7th Cir.1989). In contrast, under the common fund doctrine, the fee award is not punitively imposed upon the defendant, but taken from a common fund "to avoid the unjust enrichment of those who benefit from the fund ... who otherwise would bear none of the litigation costs." *Report of the Third Circuit Task Force: Court Awarded Attorney Fees* 108 F.R.D. 237, 250 (1986) ("based on the equitable notion that those who have benefited from the litigation should share its costs."); *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478–79, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (a litigant or an attorney who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole); *Skelton,* 860 F.2d at 252 (the common fund doctrine is based on the idea that not one plaintiff, but all "those who benefitted from litigations should share its costs"). Logically, therefore, the amount in the fund itself is the evidence of and the result of a successful claim; where the plaintiff's attorney does not prevail, he fails to add to that recovery. Therefore any recovery from it is for success in obtaining the settlements that comprise the common fund; the only issue is whether the amount of the fee award is reasonable.

Even under fee-shifting statutes, however,

[T]here is ample authority for the proposition that a partially prevailing party may recover all reasonably incurred attorney fees, even though the party did not prevail on all claims, as to all defendants, or as to all issues in a matter. . . . When the plaintiff has prevailed as to some claims and failed as to others, the key is whether the successful and unsuccessful claims are based upon the same facts and legal theories, i.e., whether the claims are related. . . . When the successful and unsuccessful claims involve a "common core of facts" or "are based on related legal theories," then attorney fees incurred in the presentation of unsuccessful claims are recoverable on the theory that they contributed to the plaintiff's ultimate success. . . . Similarly, a prevailing party may not recover for hours devoted solely to claims against defendants as to whom the plaintiff did not prevail. . . . "But when claims against multiple parties share a common core of facts or related legal theories, a fee applicant may claim all hours reasonably necessary to litigate those claims." [citations omitted]

*Coleman v. Houston ISD,* 202 F.3d 264, No. 98–20692, 1999 WL 1131554, *5 (5th Cir. Nov.8, 1999), *citing Hensley,* 103 S.Ct. at 1940, and *Kellstrom,* 50 F.3d at 327. This Court finds that such is the case here, where Lead Counsel's central theory of the case was based on scheme liability. Moreover, a common core of facts is shared by all claims in this litigation. *See, e.g., City of Riverside v. Rivera,* 477 U.S. 561, 570–73, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (Brennan, J., writing for plurality) (finding not clearly erroneous the district court's decision to allow total compensation under 42 U.S.C. § 1988 where plaintiffs had not prevailed on all original claims against the thirty-one defendants because the claims were based on a common core of facts and the amount of the damage award did not imply limited success; indeed success was evident in the excellent results achieved in a highly complex case).

The Bishop Objectors also complain that Lead Counsel misrepresented the status of certain attorneys as "of counsel," (specifically James D. Baskin, Roger M. Adelman,[106] Sol Schreiber at Milberg Weiss after Coughlin Stoia parted from that firm, and John Pierce, Exs. H–K) listed on Exhibit F, when they are actually practicing law independently.

Lead Counsel explains that these attorneys were viewed and treated as "of counsel" for the purpose of this litigation: they had offices in the firm's Houston trial office; they spent significant time in Houston working on the case; the firm paid their expenses including the cost of their apartments in Houston; they directly supervised the work of the associates and contract lawyers; and the were integral members of the *Enron* team. Even if not designated "of counsel," they could have submitted separate fee declarations for the same lodestar request. Lead Counsel also states that Adelman and Baskin have had and continue to have substantial relationships with the firm. This explanation appears reasonable to the Court and the objectors have not provided any evidence that it is not accurate. Lead Counsel agrees that whether they are designated "of counsel" is irrelevant as their time spent on legal services in this litigation is compensable from the common fund. # 5907 at 30.

The Bishop Objectors also contend that Lead Counsel inflates the lodestar by improperly including $6,168,358 which should be categorized as "expenses" generated by

forensic accountants, economic analysts, investigators, and document clerks.

In their Supplemental Objections (# 5964), filed after Lead Counsel's Compendium of time records was submitted, the Bishop Objectors comment that although two weeks is not a sufficient time to examine the Compendium of Lead Counsel's records, their "cursory review" (*id.* at 1) found that the records "illustrate the enormous difference that application of the lodestar principles [as opposed to the 'pre-arranged compact'] would have on the amount of a reasonable fee." *Id.* at 3. They re-emphasize that the bulk of the settlements were reached by mid–2005, that the Citibank, JP Morgan and CIBC settlements (totaling $6.6 billion) were announced in June and August of 2005, and thus the risk of non-recovery disappeared at that point. According to the totals submitted by Coughlin Stoia in its time records, from 2001–mid–2005, their total lodestar was $59.4 million, all that should be subject to a multiplier; fees after that time, while compensable, may not be enhanced by a multiplier since there was no longer any risk to Class Counsel.[107] Nevertheless, argue the Bishop Objectors, under Fifth Circuit case law, the lodestar must be limited to the hours spent obtaining the settlements that serve as the predicate for the fee request; post-settlement hours spent on unsuccessful litigation are not "reasonably expended." # 5964 at 5–6. They also complain that much of the post-settlement time was spent on extraneous matters, such as the work on the *Stoneridge* case, perhaps as much as $30 million of the time they are now claiming. They

---

106. For details on the work of James Baskin and Roger Adelman, see Supplemental Declaration of Helen Hodges, # 5909 at 25–26, 27.

107. The Bishop Objectors state, "For purpose of [lodestar] cross-checking the parties' negotiated fee, it is perhaps reasonable to count every hour that Lead counsel spent pursuing

any and every defendant in this case, and even hours spent trying to influence the outcome of other cases. The Regents hired Lead Counsel to pursue each of those defendants, and presumably it would be willing to give Lead Counsel credit for all of the hours worked, even those spent on unsuccessful cases and strategies." # 5964 at 5.

concede that Lead Counsel should be compensated for work after the settlements that was spent on settlement-related tasks such as settlement approval proceedings, the plan of allocation, and claims administration, but no multiplier should be applied because Lead Counsel was guaranteed full compensation for every hour worked once the $6.6 billion of settlement from the three financial institutions was achieved, Thus the Court should review all of the post-summer 2005 time records to cull out what hours were spent litigation against non-settling defendants or on political strategy to influence the outcome of *Stoneridge.*

Lead Counsel responds that multiplier is not only based on risk, but is a multi-factor determination, as this Court has indicated earlier. Furthermore, the risk is assessed at the commencement of the case, not at the time of the fee application. *See* Professor Charles Silver's Expert Report, # 5822 at 32–34, *citing inter alia In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir.2001) ("when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services in light of the risk of nonpayment and the normal rate of compensations at that time"). This Court agrees. *See also Florin*, 34 F.3d at 565 ("The court must assess the riskiness of the litigation by measuring the probability of success of this type of case *at the outset* of the litigation."); *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005) ("Although it is impossible to know *ex post* exactly what terms would have resulted from arm's length bargaining *ex ante,* courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions.").

Lead Counsel, in response to the Bishop Objectors' contention that the risk ended with the settlements in mid–2005, maintains that the risk continued: the settlements were not approved by the Court until May 2006; an appeal relating to those settlements was resolved only in October 2007, just before Lead Counsel filed its motion for preliminary approval of the plan of allocation in November 2007; and Silvercreek's November 15, 2005 (# 4165) appeal from the Bank of America settlement was briefed in 2007 and heard in April 2008, but is still not resolved. In addition, the plan of allocation is based on Plaintiffs' damages analyses, which began during the fact discovery phase, continued in 2006 in the expert discovery, and in 2007 in trial preparation. *See* Helen Hodges' Declaration (# 5818, ¶¶ 282–89).

As for Bishop Objectors' contention that time spent pursuing non-settling defendants should not be counted, Lead Counsel points out that Judge Denise Cotes rejected the same argument under similar circumstances in *In re WorldCom, Inc. Sec. Litig.*, 02 Civ. 3288(DLC), 2004 WL 2591402, **21–22, 2004 U.S. Dist. LEXIS 22992, *74–75 (S.D.N.Y. Nov. 12, 2004) (rejecting as "meritless" an objection that including in the lodestar cross-check time spent on pursuing defendants after the settlement improperly skewed the claimed multiplier and rejecting as "not persuasive" the objection "that no multiplier is appropriate for certain work such as … work performed after the settlement with the Citigroup Defendants since no risk of recovery remained.").

██ Furthermore this Court notes that it is established that post-settlement legal work performed on behalf of the class's interests, but not for work on a fee application[108] for the attorneys' interests, is

---

**108.** In response to supplemental objections

(# 5974 at 10), Lead Counsel stated about

compensable. *Mautner v. Hirsch*, 32 F.3d 37, 39 (2d Cir.1994). The areas of post-settlement services identified and submitted for fees by Lead Counsel full satisfy this criterion. Lead Counsel has made clear it has not requested fees for work relating to its petition for fees. Furthermore, since a reasonable attorney's fee is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" *(Hensley,* 461 U.S. at 433, 103 S.Ct. 1933), the determination is not based on "whether hindsight vindicates an attorney's time expenditures, but whether at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir.1992), *cert. denied sub nom Bethlehem Steel Corp. v. Grant*, 506 U.S. 1053, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993). Surely litigating appeals of the settlements, developing a plan of allocation to compensate absent class members for their *pro rata* share of losses caused by the unlawful actions of all defendants, justifying Lead Counsel's continuing efforts against the others, and addressing claims administration concerns, all on behalf of the class, fit this standard.

In a footnote, Bishop Objectors claim that when the Court performs the mandatory review of the time records, it should exclude the pre-litigation charges of Jonathan Cuneo of Cuneo Gilbert & LaDuca in twelve consecutive entries of precisely six hours each starting on 12/21/01 and ending 1/1/02 for "monitoring Congressional reports and proceedings and media reports." # 5964 at 7 n. 5. They object that Congress was not in session during this period and that it is highly unlikely that Cuneo worked exactly six hours on each of twelve consecutive days. Moreover it suggests there are probably other similar questionable items that this Court should identify and exclude in its more extensive review.

Lead Counsel responds that Cuneo's charges were not "pre-litigation" since they were incurred two months after the *Newby* case was filed, not to mention more than a couple of weeks after *Amalgamated* Bank was filed. Second the Court is not required to perform a detailed review of the time records for a percentage award or for a lodestar cross check. *Di Giacomo*, 2001 WL 34633373, at *10 ("This court will not conduct a detailed analysis of charged hours and hourly rates. To do so would undermine the utility of the percentage fee method."). The Court notes that other courts are in accord when the lodestar method is used as a cross-check. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir.2000) ("[W] here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court."), *citing In re Prudential Ins. Co. Am. Sales Litig.*, 148 F.3d 283, 342 (3d Cir.1998); *see also Rite Aid*, 396 F.3d at 300. Instead, the court can measure the claimed lodestar by its own familiarity

billing judgment in regard to time records and the fee application:

Persons very familiar with the litigation reviewed the time records and where there were issues with the amount of time recorded or the description of the time entry, those persons exercised their informed judgment, sought explanations or clarifications, and reduced or eliminated the time or clarified the entry. It is a little hard to understand the basis for this complaint [that Lead Counsel used "unexplained methodolog[ies]" with respect to the exercise of billing judgment] by

Dabrowski/Schonbrun since it only had the effect of *reducing* the lodestar. No hours were increased. The same is true of time devoted to matters related to the fee application. Lead Plaintiff's counsel, based on a review of the time records and their knowledge of the application effort, made a conservative (*i.e.,* high) estimate of the time committed and deducted it from the aggregate lodestar reported in the briefing in support of the fee agreement. Again there is no mystery to the "methodology."

with the case. *Goldberger*, 209 F.3d at 50. Because the Fifth Circuit appears to hold a stricter standard of review, this Court has conducted a substantially more specific review of the time records. Finally Lead Counsel points out that if the Bishop Objectors had reviewed the Declaration of Jonathan W. Cuneo (# 5828 at 15) and his firm's time records in early December 2001, they would know that his colleagues attended the Congressional hearings while Cuneo was in trial, and that after his trial concluded, he reviewed media, Congressional testimony and other materials in preparation for coming hearings. The Court finds the objection lacks merit.

Bishop Objectors conclude that if one applies the requested multiplier of 5.4 to all pre-settlement time, the resulting fee would be $320 million. If one assumes half of all post-settlement time was related to settlement approval and claims administration process, and if no multiplier is applied, an additional $30 million would be added to the $320 million, resulting in a fee award of $350 million. The enormous difference between this result and the $695 million fee under the contract that may be awarded under the PSLRA should force this Court to decide whether the PSLRA or Fifth Circuit lodestar jurisprudence should prevail.

Because the Fifth Circuit has not addressed the issue since the enactment of the PSLRA, thus far there is no existing conflict. For reasons explained throughout this opinion, the Court has concluded that the fee agreement deserves deference under the PSLRA, but that a lodestar cross check might also be appropriate to meet Fifth Circuit concerns. Thus it does enforce the fee agreement that it has found reasonable under the circumstances when it was made, but in the event of an appeal and a decision by the Fifth Circuit that a lodestar cross check would be necessary, the Court has provided, to save time, such an analysis.

As for the objections to including contract attorneys' services in the fee award, this Court noted previously, professional staff other than attorneys are included in the lodestar. *See, e.g., Sandoval,* 86 F.Supp.2d at 609 (fees of contract attorneys and paralegals are separately compensable, based upon prevailing market rates for the kind and quality of their services, and included in the lodestar). In a sworn supplemental declaration (# 5909 at 3), Ms. Hodges states that Lead Counsel included in their lodestar paralegals, forensic accountants and investigators, but excluded secretaries, librarians, and clerical personnel. *See, e.g., DeHoyos,* 240 F.R.D. at 325 (fees for legal assistants, paralegals, investigators, and non-secretarial support staff are included in lodestar). There is no dispute that accounting and auditing issues were at the heart of this case.[109] The forensic accountants

---

**109.** In response in her sworn Supplemental Declaration, # 5909, Helen Hodges explains that these in-house accountants, who were all Certified Public Accountants with years of experience in accounting and auditing, were essential to successful prosecution of this suit, contributing their knowledge and expertise to assist the lawyers in drafting the allegations in the Consolidated Complaint and subsequent complaints, drafting document requests, reviewing documents, analyzing the myriad transactions at issue, preparing for depositions of fact and expert witnesses, and analyzing for settlement purposes the ability

of various defendants to pay. *Id.* at 6. They also reviewed Enron's SEC filings and financial records, Andersen's audit workpapers, explained application of account rules to the complex facts here, identified document to be used in deposition of Andersen auditors, and attended some of these depositions to additionally assist the lawyers. *Id.*

Helen Hodges also states that their in-house economic analysts applied their knowledge and expertise for the benefit of the class by asserting that they helped the lawyers gather and analyze information, especially regarding

helped Lead Counsel draft the accounting allegations in the Consolidated Complaint and subsequent pleadings, document requests, document review, analyzing the many transactions at issue, preparing for depositions of fact and expert witnesses, and analysis of various defendants' abilities to pay. # 5909 at 6. They also examined Enron's SEC filings, and financial records and Andersen's audit workpapers, contributed to preparation for depositions of Andersen auditors, as well as applied accounting rules to the complicated issues in this litigation. The economic analysts assisted the attorneys in gathering and analyzing complex information about the numerous securities at issue here, loss causation, and the damages suffered by the Class. Indeed, when the Court appointed the Regents to be Lead Plaintiff, one factor was its employment of Coughlin Stoia because of its "team of two dozen lawyers, investigators, forensic accountants and corporate governance experts" already at work on this litigation. *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 454 (S.D.Tex. 2002). Ms. Hodges further declared that Coughlin Stoia's document clerks and in-house investigators performed tasks like those of paralegals (gathering and organizing data for lawyers), but at rates lower than a lawyer's rates. # 5909 at 6. This Court finds the inclusion of these professionals' fees within the lodestar is appropriate. Moreover, a comment by Judge Cotes in the *WorldCom* litigation is applicable here: "[E]xtensive use of contract attorneys was justified by the need to review [millions of] pages of documents and was a far more efficient way of proceeding than giving the task to more highly compensated counsel. There is little danger

of padded hours in this case given the volume of work that has been done and the pace of the litigation." *In re World-Com*, 2004 WL 2591402, *22, 2004 U.S. Dist. LEXIS 22992, at *76.

### g. Amicus Curiae Brief of the Texas Attorney General (# 5930)

Greg Abbott, the Attorney General for the State of Texas, objects to the amount of the fee request as excessive and claims that not only has he previously filed *amicus curiae* briefs in this litigation, but that under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1711–15, he is authorized to review the proposed settlement of claims and request for attorneys fees. # 5930 at 2 n. 1 (listing previous *amicus curiae* briefs). He argues that the agreed-to fee is a windfall to the attorneys, that compared with fees in other mega-settlements it is way too high, that Lead Counsel has mechanically applied the *Johnson* factors, that a 5.4 lodestar should not be used to justify otherwise excessive compensation. He notes the objections of others and urges the Court to appoint a special master or some other person to determine the propriety and accuracy of the information used to calculate the lodestar.

The Court agrees with Lead Counsel's response. Lead Counsel notes that CAFA applies only to cases filed after February 18, 2005, and not to this one, filed in October 2001. Moreover, basically the Texas Attorney General reiterates claims made by other objectors. Lead Plaintiff has shown that the 9.52% fee is less than awards made in other mega-fund cases and that the average megafund award is

---

damages suffered by the class and related causal issues. *Id.* at 6.

Regarding the document clerks and in-house investigators, Ms. Hodges states that they performed services similar to those of paralegals, gathering and organizing data for

lawyers at rates lower than those charged by lawyers. Investigators, under the direction of lawyers, coordinated activities with the outside investigation firm to locate and interview witness and review prior case files for relevant information. # 5905 at 6–7.

11.61%. See Top Securities Settlement chart, taken from Ex. 5 to Hodges Declaration (# 5818), this opinion at 84–86. In his "windfall" argument, the Attorney General disregards cases where similar and higher lodestar multipliers have been awarded in mega-fund cases. *See, e.g., In re Waste Management, Inc.,* No. 99–2183, sl. op. at 64 (S.D.Tex. May 10, 2002), in Lead Counsel's Compendium. # 5817, Ex. B) (multiplier of 5.296 awarded); *Cardinal Health* (multiplier of 5.9); *In re Charter Communications* (multiplier of 5.6); # 5930 (Lead Counsel's Response) at 3 n. 4, listing a number of cases with few awarding (multipliers above 5.4). As this Court has explained previously, it finds no "windfall" here, but a reasonable fee earned by an extraordinary group of attorneys who achieved the largest settlement fund ever despite the great odds against them.

## IV. Court's Rulings

Accordingly, because this Court has concluded that the blended 9.52% fee in the *ex ante* fee agreement is fair and reasonable and should be enforced here as a matter of law under the PSLRA, the Court

ORDERS that Lead Counsel's motion for an award of attorney's fees (instrument # 5815) of 9.52% of the recovery, or approximately $688 million, plus interest accrued, pursuant to and in accordance with a fee agreement negotiated with Lead Plaintiff the Regents of the University of California at the outset of this litigation, is GRANTED. The Court further

ORDERS that Peter Carfagna's motion for additional information and for appointment of special master or enlargement of time for review (# 5963) and the Rinis Objectors' motion for and order directing counsel to file and serve within two weeks a summary by law firm of what software was used by each firm to track and generate the time or billing records submitted, and CDs or DVDs of the data in electronic format with the metadata stripped (# 5967) are DENIED. The Court further

ORDERS that Plaintiff Class Member/Objector Brian Dabrowski's unopposed request to file supplemental objection (# 5890) is GRANTED. In ruling on the motion for reimbursement, the Court has reviewed Mr. Dabrowski's supplemental objection (# 5891). Finally, Chitwood Harley and Cunningham Darlow LLP's partial objection to Lead Counsel's motion for award of fees and their separate motion for attorney's fees and reimbursement of expenses (# 5858) have been withdrawn (# 5990).

"under-spends" compensation dollars on providing counsel with incentives to obtain extra dollars beyond the easy-to-obtain settlement sums, thereby failing to attain some of the extra dollars that more effective incentives could produce.